In The

# United States Court of Appeals

## For The Seventh Circuit

# MACH MINING, LLC,

*Petitioner,*

**v.**

# SECRETARY OF LABOR,
## Mine Safety and Health Administration, *et al.*,

*Respondents.*

## ON PETITION FOR REVIEW OF A FINAL DECISION OF THE
## FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

————————

## STIPULATED JOINT APPENDIX

————————

Thomas C. Means
Daniel W. Wolff
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 624-2621

Edward Waldman
MINE SAFETY AND HEALTH DIVISION
OFFICE OF THE SOLICITOR
U.S. DEPARTMENT OF LABOR
1100 Wilson Boulevard
22nd Floor West
Arlington, Virginia 22209
(202) 693-9344

John T. Sullivan
OFFICE OF GENERAL COUNSEL
FEDERAL MINE SAFETY AND
   HEALTH REVIEW COMMISSION
601 New Jersey Avenue, N.W.
Suite 9500
Washington, D.C. 20001
(202) 434-9929

*Counsel for Petitioner*

*Counsel for Respondent
   Secretary of Labor*

*Counsel for Respondent
   Federal Mine Safety and
   Health Review Commission*

# TABLE OF CONTENTS

**Appendix Page**

Certified Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-CI1

Excerpts of Transcript of Trial Proceedings before
The Honorable Margaret A. Miller
(Transcript Pages 1-43, 180, 203, 209, 233-240)
      on November 3, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-1

    <u>Testimony of Keith Roberts</u>:

    Direct Examination by Mr. Nessen . . . . . . . . . . . . . . . . . . . . . . . . . JA-43

    <u>Testimony of Dennis Beiter</u>:

    Direct Examination by Mr. Nessen . . . . . . . . . . . . . . . . . . . . . . . . . JA-44
    Cross Examination by Mr. Glasser . . . . . . . . . . . . . . . . . . . . . . . . . JA-47

Excerpts of Transcript of Trial Proceedings before
The Honorable Margaret A. Miller
(Transcript Pages 281-285, 325-327,
355, 497-498, 526-527, 574-576, 595-598)
      on November 4, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-60

    <u>Testimony of Robert Phillips</u>:

    Cross Examination by Mr. Wolff . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-60

    <u>Testimony of Gary Hartsog</u>:

    Direct Examination by Mr. Hardy . . . . . . . . . . . . . . . . . . . . . . . . . JA-66
    Cross Examination by Mr. Paige . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-68

Excerpts of Transcript of Trial Proceedings before
The Honorable Margaret A. Miller
(Transcript Pages 601-604, 624, 631,
635-637, 639, 641, 643-644, 649, 651-652)
    on November 4, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-75

Testimony of Michael Lawless:

Direct Examination by Mr. Wolff . . . . . . . . . . . . . . . . . . . . . . . . . JA-79

Secretary's Exhibits:

4.    Memorandum for Robert L. Phillips
      Re:  Mine Ventilation Air Pressure and
      Air Quantity Investigation, and Tacer Gas Study
            dated May 19, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-91

5.    Memo for Robert L. Phillips from
      Richard T. Stoltz
      Re:  Mine Ventilation Air
      Pressure and Air Quantity Investigation
            dated September 14, 2009 . . . . . . . . . . . . . . . . . . . . . . . . JA-111

12.   Letters to
      Mr. Anthony Webb from
      Robert J. Phillips
      Re:  Ventilation Plan
            dated September 29, 2009  . . . . . . . . . . . . . . . . . . . . . . JA-129

Mach's Exhibits:

1.    Summary of Data in Map Form
            dated April 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-143

2.    Representation of the Summary Air Readings from
      Alpha Engineering's Ventilation Survey
            dated July 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-144

4.    Longwall Gob Overall Evaluation System
            undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-145

**Mach's Exhibits,** continued:

7.  **Resume of Gary M. Hartsog**
    undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA-146**

8.  **Curriculum Vitae of Michael J. Lawless**
    undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA-147**

64. **Ventilation Drawing**
    undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA-153**

**Decision of**
**The Administrative Law Judge Margaret A. Miller**
**Re: Ruling on Various Docket Numbers**
    filed June 28, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA-154**

**Order of**
**The Administrative Law Judge Margaret A. Miller**
**Re: Granting Secretary's Petition and the Parties' Joint Motion**
    filed November 3, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA-173**

**Decision on Remand of**
**The Administrative Law Judge Margaret A. Miller**
**Reaffirming the Findings of Original Decision**
    filed September 21, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA-176**

**Notice of Denial of Review**
    filed October 24, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA-179**

## CIRCUIT RULE 30(d) STATEMENT

Counsel for Petitioner certify that all materials required by Circuit Rules

30(a) and (b) are included in the Short Appendix and in this Stipulated Joint

Appendix.

IN THE U.S. COURT OF APPEALS
FOR THE SEVENTH CIRCUIT


MACH MINING, LLC,                        :
            Petitioner                   :
                                         :
                v.                       :          No.   12-3598
                                         :
FEDERAL MINE SAFETY AND HEALTH :
  REVIEW COMMISSION, and                 :
SECRETARY OF LABOR, MSHA,                :
            Respondents                  :


## AMENDED CERTIFIED INDEX TO MATERIALS COMPRISING THE ADMINISTRATIVE RECORD FILED PURSUANT TO RULE 17(b) OF THE FEDERAL RULES OF APPELLATE PROCEDURE

<u>CONTENTS</u>                                                    <u>PAGE</u>

Mach Mining's Notice of Contest of Citation Nos. 6680550 and 6680551, filed with
the Federal Mine Safety and Health Review Commission (FMSHRC) on
October 1, 2009, and Uncontested Motion to Expedite Proceedings ..................... 1-20

Notice of Docketing cases as LAKE 2010-1-R and LAKE 2010-2-R issued by
Chief Administrative Law Judge Robert Lesnick on October 5, 2009 ..................... 21

Order of Assignment of cases to Administrative Law Judge Margaret Miller issued
by Chief Judge Lesnick on October 12, 2009 ......................................... 22

Notice of Hearing issued by Judge Miller on October 8, 2009 ........................... 23

E-mail, dated October 8, 2009 from Solicitor to Judge Miller
requesting a change in hearing date ................................................. 24

Secretary of Labor's Motion to Reconsider changing Hearing Date, filed October 9, 2009 ... 25-27

Mach Mining's objection to the Secretary's Motion to Reconsider hearing date,
filed October 9, 2009 .............................................................. 28-30

Judge Miller's Order Denying Motion to Reconsider Hearing Date,
dated October 16, 2009 ............................................................. 31-32

1

Mach Mining's Notice of Expedited Depositions filed October 19, 2009 . . . . . . . . . . . . . . . 33-35

Answer of the Secretary of Labor filed October 22, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-38

Secretary's Motion in Limine filed October 26, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39-58

Secretary's Motion to Strike witness and exhibits received October 30, 2009 . . . . . . . . . . . 59-62

Mach Mining's Opposition to Motion in Limine filed October 30, 2009 . . . . . . . . . . . . . . . 63-73

Statement of Contestant Mach Mining, filed November 2, 2009 . . . . . . . . . . . . . . . . . . . . . 73a-73v

Notice of Hearing issued by Judge Miller for November 3, 2009 . . . . . . . . . . . . . . . . . . . . . . . 74

Secretary of Labor's Expected Witnesses and Exhibits filed October 22, 2009 . . . . . . . . . . . 75-77

Secretary's Proposed Stipulations and List of Exhibits filed October 29, 2009 . . . . . . . . . . . 78-83

Mach Mining's Disclosure of Witnesses and Exhibits filed November 3, 2009 . . . . . . . . . . . 84-90

Transcript of Hearing held November 3, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91-370

Transcript of Hearing held November 4, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371-691

Transcript of Hearing held November 5, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 692-758

    Contestant's Exhibit 1 - April 2009 Ventilation survey . . . . . . . . . . . . . . . . . . . . . . . . 759
    Contestant's Exhibit 2 - July 2009 Ventilation survey . . . . . . . . . . . . . . . . . . . . . . . . . 760
    Contestant's Exhibit 4 - Longwall Gob Evaluation System-Oct. 2009 . . . . . . . . . . . . 761
    Contestant's Exhibit 5 - Chart of Mach Mine Fans AES-80B . . . . . . . . . . . . . . . . . . . 762
    Contestant's Exhibit 7 - Resume of Gary Hartsog . . . . . . . . . . . . . . . . . . . . . . . . . . . . 763
    Contestant's Exhibit 8 - Michael Lewis Resume . . . . . . . . . . . . . . . . . . . . . . . . . . . 764-769
    Contestant's Exhibit 9 - Curriculum Vitae of Dennis Beiter -See Gov't Exhibit 9 . . . . . 770
    Contestant's Exhibit 33 - 6/16/2009 letter to A. Webb from R. Phillips . . . . . . . . . 771-772
    Contestant's Exhibit 35- 6/25/2009 Letter to R. Phillips from A. Webb . . . . . . . . . 773-774
    Contestant's Exhibit 46- Termination Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 775
    Contestant's Exhibit 51- D(2) order 8414529 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 776
    Contestant's Exhibit 64-Ventilation drawing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 777
    Contestant's Exhibit 68- photo of curtain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 778
    Contestant's Exhibit 69- photo of main fan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 779
    Contestant's Exhibit-70- Photo of bleeder fans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 780
    Contestant's Exhibit 80 & 81-Readings Referenced in Stoltz Memo . . . . . . . . . . 781-835
    Contestant's Exhibit 101- Ventilation LW panel #3 drawing . . . . . . . . . . . . . . . . . . . . 836

Contestant's Exhibit 102-Former HG #1 EP ................................... 837
Contestant's Exhibit 103-Ventilation Drawing, October 2009 .................... 838
*Rejected Exhibits (Contestant's)*
    Contestant's 57 - Chart of Belt Air Comparison ........................... 838a
    Contestant's 63 - Longwall Face Ventilation Comparisons ............... 838b-838c
    Contestant's 65 - Water Handling Method list ......................... 838d-838f
    Contestant's 66 - Production and Dust Sample Results-Aug. 2009 ......... 838g-838u
    Contestant's 78 - Production and Dust Sample Results-2008 ............ 838v-838ii
    Contestant's 79 - Curriculum Vitae of Thomas Blandford, III .......... 838jj-838mm
Government Exhibit 1- June 4, 2009 Revised Ventilation Plan ................ 839-872
Government Exhibit 2 - Mach's Sept. 3, 2009 response to Aug. 6 letter w. exhibits 873-893
Government Exhibit 3 - January 26, 2009 Memo on Ventilation Plan Approval .. 894-896
Government Exhibit 4 - May 19, 2009 Memo on Mine Ventilation Air Pressure .. 897-916
Government Exhibit 5 - September 14, 2009 Memo on Mine Ventilation w/ Ex. . 917-934
Government Exhibit 6 - Stress Analysis & Support Recommendations ........ 935-1026
Government Exhibit 7 - Procedure Instruction letter No. 108-V-03 .......... 1027-1037
Government Exhibit 8 - Copy of Citation 8414236-06 .................... 1038-1039
Government Exhibit 9 - Curriculum Vitae of Dennis Beiter ................ 1040-1045
Government Exhibit 11 - Aug. 6, 2009 letter from R. Phillips to A. Webb .... 1046-1047
Government Exhibit 12 - Sept. 29, 2009 letters from R. Phillips to A. Webb ... 1048-1061

Secretary's Posthearing Brief filed November 30, 2009 .......................... 1062-1090

Mach Mining Posthearing Brief with appendix filed December 3, 2009 ............. 1091-1154

Decision of Judge Miller, issued January 28, 2010, affirming citations .............. 1155-1173

Petition for Discretionary Review filed by Mach Mining on February 26, 2010 ....... 1174-1210

Direction for Review issued by the Commission on March 5, 2010 ................. 1211-1212

Letter from counsel for Mach Mining that their Petition for Review will
constitute their Brief, received March 16, 2010 ................................. 1213-1214

Secretary's entry of appearance and Unopposed Motion for an Extension of Time to
File Response Brief filed March 29, 2010 ...................................... 1215-1218

Commission Order Granting Extension of Time, issued March 31, 2010 ............ 1219-1220

Secretary's Unopposed Motion to Hold in Abeyance pending the final disposition of a
motion to reopen the penalty case, LAKE 2010-714, filed May 5, 2010 ............ 1221-1235

Commission order Granting Secretary's Motion dated May 10, 2010 ............... 1236-1237

3

Mach Mining's motion for Relief from a final civil penalty order, filed with the
Commission on May 7, 2010 .............................................. 1238-1268

Notice of Docketing Motion to Reopen as LAKE 2010-714, issued by the
Commission on May 11, 2010 ................................................ 1269

Secretary of Labor's Opposition to Request to Reopen Penalty Assessment, filed
May 17, 2010 ........................................................ 1270-1279

Mach Mining's Reply in Support of Motion for Relief from a Final Civil Penalty
Order received May 24, 2010 ............................................ 1280-1286

Commission Order Granting Mach Mining's Motion to Reopen and remanding case
to Judge Miller for further proceedings, issued August 31, 2010 .................. 1287-1290

Petition for Assessment of Civil Penalty filed by the Secretary of Labor with the
Review Commission on October 5, 2010 ................................... 1291-1317

Commission Order granting the Secretary's motion to Hold cases(LAKE 2010-1-R/2-R)
in Abeyance, issued October 5, 2010 ................................... 1317a-1317b

Joint Motion to Reconsider Order Lifting Stay and to Reinstate Stay filed October
8, 2010 (LAKE 2010-1-R/2-R) ......................................... 1317c-1317g

Commission Order Reinstating Stay issued October 14, 2010 ................... 1317h-1317i

Answer to the Secretary's Petition filed by Mach Mining on October 15, 2010 ........ 1318-1320

Order of Assignment and Prehearing Order issued by the Commission
on October 19, 2010 .................................................... 1321-1323

Joint Motion for Order Assessing Penalties and Incorporating by Reference
January 28, 2010 Decision and copy of Proposed Order filed October 26, 2010 ....... 1324-1332

Order Granting the Parties Joint Motion and assessing a civil penalty of $200 for
citations, issued November 3, 2010 ....................................... 1333-1335

Petition for Discretionary Review filed by Mach Mining on November 16, 2010 ...... 1336-1378

Direction for review issued by the Commission on November 23, 2010 ............ 1379-1380

Unopposed Motion to Consolidate Contest and Penalty cases filed by Mach
Mining on November 30, 2010 ........................................... 1381-1384

4

Mach Mining letter indicating Petition for Review will constitute its brief,
dated December 22, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1385

Order granting Consolidation of Cases issued January 12, 2011 . . . . . . . . . . . . . . . . . . . 1386-1387

Secretary's Response Brief filed January 26, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1388-1427

Reply Brief of Mach Mining with Ex. A, filed February 22, 2011 . . . . . . . . . . . . . . . . . 1428-1446

The Secretary's complete copies of the Government's Memorandum in Support
of motion to dismiss and Reply Memorandum in support of motion to dismiss
in Elk Run, filed February 23, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1447-1512

Commission Decision dated August 9, 2012 affirming in part, vacating in part and
remanding cases to Judge Miller for further action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1513-1546

Mach Mining's Unopposed Motion for Entry of a Decision that the Remanded issue is
Moot, filed September 12, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1547-1549

Decision on Remand issued by Judge Miller on September 21, 2012 . . . . . . . . . . . . . . . 1550-1552

Petition for Discretionary Review filed by Mach Mining on October 15, 2012 . . . . . . . . 1553-1600

Notice issued by the Commission on October 24, 2012 that Petition for Review
is not granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1601-1602

JA-CI5

## CERTIFICATE

I, JEAN H. ELLEN, Chief Docket Clerk, Federal Mine Safety and Health Review Commission, hereby certify that the foregoing is a true and correct Amended Index to Materials Comprising the Administrative Record in the captioned proceeding.

JEAN H. ELLEN

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the Amended Certified Index to Materials Comprising the Administrative Record was served this 14th day of January, 2013, to the following:

Daniel W. Wolff, Esq.
Crowell & Moring, LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20002
by e-mail
dwolff@crowell.com

W. Christian Schumann, Esq.
Edward Waldman, Esq.
Office of the Solicitor
U. S. Department of Labor
1100 Wilson Boulevard, 22nd Floor West
Arlington, VA 22209-2296
by e-mail
schumann.walter@dol.gov
waldman.edward@dol.gov

M. Patricia Smith, Solicitor
U.S. Department of Labor
Room N-2428
200 Constitution Ave., N.W.
Washington, D.C. 20210
(by regular mail)

Jean H. Ellen
Chief Docket Clerk
jellen@fmshrc.gov

FMSHRC counsel
John Sullivan
jsullivan@fmshrc.gov

7

JA-CI7

FEDERAL MINE SAFETY AND HEALTH ADMINISTRATION REVIEW
COMMISSION
OFFICE OF ADMINISTRATIVE LAW JUDGES
_____

| | | |
|---|---|---|
| MACH MINING, LLC | ) | CONTEST PROCEEDING |
| | ) | |
|        Contestant, | ) | Docket No. LAKE 2010-J-R |
| | ) | Citation No. 6680550; |
|          v. | ) |         9/29/2009 |
| | ) | |
| SECRETARY OF LABOR, | ) | Docket No. LAKE 2010-2-R |
| MINE SAFETY AND HEALTH | ) | Citation No. 6680551; |
| ADMINISTRATION (MSHA), | ) |         9/29/2009 |
| | ) | |
|        Respondent. | ) | MACH #1 MINE |

_____

TRANSCRIPT OF HEARING
VOLUME I
November 3, 2009

      On November 3, 2009, the above cause came on
for hearing before the HONORABLE MARGARET A. MILLER,
Administrative Law Judge, Federal Mine Safety and
Health Review Commission, 721 19th Street, Suite 443,
Denver, CO 80202-2500, 303.844.1616.

APPEARANCES:

For the Contestant:

Brian A. Glasser        David J. Hardy
Bailey & Glasser, LLP   Christopher D. Pence
209 Capitol Street      Allen Guthrie & Thomas, PLLC
Charleston, WV 25301    500 Lee Street East,
304.345.6555            Suite 800
                         Post Office Box 3394
                         Charleston, WV 25333
Daniel A. Wolff        304.345.7250
Crowell & Moring, LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
202.624.2621

```
 1              APPEARANCES CONTINUED

 2   For the Respondent:

 3   R. Peter Nessen
     Office of the Solicitor
 4   US Department of Labor
     230 South Dearborn Street, Suite 844
 5   Chicago, IL 60604
     312.353.4994
 6
     Thomas A. Paige
 7   Joshua Falk
     Office of the Solicitor
 8   US Department of Labor
     1100 Wilson Boulevard, 22nd Floor
 9   Arlington, VA 22209
     202.693.9343
10

11

12

13

14

15

16

17

18

19              JULIE HUNDELT, CCR
           MORIARTY REPORTING & VIDEO, LLC
20              777 WHISPERING FOREST
                 BALLWIN, MO 63021
21             OFFICE: (636) 230-8838
                  FAX: (636) 230-8848
22             MOBILE: (314) 952-0437

23          WWW.MORIARTYREPORTING.COM

24

25
```

1                       INDEX

2                      VOLUME II

3             TUESDAY, NOVEMBER 3, 2009

4                      HEARING

5
   Respondent's Evidence                      Page
6

7              Keith Roberts:

8  Direct Examination by Mr. Nessen            42

9  Cross-Examination by Mr. Glasser            87

10 Redirect Examination by Mr. Nessen          133

11             Dennis Beiter:

12 Direct Examination by Mr. Nessen            134

13 Cross-Examination by Mr. Glasser            223

14

15

16

17

18

19

20

21

22

23

24

25

1                          EXHIBITS

2    SECRETARY'S EXHIBITS:

3                                              Page
     1  - 6/4/09 Ventilation Plan              46
4    2  - 9/13/09 Cover Letter                 47
     3  - Memorandum for District Managers     76
5         from the Administrator for Coal Mine
          Safety and Health
6    4  - Memorandum from the Ventilation     145
          Division signed by Richard Stoltz
7    5  - Memo Rich Stoltz to Robert Phillips 212
     6  - Stress Analysis and Support         224
8         Recommendations
     7  - Procedure Instruction Letter         58
9    9  - Dennis Beiter's CV                  139
     11 - 8/6/09 Letter to Anthony Webb from   54
10        Robert Phillips
     12 - 9/6/09 Letter to Anthony Webb from   50
11        Robert Phillips

12

13   MACH'S EXHIBITS:
                                               Page
     1   - Ventilation Plan                    95
14   101 - Drawing of Mine                    235
     102 - Blown up Portion of Ventilation Survey   235
15

16

17

18

19

20

21

22

23

24

25

1          IT IS HEREBY STIPULATED AND AGREED

2   That this hearing may be taken in shorthand by Julie

3   Hundelt, Certified Court Reporter, and Notary Public,

4   and afterwards transcribed into typewriting.

5                        o-O-o

6   PROCEEDINGS BEGAN AT 9:00 a.m.:

7                    PROCEEDINGS:

8          THE COURT:  Good morning everyone.  This

9   hearing will now come to order.  This is a hearing

10  before the Mine Safety and Health Review

11  Commission in the case of Mach Mining versus the

12  Secretary of Labor, Mine Safety and Health

13  Administration, Docket Number Lake 2010-1-R and

14  Lake 2010-2-R.

15          This hearing is being held under the

16  authority of the Federal Mine Safety and Health Act of

17  1977 in St. Louis Missouri on November 3, 2009, Judge

18  Margaret Miller presiding.  At this point, I would

19  like a statement of appearance for the record.  First

20  for the Secretary of Labor.

21          MR. NESSEN:  My name is Peter Nessen for

22  the Secretary.

23          MR. PAIGE:  Thomas A. Paige for the

24  Secretary.

25          MR. FALK:  Joshua Falk for the

1    Secretary.

2         THE COURT:  And for the mine operator?

3         MR. WOLFF:  Dan Wolff for Mach Mining.

4    Can I just introduce my co-counsel?

5         THE COURT:  Absolutely.

6         MR. WOLFF:  David Hardy and Christopher

7    Pence and Brian Glasser, and just as a formality,

8    Your Honor, to the extent they haven't formally

9    appeared, we hereby orally move for the appearance

10   of all the attorneys.

11        THE COURT:  All right, is there anyone

12   present at the hearing representing the miners at

13   the mine?  Let the record show that no

14   representative has made an appearance.  Everything

15   said during the course of the hearing will be

16   recorded by the court reporter who will make the

17   official transcript in this case.

18        If any of the parties in the case desire a

19   copy of the transcript, you may wish to order it from

20   the reporter.  As a general matter, this proceeding

21   will be governed by the Federal Mine and Safety Health

22   Act of 1977 and the Commission's Rules of Procedure.

23        On procedural issues not covered by the Mine

24   Act or Commission Rules, I generally follow the

25   pertinent provisions of the Administrative Procedure

1  Act and the Federal Rules of Civil Procedure.

2          So let me ask you for the Secretary first,

3  since both sides seem to have a number of attorneys, I

4  really want to deal with one at a time.  Okay.  Save

5  me a lot of confusion.  So if one of you wants to

6  start, that's great.  If you take a certain witness

7  for cross and direct, that's fine, but please don't

8  cross over.  One attorney per witness and one attorney

9  for subject.  So let's start with preliminary matters

10  for the Secretary.

11          MR. NESSEN:  Thank you, Your Honor.  I'm

12  a little confused by the statement made by -- I

13  want to start with the statement filed by Mach

14  just recently, I think yesterday, a prehearing

15  statement.  It confuses me a bit, because first of

16  all, at the very end of that statement, they ask

17  the Court to hold a mediation or settlement

18  conference prior to opening statements.

19          Now I presume that Mach understands that

20  while the Secretary has been and continues to be

21  willing to mediate, to have settlement conferences,

22  and in fact has consistently been back and forth for

23  the past months or months even after the citations

24  were filed, it just doesn't make sense to hold a

25  settlement conference here and now today for various

1   reasons.

2           One, it would be inappropriate for Your

3   Honor as a trial judge to hold the settlement

4   conference.  Two, we haven't prepared for a settlement

5   conference; and as Your Honor knows, it's a different

6   type of preparation.  Third, we don't have anyone with

7   authority to settle this case right here and now.  And

8   fourth, as Your Honor knows, these are very technical

9   issues.  Six, seven, or eight lawyers in one room

10  aren't going to solve these problems.  It's going to

11  take the expertise of MSHA, Mach, and a whole variety

12  of people to hash this out.

13          While we're willing to do a settlement

14  conference, we can't do it here today.  If Mach is

15  willing, we would be willing to continue this hearing,

16  have a settlement conference before another ALJ as

17  soon as they would, if one can be found and scheduled.

18  So that is an offer we make to Mach today.

19          If they want to continue to have discussions

20  prior to hearing, I think it's important to note that

21  those discussions may have some value in that if

22  you'll note, Your Honor, in the prehearing statement

23  filed yesterday, they say and I quote, Mach stipulates

24  it's only challenging the following issues, and it

25  lists ten issues that it apparently is challenging.

1           It is my understanding that those are the

2    ten that will be tried today and the rest of this week

3    by MSHA and Mach.  And also for Your Honor's

4    knowledge, we are again showing how valuable some

5    sessions might be, we are accepting the offers and

6    stipulations to withdraw 5 and 13, Items 5 and 13 off

7    of the base plan citation that's number 550 I believe,

8    and we are right now unilaterally withdrawing number

9    16.  We will withdraw that as one of the items in the

10   citation.

11          So that means that 5, 13, and 16 are out

12   right now.  They've stipulated that they're not going

13   to contest a bunch of other ones in their prehearing

14   statement.  So as to their prehearing statement, that

15   is where we stand stated in that item.

16          Your Honor, we know that there are as you

17   know, there's motions, two motions in limine with you.

18   I think our rationale is in the papers.  If you have

19   any questions about that, I think Mr. Paige will

20   answer those.  So I think at this point that's what we

21   have to say.

22          Actually, one other thing is we offered some

23   stipulations regarding post stipulations, regarding

24   jurisdiction, and I'm hoping and presuming we don't

25   have to get into that and that Mach will agree to

1    those stipulations.  Thank you.

2            THE COURT:  Let's start with that.

3    That's a good place to start.  Mr. Wolff, do you

4    want to address that?  I do have your prehearing

5    statement in front of me.  Let me just ask you

6    this question, you listed a number of issues that

7    you thought you would stipulate to being heard

8    today.  Is that still the case that you would

9    stipulate that these are the issues remaining for

10   hearing?

11           MR. WOLFF:  By all means, correct.

12           THE COURT:  Mr. Nessen; right?

13           MR. NESSEN:  Yes.

14           THE COURT:  Did you just tell me Issue

15   Number 16 would be off of that list?

16           MR. NESSEN:  Number 16 would be off of

17   that list, yes, Your Honor.

18           THE COURT:  That leaves nine?

19           MR. NESSEN:  Just for a point of request

20   just so the record is clear, if Mr. Wolff could in

21   terms of procedure withdraw his motion to contest

22   as to those items then it will be on the record

23   that those things are not at issue, and they're

24   not being contested.

25           THE COURT:  All right, sorry, Mr. Wolff,

1   come back.  So we're down to those issues.  Is

2   that your understanding that would leave nine if

3   you withdrew, if number 16 is off the table?

4          MR. WOLFF:  That's correct.  As far as

5   withdrawing those contested, I guess what we need

6   is the Government has to act first.  If those

7   issues are officially off, then there's no

8   contest.  Essentially it's mooted.  We don't

9   disagree with 16 not being in dispute.  We're not

10  going to try to argue over something that they're

11  not charging us with not included in the plan.

12         THE COURT:  My question to you is in

13  your prehearing brief, you indicated there were

14  ten issues that you believed were still something

15  that needed to be addressed by the Court.  They

16  have now taken number 16 out of that list.

17         MR. WOLFF:  Which would drop us to nine.

18         THE COURT:  Are those the issues that

19  you think in your opinion we're dealing with

20  today?

21         MR. WOLFF:  That's what we understand.

22  Of course, we're at somewhat of a disadvantage,

23  because we haven't heard from the Government yet.

24  The Government obviously bears the burden of

25  proving up the elements of its case, so we need to

1    hear from it.  As far as we understand the

2    charging papers, these are the nine issues we're

3    prepared to argue about today, which is exactly

4    why we offered to do this by stipulation so it was

5    crystallized for Your Honor, and we didn't have to

6    have this banter back and forth.

7         THE COURT:  So you're asking the

8    Secretary if they stipulate that these are the

9    issues left to be resolved.  If there's anything

10   else on the citation, they have let it go or

11   they're not pursuing it; is that what you're

12   saying to me?

13        MR. WOLFF:  We imagine through

14   stipulations we can crystallize the issues that we

15   will be hearing over the next four or however many

16   days it takes to get to the end of this hearing.

17   The answer is yes.

18        THE COURT:  So the answer is you're

19   asking the Secretary to look at your stipulations

20   and see if they agree those are the stipulations

21   that remain for discussion?

22        MR. NESSEN:  Your Honor, that's slightly

23   different that's what the statement in the

24   prehearing statement says.

25        THE COURT:  It's different than what I

1    understood too.  I know what you're saying, sir.

2            MR. NESSEN:  The ones we stipulate to,

3    the ones we'll stipulate to being resolved are 16,

4    5, and 13.  The other items if they're willing to

5    withdraw their notice of contest as to numbers --

6    if you'll excuse me, Your Honor -- as to numbers 7

7    and 17, we agree that those are very close to

8    resolution.  If they withdraw their notice of

9    contest as to those, we will move forward and

10   stipulate to those being revolved.  We believe

11   they're very close.

12           As to the other ones we at this time cannot

13   stipulate to them being finalized, and so we are

14   prepared to try the ones, even the ones not on their

15   list though.  We're disappointed to find out that

16   there are more issues than we thought there were as of

17   yesterday.

18           THE COURT:  Mr. Wolff, so your

19   prehearing brief says Mach stipulates it's only

20   challenging the following issues, then it lists

21   ten.

22           MR. WOLFF:  I mean if withdrawing a

23   notice of contest with respect to specific issues

24   is the mechanism of getting those issues out of

25   the case, then that's what we'll do.  We'll agree

1    to withdraw the contest with respect to issue 5

2    which the Secretary -- I mean, is that finalized?

3    Is that plan finalized on 5 and 13?

4         MR. NESSEN:  It is our understanding

5    that the parties have reached an agreement to some

6    extent on 5 and 13, and we will stipulate to the

7    requested stipulation that those have been

8    resolved.

9         THE COURT:  All right.

10         MR. WOLFF:  5, 13, 16, 7, and 17, out

11    the window.

12         THE COURT:  All right.

13         MR. WOLFFF:  Now we've actually

14    stipulated we're only here -- we only need to

15    argue about a narrow set of issues.  If the

16    Government is going to put on a case on a broader

17    set of issues, we are prepared as well to defend

18    as we must.

19         THE COURT:  All right, so now address

20    the -- in your prehearing you also address a

21    settlement conference.  Do you want to talk about

22    that a little bit or is it not something --

23         MR. WOLFF:  I don't know what to say.

24    We're a little bit disappointed that the Secretary

25    has adopted this approach.  Our position, our

1    point, Your Honor, is that this game really

2    started on September 29 not only with the

3    citations, but the deficiency letters.  Since

4    September 29, we've been making a good faith

5    effort to resolve as many of these issues as

6    possible.

7          We wanted to make you aware that in the

8    event we could possibly come together either in

9    mediation or in prehearing conference and talk about

10   these to see if there's any other way to get to

11   ultimate resolution.  Now we're fully prepared.  We've

12   got a full room of people ready to have this hearing,

13   so we'll go forward.  That's not a problem.  A little

14   disappointed with the approach that the Secretary has

15   adopted though; but if there's nothing to talk about

16   today, then we'll just leave it at that.

17         THE COURT:  When did you first start

18   discussing the plan, the ventilation plan either

19   the general one that you call the base plan or the

20   site specific with MSHA?

21         MR. WOLFF:  Well, that kind of gets into

22   the merits of the case here; but frankly this

23   discussion or this disagreement has been going on

24   for the better part of the year.  One of the

25   confusing points is that there are these multiple

1    plans floating around because of the process

2    through which District 8 actually issues decisions

3    or considers ventilation plans.

4           I guess if we're talking about the site

5    specific, that frankly dates back in substance to

6    February.  If we're talking about the base plan, that

7    also has had several iterations, most recently we

8    submitted a full comprehensive plan on June 4 in

9    response to a letter of mid-May from the district

10   manager, but that also has antecedence that goes back

11   earlier into the year.

12          THE COURT:  I guess the question I have

13   in my mind is this, the Commission tells us that

14   in order to bring this case before a judge, you

15   need to negotiate, talk about the plan, try to

16   work it out in good faith, only then come here.

17          MR. WOLFF:  Correct.

18          THE COURT:  So my question is if as you

19   say in your prehearing brief you didn't get a

20   chance to respond to the deficiency letters, and

21   you still are ongoing submitting information, why

22   are we at an impasse?

23          MR. WOLFF:  Your Honor, the message we

24   were conveying is simply this, that we are willing

25   to try to resolve through extra-judicial means if

1    possible.  That does not erase or moot the fact

2    that there's a live dispute that ripened as a case

3    in controversy on September 29 when the citations

4    were issued.

5              As you know from prior conference calls,

6    this has been a long time coming, so there is a ripe

7    live dispute here.  Of course, by necessity, the

8    negotiation is always an ongoing one.  We could go on

9    at infinitum.  It will never end.  There's always a

10   back and forth.  But the Secretary issued citations on

11   September 29.  We are prepared to defend our position

12   on September 29 on the merits.  So that is a ripe,

13   live dispute for you to hear this week.

14             THE COURT:  All right, then I guess if I

15   understand -- and I certainly encourage people to

16   keep talking.  That's not an issue.  I encourage

17   people to keep talking and try to work something

18   out.  Certainly a ventilation plan is something

19   that the mine operator and MSHA, not the attorneys

20   in the court, know the most about.  I certainly

21   think they should keep talking and doing that.

22             The question that keeps coming up is Mach

23   asked for those citations to be issued.  In fact, in

24   your prehearing submission, you say several times we

25   wanted it, we wanted it; and we had a conference call

1  months before when you wanted another hearing.

2          My question is, I don't want this process --

3  I don't want this hearing to be a part of your

4  negotiation process.  This is the final end of the

5  line where you can't, where you've come to a point

6  where you just cannot go any farther.

7          MR. WOLFF:  That's correct.  We say in

8  our brief, we hope this is the last time we have

9  to have this dispute.  We are appreciative of you

10  granting the expedited hearing to hear this week.

11          THE COURT:  I just want to be sure this

12  is the right time to do it.

13          MR. WOLFF:  By all means, this is the

14  right time to do it.

15          THE COURT:  Will you understand when I

16  say to you during your presentation of your case

17  that I'm not going to hear anything after

18  September 29, because we're talking about a plan

19  and what the district manager had to deal with on

20  September 29.  If you're bringing new evidence to

21  me, this is not the place to do it.

22          MR. WOLFF:  Well, Your Honor, let me

23  approach that this way.  You cannot decide this

24  fairly and evenly in a vacuum.  Now you're the

25  decision maker.  You're also the -- you are the

1    judge and the jury, so you can actually make

2    decisions of relevance as we go.

3           What we intend to do is not recreate the

4    facts or restate history as it occurred and took place

5    as of September 29.  Our goal is to inform you as

6    fully as possible as to what this mine is all about,

7    its ventilation system, who the key mine management

8    people are, what takes place from a matter of safety

9    and ground ventilation at the mine, and also to give

10    you some sense, some context as to what the

11    considerations are that go into the decision making

12    process of the mines or should go into the decision

13    making process as a matter of law by the Mine Safety

14    and Health Administration.

15           You can in your role as a judge and jury

16    decide on an evidence by evidence basis or expert by

17    expert basis what is relevant to your decision on

18    whether the citations should be upheld or not.  But

19    that doesn't exclude or preclude you from considering

20    a more complete picture of the mine so you understand

21    just exactly what it is we're talking about.

22           THE COURT:  I have no problem with that.

23    In fact, I would like to know what everyone is

24    talking about.  That's not the issue.  The thing

25    that I really want to be sure that you understand

1   and that Mach understands is that I'm not going --

2   I don't take the place of the district manager in

3   making decisions on ventilation plans.  I don't

4   have that kind of expertise.

5          So if there are things that have come up or

6   that should have been presented or that have not yet

7   been put in front of the district manager as part of

8   his decision making process, it's not relevant to me,

9   doesn't help me at all to focus on what happened at

10  the time of the citation.  That's what my authority is

11  to look at that timeframe.

12         MR. WOLFF:  Well, I will say, Your

13  Honor, the Mine Act does make it incumbent upon

14  the Commission and the Commission Administrative

15  Law Judges to review citation cases.  That means

16  not simply to ask did the district manager act in

17  an arbitrary and capricious manner, we're actually

18  having today, we should be having today a de novo

19  hearing on whether Mach has presented a suitable

20  mine ventilation plan that the district manager

21  should have approved.

22         As the adjudicator I would say that you have

23  a role to question whether those in the decision

24  making roles at MSHA made the correct decision,

25  because that is what the adjudication process is

1   about.  We have to look at what District Manager

2   Phillips did.  We have to look at what his advice was

3   from Mr. Beiter, from Mr. Roberts, and you need to

4   decide is that consistent with the law and the role of

5   MSHA in the plan approval process.

6           So I would say that you do question, you are

7   charged by the Mine Act with questioning in

8   challenging MSHA to demonstrate to you by a

9   preponderance of the evidence that it made the correct

10  decision when it disapproved the site specific

11  ventilation plan and the base plan.  That's our

12  position.

13          THE COURT:  Thank you.  I appreciate

14  that.  So the next thing, is there any -- let me

15  go back to the stipulations.  The Secretary

16  proposed some stipulations.  Did you see that?

17          MR. WOLFF:  We'll stipulate to those or

18  reaccept those.

19          THE COURT:  They're all jurisdiction

20  directed stipulations.  Okay.  So we have that.

21          MR. NESSEN:  Your Honor, could I respond

22  a little too?

23          THE COURT:  Sure.

24          MR. NESSEN:  Just a couple things.  One

25  is I want to make it very clear, if Mach or

1   representatives want to meet with MSHA

2   representatives now outside the presence of the

3   Court, we're more than happy to do so.  I do think

4   that it is interesting, and I am a little

5   confused, they both -- I think Your Honor hit on

6   it, they both want to bring into evidence the

7   continuing negotiations between the parties at the

8   same time they have claimed and asked us to accept

9   the claim of impasse.

10          Negotiations are still ongoing.  I don't

11  think they can deny that.  In fact with their request,

12  I think that's obvious.  We're ready to try the case

13  now.  If Your Honor has jurisdictional worries about

14  whether we're actually at impasse, we understand.

15          But again, I want to make it clear if they

16  want to talk outside the presence of the Court and

17  have some discussions, that is fine.  I'm not sure how

18  long that would take, how long they're perceiving that

19  would take, and whether we could get the trial in this

20  week if that were to be done.  As to the issues of

21  arbitrary and capricious and motion of limine, I'll

22  tag team to Mr. Paige.

23          THE COURT:  So next, we'll address the

24  motion in limine and the motion to strike, then

25  we'll get started and try to get moving on the

1  merits of the case.  Mr. Paige?

2        MR. PAIGE:  Thank you, Your Honor.  I

3  just want to highlight what we've, what I hope is

4  clearly laid out in the motion in limine.  You

5  know the recent decision, the Commission's

6  decision in 20 Mile Coal really sets out the legal

7  standard that this Court and the Commission looks

8  at in these plan dispute cases.

9        It is true that 20 Mile Coal involved a plan

10  dispute under the emergency response plan provisions

11  of the Miner Act of 2006; but in doing that, the Court

12  reiterated the traditional principals of plan review,

13  and that is the arbitrary and capricious standard that

14  the finder of fact uses to determine whether the

15  district manager's decision making process was sound.

16  If the district manager's decision making process was

17  sound, then the district manager's decision stands.

18        Along those lines, it's important to

19  remember that 20 Mile Coal also incorporated the

20  notion of good faith for evaluating MSHA's conduct as

21  well as evaluating the operator's conduct.  The

22  operator bears a burden of presenting the district

23  manager with information that supports the operators

24  position.  During that negotiation process to the

25  extent that the operator fails to do that, the

1    district manager has nothing to consider or at least

2    the information he has is limited.

3            So the standard is not the suitability of

4    Mach's plan or the suitability of MSHA's proposals,

5    but it is the decision making process in arriving at

6    that ultimate decision by the district manager.  This

7    Court has already mentioned that this is, these are

8    highly technical ventilation issues; and neither the

9    Court nor counsel frankly are in the position of

10   evaluating the merits or otherwise of a particular

11   ventilation proposal.  Thank you.

12           THE COURT:  Mr. Paige, just one other

13   thing, because I want to address the exhibits all

14   at one time.  The last motion to strike, I don't

15   know who wants to address that, there was some

16   exhibits that were added at the last minute, and I

17   believe Ms. Dunne's motion referenced the last ten

18   exhibits that were added that MSHA was not aware

19   of at the time or that were not disclosed prior to

20   your discovery process.

21           MR. PAIGE:  Yes, ma'am.

22           THE COURT:  I just want to be sure I'm

23   clear on that.

24           MR. PAIGE:  So the Secretary's motion is

25   to strike any documentary evidence or any

1  testimony that was not provided to MSHA before the

2  citations were issued on September 29.

3          THE COURT:  Thank you.

4          MR. PAIGE:  Thank you, Your Honor.

5          THE COURT:  Is this yours too,

6  Mr. Wolff?  Are you going to address this?

7          MR. WOLFF:  Yes.  It's one continuing

8  dialogue.  Your Honor, this happens in planned

9  disputes, at least in the couple years at least

10  since the passage of the Miner Act, the Secretary

11  says arbitrary and capricious, but frankly I don't

12  understand how it can't be a suitability standard

13  when the Peabody Coal case and the CW Coal case

14  clearly say the burden of proof is on the

15  Secretary of Labor to show the non-suitability of

16  what the operator has proposed and the suitability

17  of what they've proposed in lieu of.

18          Now why are the ERP cases such as this 20

19  Mile not relevant?  Well, frankly because the ERP

20  process is a creature of Congress.  It was enacted in

21  2006, and there's nothing in the language of the

22  relevant provision that mentions suitability.  So it's

23  just out the door.  That's a separate process that was

24  set up by Congress.

25          We're talking about the question that has

Page 26

1   been addressed by the Commission, and it's been said

2   the question is suitability.  Now Judge Melick had a

3   case, a planned dispute case in July of 2009, he

4   didn't cite the ERP cases.  He didn't cite the

5   arbitrary and capricious standard.  He said the

6   question is suitability.

7          What's suitability?  Well, we looked to the

8   dictionary definition.  Is it consistent, is it

9   appropriate for the mine?  But I'll submit to you that

10  regardless of what the standard is, let's say you do

11  review Mr. Phillips' action for arbitrary and

12  capricious, we'll win still, because the evidence is

13  going to show you that he should have approved the

14  plan.

15         Now Mr. Paige suggested that the lawyers in

16  the room and the parties in the room and you, Your

17  Honor, are not in a position to decide whether

18  Mr. Phillips made the correct decision or not.  That's

19  flat out wrong.  Tough decisions are made in courts

20  every day regarding subjects that are just mind

21  boggling -- tobacco, asbestos, any number of

22  chemicals, toxic torts cases, financial cases.  These

23  are tough decisions.  Judges make them every day.

24         We're going to do our level best here as the

25  attorneys for Mach to present this in a clear and

1 crisp way so you actually get to know the personality

2 of this mine. I assume the Government is prepared to

3 try to do their best to show you the same thing.

4 That's your role as the judge. So I disagree

5 completely with the idea, the notion that you cannot

6 judge at the end of this hearing whether MSHA and

7 Mr. Phillips made the correct decision or not.

8         Now as for the motion itself, again, this

9 gets back to our earlier discussion, you are the

10 judge. We cited the Ninth Circuit Case which pretty

11 much froze water on the idea that motions in limine

12 are even necessary in bench trials, because there is

13 no jury here, so there is no reason to screen the jury

14 from potential prejudice.

15         You can make these decisions on a seriated

16 basis as the exhibits, testimony, witnesses come up,

17 and that's what I would ask that you do. Through the

18 normal course of objections on relevance, you can make

19 your rulings.

20         As for the motion to strike, there was a

21 couple issues. Again, as for the exhibits, as they

22 come up, if they're not relevant to the testimony at

23 the time, I would suggest that you rule on objections

24 as we go.

25         They also objected to qualification of

1    Mr. Drexel Short as an expert.  Frankly at the time of

2    his deposition, the fact that he didn't present a

3    resume which he did not even have became stale,

4    because Mr. Nessen had a complete and full opportunity

5    to depose him and did depose him for his

6    qualifications on the relevant issues.  That a

7    nonstarter.  There's no prejudice there, because

8    they've had a full opportunity to depose Mr. Short as

9    an expert.

10          So our response is that the motions in

11   limine and to strike do not need to be ruled and

12   should be denied, and then you retain obviously your

13   discretion to make evidentiary decisions as the

14   hearing progresses.

15          THE COURT:  Thank you, Mr. Wolff.

16          MR. WOLFF:  I do want to say one thing

17   about what MSHA is proposing for their motion in

18   limine.  They're really putting the operator in an

19   impossible position.  Their program policy

20   contemplates that we're going to come into a court

21   and put on our best case to you.  Now what they're

22   trying to do without citing a single case as an

23   example of where this has been done, deny us our

24   fair opportunity to give you a full and complete

25   picture of the Mach Mine.  It's a loaded hearing.

1          If that's the law, then it's a dead letter.

2   I would submit to you that your role under the Mine

3   Act is far more robust than what the Secretary is

4   trying to say through it's motion in limine.

5          THE COURT:  Now from the list of

6   exhibits, I cannot sometimes tell what they are

7   simply from the list.  Many of the decisions

8   regarding evidence and its admission will be made

9   as Mr. Wolff suggests at the time the evidence is

10  presented.  I will tell you, however, that as far

11  as ventilation plans from other mines which I see,

12  I'm not sure where they start on my list, it looks

13  like number 73, I'm not going to consider

14  ventilation plans from other mines, nor am I going

15  to consider -- again, they just don't help me.

16  They have no relevance at all.  Every plan is by

17  statute mine specific.  So I'm not going to look

18  at ventilation plans from other mines.

19          I'm also not going to -- this part causes me

20  a little bit of trouble.  When Mach asked for a

21  hearing and we set the hearing on the date that they

22  wanted over the objection of the Secretary, I was

23  assured they were prepared and that everything was

24  ready.  And at their request, I set a date for an

25  exchange of exhibits and witnesses so you could

1    complete your discovery, and everybody would be

2    prepared, and everybody would have the same

3    information.

4            From the little I have in my file, I see

5    that the disclosure date, it sounds like everyone

6    disclosed information on the date I gave; but then

7    Mach did an amended one and amended two supplementing

8    their information at later dates, and I can see in the

9    course of litigation how that might happen.

10           I am concerned though about at the last

11   moment adding, tacking on ten additional exhibits that

12   should have been brought to the Secretary's attention

13   while they had a chance to address it in discovery.

14   So as to those items -- and the other thing about them

15   that I can tell from here, certainly if something

16   comes up that is different than I say now, you're

17   welcome to bring it up.  But from the dates I see on

18   here, they are all after the date of citation which to

19   me means they're not going to be relevant to my

20   decision anyway and that they are exhibits that came

21   after you allegedly reached this impasse and contested

22   the district manager's decision on the ventilation

23   plan.

24           So I'm going to exclude those exhibits,

25   although not all ten.  I would start at Number 82,

1    because it looks like they're all documents that came

2    after and because I don't think it's fair at this

3    point after all the discussion we had back and forth

4    about disclosure and being fair that these should come

5    up at the last moment.

6            Now the other issue I'd like to address is,

7    we can talk about this some more when the time comes,

8    but I really don't -- you know the rules say that we

9    don't need repetitive evidence.  So if one of your

10   experts say it, I don't need to hear it from two or

11   three other experts.  I usually get it the first time,

12   and I want to focus on the evidence and what the

13   expert has to say; but I don't need to hear it more

14   than one time.  Please consider that, because I won't

15   allow it.  When you're making your decision as to who

16   is going to testify, keep that in mind.  Okay?

17           All right, now is there anything before

18   we -- I think it's time to get started, unless there's

19   something else we need to talk about.  Are there

20   people in the courtroom who are going to testify?  We

21   need to find a place for them to wait.

22           MR. WOLFF:  Are you asking me at this

23   point?

24           THE COURT:  Yeah.

25           MR. WOLFF:  Well, we got Mr. Gary

1    Hartsog, Mr. Mike Lawless, these are our two

2    experts.  Drexel Short is the gentleman in the tie

3    who is raising his hand, he's also proposed as an

4    expert.  Next to him is Tom Blandford proposed as

5    an expert.  We got one -- well, Mr. Webb is the

6    mine manager.  He'll be here as the company

7    representative.  He'll also be testifying.  We've

8    got one fact witness from the group of miners that

9    are in the room that will also be testifying.

10           THE COURT:  I assume you want the

11   witnesses sequestered?

12           MR. NESSEN:  Your Honor, I believe the

13   miner that they're speaking of is Mr. Patton.  We

14   have no problem with him being here.  Mr. Short we

15   do have a problem with being here.  Mr. Short

16   they've offered as an expert after -- Your Honor

17   said, told us, ordered us based on their need for

18   speed to say who the experts were on October 19

19   and provide their CV's.

20           On October 19 they said Drexel Short would

21   be a witness, but did not say an expert witness, and

22   no CV was forthcoming.  I proposed Drexel Short.  I

23   prepared for him as a fact witness not an expert

24   witness.  As Your Honor well knows, those are

25   different things.

1           THE COURT:  All I really want to know is

2     are we sequestering witnesses or not?

3           MR. NESSEN:  We would like to sequester

4     Mr. Short.

5           THE COURT:  All right, then I will enter

6     a sequester order, and everybody who is a witness

7     who is not the advisory witness needs to leave the

8     courtroom.  There are two rooms, a conference

9     room, one on each side.  The witnesses can wait

10    out there.

11          MR. NESSEN:  Your Honor, then we'll

12    withdraw the request.

13          THE COURT:  Okay.  Mr. Wolff, what's

14    your position?  Do you want the witnesses

15    sequestered or not?

16          MR. WOLFF:  Yeah.  We certainly do,

17    because I think Mr. Roberts and Mr. Phillips are

18    both here as fact witnesses.  We think they should

19    be sequestered to the extent they're not serving

20    the role.  Mr. Phillips I believe is no longer

21    employed by the Mine Safety and Health

22    Administration, so I think he needs to be

23    sequestered by all means.

24          THE COURT:  I think the Secretary can

25    choose an advisory witness to sit at their table,

1    whoever is may be.  If you choose someone,

2    everyone else who is going to testify including

3    all of your experts need to go outside and wait.

4              MR. WOLFF:  I didn't understand that.  I

5    thought by advisory, I thought you meant experts.

6    If you're suggesting that experts also have to be

7    sequestered, we also withdraw the request.

8              THE COURT:  Okay.  So nobody wants the

9    witnesses sequestered; is that correct?

10             MR. NESSEN:  That's correct, Your Honor.

11             THE COURT:  We'll move forward.  Now I

12   am very familiar with the case.  I want to give

13   you a chance to do an opening statement, but

14   please keep it brief, because I want to get

15   moving.  All right?

16             MR. PAIGE:  Thank you, Your Honor.  I

17   will keep the Secretary's opening statement brief.

18   The Court is going to hear a lot testimony today

19   about how much air is going through panels one and

20   two of Mach's underground coal mine the No. 1

21   mine.  There is a lot of air going through those

22   panels to ventilate those worked out areas.

23             This case is not so much about how much air

24   is going through there, but how to determine how much

25   air is going through there.  It's about the evaluation

1    of Mach's proposed ventilation system and not

2    necessarily with panels one and two but with going

3    forward in panels three, four, five, and six.  It's

4    about how to determine whether or not the bleeder

5    system is working effectively.  That's what this case

6    is about.  Thank you, Your Honor.

7              THE COURT:  Mr. Wolff, you're up again.

8              MR. WOLFF:  I am.  Can I move about to

9    present this, because I'd also like to refer to my

10   map over here?

11             THE COURT:  We need to put your map

12   somewhere, because the witness is going to be

13   sitting over there, and it's going to be hard.

14             MR. WOLFF:  We will relocate this.  I

15   put it there for purposes of opening statement.

16             THE COURT:  Just so you know from up

17   here, I can only see the top.  So if it matters to

18   you, you may move it.

19             MR. WOLFF:  Can you get a better glimpse

20   over here?

21             MR. NESSEN:  Your Honor, can we move so

22   we can have a better view?

23             THE COURT:  Absolutely.

24             MR. WOLFF:  Your Honor, this case is

25   about a lot of air.  This case is about a system

1  that not only works effectively, that is not only

2  safe, effective, and suitable, but frankly should

3  be the model for ventilation systems to be adopted

4  by MSHA and used at other mines.

5       Mach is an underground, longwall coal mine.

6  It's located in Southern Illinois.  It started in

7  2005, brand new.  No operations had ever been put in

8  there.  When Mach designed its ventilation system, it

9  said, we're not going to settle for the status quo.

10  We're not going to do it the way MSHA and others have

11  always done it, because there's a better way.

12       So for purposes of this opening, I'm going

13  to refer to the map to give you the basic overview of

14  what makes this such a safe, effective, and suitable

15  ventilation system.  What they have done essentially

16  is they've over-designed this to flush the gob of

17  methane, respirable dust, and noxious gases.

18       They've got a huge intake fan here putting

19  in over 500 cubic feet per minute of air.  That's a

20  lot of air as you'll hear testimony on.  Over here on

21  the northeast corner is their bleeder exhaust shaft.

22  They've got a huge fan sucking the air out of the

23  mine.  What this does is creates a push/pull system of

24  ventilation.  Air goes in, it flushes the gob, goes

25  out the other side.  Moving with it in the words of

1    the regulation, methane air mixtures, other gases,

2    dust, and fumes away from the workout areas and out of

3    the mine.  That is what the system does.

4              How do we know this?  We know this for a few

5    reasons.  First of all, basic physics tells us that

6    air moves from high pressure to low pressure.  So this

7    is the high pressure point of the mine over here where

8    the intake fan is.  The air moves through the mine,

9    ventilates the working sections, and then moves out to

10   the low pressure point in the northeast corner.

11             How else do we know this?  Well,

12   conveniently we have got two ventilation surveys

13   conducted by none other than the Mine Safety and

14   Health Administration -- the first in March and April,

15   the second in June.

16             Now this is going to be an exhibit.  I think

17   it was proposed by the Government.  I'm just going to

18   read you a statement.  This was based on the April

19   survey.  It was determined the bleeder system was

20   effective.  That's not Mach talking.  That's the Mine

21   Safety and Health Administration.  June, they go back,

22   they do a second study.  From their own exhibit, I'm

23   going to read to you what they concluded.  Based on

24   the information collected, it was determined the

25   bleeder system was working effectively on that date.

1    That's not Mach talking.  That's the Mine and Safety

2    Health Administration.

3            So why are we here?  Why does the Mine and

4    Safety Health Administration, the federal agency

5    responsible for the safety and health along with the

6    operator of these miners in the back room, of the

7    miners at Mach?  Why are we here?  We're here because

8    MSHA despite the fact that their own ventilation

9    survey confirms that the system is working effectively

10   which is corroborated by a third survey that we had

11   done that corroborated the effectiveness of the mine,

12   they want to make some changes.

13           Now there's a lot of issues in this case,

14   and we'll get to them, and we'll present expert

15   testimony and evidence on all of them.  For purposes

16   of succinctness, I just want to hit on three.  First,

17   they want Mach to install a series of ventilation

18   controls in a couple of places -- in the active

19   tailgate, and with each successive panel the active

20   tailgate would progress, also in the back bleeders

21   they want a series of stoppings and regulators.

22           Why do they want this?  This is just the way

23   other mines do it.  This is pertinent to the question

24   of other mines, because we are being held accountable

25   here for not doing it like other mines.  We only

1  brought other mines into this case, because that's

2  what MSHA had done first.

3        What those ventilation controls will do is

4  first completely impede the very system that MSHA's

5  own system survey shows is working effectively.

6  Secondly, it will require miners, these folks back

7  here in the room -- and these folks are going to be

8  here every day, because Mach management wants them to

9  know completely and fully about what's going on here;

10  because ultimately this case is about their jobs and

11  their safety.

12        What MSHA wants them to do is put in these

13  ventilation controls which would require them to

14  monitor them, so now you have to send mine examiners

15  into these areas.  This is particularly troublesome

16  back here in the bleeder system where everyone

17  agrees -- Mr. Phillips, Mr. Roberts, and all of our

18  people -- that that roof is poor.  It's a bad roof.

19  They get a lot of roof falls.

20        What has Mach done, because Mr. Paige

21  mentioned this should really be about the evaluation

22  of the bleeder system?  Well, they have an evaluation

23  system as they are required to do by law.  What Mr.

24  Paige did not tell you is that there's no legal

25  obligation for someone to actually physically walk the

1    bleeders.  The obligation is to be able to evaluate

2    the effectiveness of the bleeder system.

3              Mach has evaluation points, and I know you

4    can't see the entire map, so I'll just tell you

5    there's evaluation points that you will learn about;

6    and they basically go around the perimeter of the

7    bleeder system.  Those evaluation points give Mach

8    every bit of relevant material information that it

9    needs to determine what is going in, the air quality

10   and the air quantity, and what is coming out, the air

11   quality and the air quantity.

12             You'll hear from Mach, and you'll hear from

13   our experts this tell you that there's not one bit of

14   information that is material information that Mach can

15   get by walking to those points that cannot get by the

16   points as it has established.  So MSHA is taking a

17   safe, effective, and suitable plan, and basically

18   rendering it less safe, less effective, and unsuitable

19   to the Mach mine.

20             The third point I want to address is the use

21   of belt air.  This system was designed as MSHA knows

22   to throw high quantities of air, high volumes of air

23   through the mine.  Mach committed in its ventilation

24   plan to twice the legal amount required of air to go

25   across the longwall face.  It was able to do that,

1   because it uses the belt air entry to bring air -- the

2   natural flow of air from the high pressure to low

3   pressure takes the air through the belt entry, and

4   it's used to help ventilate the working face and

5   ultimately to flush the gob.

6           MSHA has said, Mach, you have not justified

7   the continued use of belt air.  You've used it in

8   panel one, you've used it in panel two, it's worked

9   effectively; but you can no longer use it in panel

10  three.

11          Your Honor, as you're probably aware, there

12  was a new belt air rule that went into effect in

13  December 2008 that says the use of belt air is

14  permissible if it's no less safe than not using belt

15  air.  You'll hear evidence and testimony that shows

16  not only is it no less safe, but at Mach, it's far

17  safer to use belt air; and in fact to reengineer the

18  mine on this date, to channel the belt air back outby

19  away from the longwall face back into the mains would

20  essentially require, if it's possible at all, that

21  Mach would have to dial down that exhaust fan that I

22  pointed out in the northeast corner so much that it

23  might allow Mach to turn the air, the belt air around

24  and get it out away from the longwall face; but in

25  doing so, it basically renders inert the whole point

1  of this beautiful push/pull system.  That is the

2  effect of denying the use of the belt air at Mach.

3       I want to raise one more point before I sit

4  down, and that is simply the process by which Mach has

5  been kept on a short leash by District 8.  What you're

6  going to hear today concerns panel three, but what you

7  should know is that all these issues that are in

8  dispute were issues that Mach was allowed to use at

9  panel one, allowed to use at panel two, now they're

10 being pulled away from it, revoked for use at panel

11 three.

12      The change is being made by MSHA despite the

13 fact that nothing went wrong on panels one and two,

14 and the system worked as confirmed by the ventilation

15 surveys in the middle part of this year.  But there's

16 another problem here.  There's a process problem, and

17 that's the fact that District 8 keeps Mach on this

18 panel by panel approval basis.

19      So they do panel one, then they have to get

20 a new ventilation plan.  Then they get one for panel

21 two, then they have to get a new ventilation plan.

22 That really is what feeds the dispute that we speak

23 of, the year-long dispute that we speak of in the

24 prehearing brief in which you've heard so much of in

25 prior phone conferences.

1          I submit to you the Mine Act and MSHA's own

2     regulations contemplate the single ventilation plan,

3     and that this notion that MSHA is allowed to just do

4     it on a panel by panel basis is unlawful.  And as part

5     of our request for relief, we ask that you declare it

6     unlawful, because MSHA has a six-month review process

7     that written in the law which gives it a complete full

8     opportunity to review the status of the ventilation

9     plan for its suitability as the mine progresses.

10    Using the panel by panel approval process on the front

11    end is unlawful and frankly arbitrary and capricious.

12    Thank you.

13          THE COURT:  All right, are you ready for

14    your first witness?

15          MR. NESSEN:  Yes, Your Honor.  We call

16    Mr. Keith Roberts.

17                    KEITH ROBERTS,

18    having been duly sworn, testifies as follows:

19                 DIRECT EXAMINATION

20    QUESTIONS BY MR. NESSEN:

21          MR. NESSEN:  Your Honor would you like a

22    copy of the exhibit?

23          THE COURT:  Sure.  Thank you.

24      Q  (By Mr. Nessen) Good morning.

25      A    Good morning.


Page 180

1    entry and was lost as mining began.

2        Q    Did you walk any portion of the

3    bleeder entries that you just described in conducting

4    the survey?

5        A    We did.  Myself, Rich Stoltz, and Anthony

6    Webb on the first day of the survey, we traveled from

7    the longwall face inby by the number two and number

8    three entries of headgate number two and across the

9    bleeder entries from headgate number two to the

10   bleeder shafts and outby in tailgate number one for

11   approximately four cross-cuts to about 185, 184

12   cross-cuts in that tailgate number one.

13       Q    Why did you travel the bleeder entries as

14   part of this investigation?

15       A    Collection of information regarding the

16   adequacy of the airflow distribution and the adequacy

17   of the dilution of the gases including especially

18   methane is an important consideration in the

19   assessment as to whether or not the bleeder system is

20   effective.

21            Air traveled in the south mains area to the

22   bleeder system and from the longwall face both in the

23   tailgate and the headgate and traveled through the

24   worked out area into the bleeder entries, and it was

25   necessary to travel those bleeder entries to measure




Page 203

1    are no ventilation controls proposed to be maintained

2    in the bleeder entries at that time that an

3    examination and evaluation point or measurement point

4    location in the area of the headgate number two,

5    number two and number one entries at approximately 175

6    and a half cross-cut would tell you that airflow was

7    not short circuiting across that caved area, but was

8    indeed traveling around and making the corner so the

9    whole area was ventilated, and there were no dead

10   spots where gases could accumulate.

11        Q    Now let me just follow up now.  I want to

12   focus ourselves on panels four, five, and six.  You

13   mentioned this was a stair step.  Will panels four,

14   five, and six be the length of panels one and two or

15   the length of panel three?

16        A    I understand they're proposed to be the

17   length of panel three, so that you have one stair

18   step.  Then beyond that, it would be straight on

19   across.

20        Q    Now in considering evaluation points for

21   panels four, five and six, using panel three on

22   Exhibit 3 of Secretary's Exhibit 2, where would those

23   evaluation points be on panels four, five, and six

24   comparable location?

25        A    I would expect that the present ones that I




1  tailgate entries of headgate number two, and

2  measurement point locations in the face area adjacent

3  to the face in headgate number two, at measurement

4  point locations in headgate number three across the

5  three entries adjacent to the face at the evaluation

6  point that floats with the longwall face and the

7  headgate which would be headgate number three which is

8  located approximately three cross-cuts inby the

9  longwall face, information that's collected at the

10  inby end of panel three in headgate number three and

11  at the surface of the bleeder shots.

12      Q    That's your understanding of what Mach wants

13  to do?  What's missing?

14      A    Consideration of a very significant piece of

15  information, and that's the adequacy of the airflow to

16  dilute the contaminants that are being liberated in

17  that worked out area to safe levels.

18      Q    Are those the evaluation points that you

19  pointed out to us at the back end of panel three and

20  the bleeder entries for panel three?

21      A    Yes.  Those locations that I added onto that

22  evaluation would be places where representative

23  information could be collected regarding the airflow

24  and the dilution of those contaminants.

25      Q    I just wanted to go back to one item on the




Page 233

1    Q    I'm trying to ask a really pretty clear

2  question that I didn't even ask about a bore hole.  My

3  question is are you today saying -- I'm trying to

4  figure out what's in dispute in this case.  Maybe your

5  lawyer can answer it.  I do not understand anybody to

6  have said that there needs to be a point here at the

7  back of headgate one.

8          MR. GLASSER:  Are we litigating over a

9  point over the back of headgate one?

10         MR. PAIGE:  No.

11    Q  (By Mr. Glasser) So your desire for a point

12  back there, was it ever expressed internally?

13    A    Yes.  I think it was also in the first

14  bullets you and Keith talked about.

15    Q    Then lastly, you proposed in your

16  examination a point back here in the end of tailgate

17  number one.  Again, I understand neither MSHA or the

18  operator has ever proposed a point here at the

19  junction of tailgate number one and the bleeders.  Am

20  I wrong about what we're litigating in this case?

21         MR. PAIGE:  No.

22    Q  (By Mr. Glasser) So the only point that is

23  proposed for the EP, the only two points proposed

24  for the EP that we're fighting about in this case as

25  I understand it is this circle right here, and you

1    proposed another one back here; is that right?

2        A    Those two locations.

3        Q    So I'm going to circle what's at dispute in

4    this case?

5        A    The specific location of that is more

6    important than the one down here, because the location

7    of the ventilation controls and the need to determine

8    air quality and direction out of that worked out area

9    caused by the direction of those vent controls.

10        Q    So if one of these two had to be given up,

11    it would be one in the junction?

12        A    If you remember when we had those two

13    different drawings specifically, that's why I had

14    those drawings up there.  There's a difference in the

15    evaluation and the ventilation of the system during

16    the first part of the panel as compared to the mining

17    in the second part of the panel.

18             I thought I clearly identified why there was

19    differences and the need for consideration of

20    different examination locations at different points in

21    time.  Talking about a different airflow path.

22             MR. GLASSER:  I'm going to mark this

23    with a DB, make it a new exhibit.  Whatever we're

24    up to, just so the Court will have it for your

25    judgment, so you know what we're talking about on

1    the record.  So I offer that as Mach Exhibit 101.

2    I'll pick a number that isn't in use.  Any

3    objection?  Now I guess I'm --

4         Q   (By Mr. Glasser) Now I understand that the

5    desire for an EP point has to do with the

6    information gathered at the EP point; is that

7    correct?

8         A    Yes.

9         Q    And you admitted your exhibit, your

10   September -- I'm sorry.  The ventilation survey that

11   was conducted in June, but that was kind of summarized

12   in the September memo, that was just admitted into

13   evidence; is that right?

14        A    Yes.

15             MR. GLASSER:  Your Honor, I've blown up

16   a portion of that ventilation survey.  It's from

17   Figure 5, but we'll make it Mach Exhibit 102.

18   I'll hand this to the Court.  I want to be drawing

19   the Court's attention to this area right here.

20        Q   (By Mr. Glasser) Mr. Beiter, what I've done

21   here is I've gone to your Figure 5 which is in the

22   bleeders.  I've just blown up the junction of

23   headgate number two with the bleeder system.  Okay?

24        A    Yes.

25        Q    That's the place where, that's one, that's

1    the place on this map that would have been right here,

2    the point that -- well, frankly it's the analogue on

3    panel three is this point right here where the

4    headgate meets the bleeder; right?

5        A    Would be this point over here?

6        Q    That's an analogous point in panel two?

7        A    And this point over here in the second

8    circle on the general area in DB Mach Exhibit 101

9    depicted at the intersection of headgate number two

10   and the bleeder entries that are presently there.

11       Q    Now I presume one of the reasons we're going

12   in here is to get data that is actionable data, data

13   that we can use; right?

14       A    Yes.

15       Q    I want to draw your attention to cross-cut

16   number 14.  Do you see that?

17       A    Yes.

18       Q    Cross-cut number 14 on the day of your

19   survey, there was .5 percent methane in that

20   cross-cut; is that right?

21       A    Yes.

22       Q    Now I want to draw your attention to the

23   next entry over, 120 feet different.

24       A    Yes.

25       Q    1 percent methane; is that correct?

1        A     Yes.

2        Q     So there was a 100 percent change in the

3    methane content of the bleeder within 120-foot linear

4    distance; correct?

5        A     Yes.

6        Q     Then if you go another about 180 feet to the

7    east, you get to a 0 percent methane concentration.

8    Do you see that?

9        A     Yes.  You'll notice that the air is going

10   the opposite direction at that point.

11       Q     Okay.  So in this say 300-foot expanse of

12   the bleeder, your own measurements show methane

13   concentrations of zero, 1, and .5 in about a 300-foot

14   area; correct?

15       A     Yes.

16       Q     Now this area also has lots of rock falls in

17   it?

18       A     Yes.

19       Q     So you had to kind of weave your way around

20   all this danger to even get in there and take those

21   measurements; isn't that right, Mr. Beiter?

22       A     Yes.

23       Q     And now this measurement, I take it this EP

24   point of the junction, if I'm understanding your

25   testimony correctly, is intended to give some idea of

1   what's coming down this whole 3-mile long air course;

2   is that right?

3       A    Yes.  It did.

4       Q    Well, it did with a 300 percent variation at

5   300 feet?

6       A    Maybe you are misunderstanding.  I could try

7   to explain it to you if I like.

8       Q    I'm sure your good lawyer -- go ahead.

9   Explain it to me.

10      A    Your airflow where you indicated was

11  zero percent methane is exiting the worked out area

12  between those two panels coming from the longwall

13  face.  That's what I pointed out in previous testimony

14  regarding the exhibits we had.  The airflow there

15  indicated that you had pretty much fresh air all the

16  way from the longwall face to the bleeder entries.

17      Q    Three miles?

18      A    No.  At this point in time we only had 5,400

19  square feet.

20      Q    One mile?

21      A    Yes.  As I discussed previously, the airflow

22  patterns were such that methane was being moved from

23  the worked out area of panel two from headgate number

24  one towards headgate number two; and I described how

25  that's concentrations at the back end of headgate

1  number two and at that former pre-shift examination

2  location revealed that information.

3      Q    So I think I'm hearing you tell me that even

4  though they are radical variations -- by the way,

5  every one of these readings is well below the danger

6  level of methane, isn't it, reading of .5?

7      A    Yes.  That's what the report said.

8      Q    I think I'm hearing you telling me that even

9  though there seems to me as a layman to see radical

10  variations in very short periods in these bleeders

11  that this somehow gives you statistically significant

12  information about a 3-mile long expanse of mine?

13          MR. PAIGE:  Objection to the

14  characterization of the testimony.

15          MR. GLASSER:  I'm asking him.

16          MR. PAIGE:  I'm trying to explain my

17  objection.  He's asking about statistics.

18          MR. GLASSER:  Right.

19          MR. PAIGE:  A statistical variation,

20  statistics has a very specific meaning.

21      Q  (By Mr. Glasser) That's what I'm asking.

22  Have you done any statistical analysis to determine

23  if any one reading in that cross-cut area is

24  statistically significant in respect to the 3 miles?

25      A    Understanding from a ventilation

1 perspective, the direction of airflow patterns within

2 this worked out area and the bleeder entries and

3 around the cave materials through the adjacent

4 open entries, it can be concluded that the location at

5 189 or 190 cross-cut in the number two entry of

6 headgate number one where there's a measurement of

7 zero percent methane and 20.6 percent oxygen on a

8 handheld and 13,122 CFM of airflow quantity, that

9 information is telling you about the dilution of the

10 gas and the movement of the gas and movement of

11 airflow from the longwall face toward the

12 bleeder entries through that airflow path.

13      Q    And I think I hear you kind of telling me

14 that the information is so valuable that once a week,

15 we should send a miner to weave his way through this

16 mess to reach that point and take that measurement?

17      A    I believe that proper evaluation includes

18 that information.

19      Q    Now --

20      A    Whether it's safe to do so or not --

21      Q    Well, that point is right here.  Is that

22 right?  Where my finger is at the far end, that point

23 will tell you nothing about the methane at 50 breaks

24 back in the gob; will it?

25      A    It will tell you something about the methane

```
 1        FEDERAL MINE SAFETY AND HEALTH ADMINISTRATION REVIEW
                              COMMISSION
 2             OFFICE OF ADMINISTRATIVE LAW JUDGES


 3     _____

 4     MACH MINING, LLC              )  CONTEST PROCEEDING
                                     )
 5            Contestant,            ) Docket No. LAKE 2010-J-R
                                     ) Citation No. 6680550;
 6                                   )              09/29/2009
                                     )
 7            v.                     )
                                     ) Docket No. LAKE 2010-2-R
       SECRETARY OF LABOR,           ) Citation No. 6680551;
 8     MINE SAFETY AND HEALTH        )              09/29/2009
       ADMINISTRATION (MSHA),        )
 9                                   ) Mach #1 Mine
                                     ) Mine ID 11-03141
10            Respondent.            )
       _____)
11

12

13                   TRANSCRIPT OF HEARING
                           VOLUME II
14                     November 4, 2009

15            On November 4, 2009, the above cause came on for
       hearing before the HONORABLE MARGARET A. MILLER, Judge for the
16     Federal Mine Safety and Health Review Commission, 721 19th
       Street, Suite 443, Denver, CO 80202.
17

18     APPEARANCES

19     For the Contestant:

20     Brian A. Glasser              David J. Hardy
       Bailey & Glasser, LLP         Christopher D. Pence
21     209 Capitol Street            Allen, Guthrie & Thomas
       Charleston, WV 25301          500 Lee Street East
22     (304) 345-6555                Suite 800
                                     Charleston, WV 25301
23     Daniel A. Wolff               (304) 720-4214
       Crowell & Moring, LLP
24     1001 Pennsylvania Avenue, N.W.
       Washington, D.C. 20004
25     (202) 624-2621
```

Page 282

1    APPEARANCES CONTINUED

2    For the Respondent:

3    R. Peter Nessen
     Office of the Solicitor
4    US Department of Labor
     230 South Dearborn Street, Suite 844
5    Chicago, IL 60604
     (312) 353-4994
6
     Thomas A. Paige
7    Joshua Falk
     Office of the Solicitor
8    US Department of Labor
     1100 Wilson Boulevard, 22nd Floor
9    Arlington, VA 22209
     (202) 693-9343
10

11

12

13

14

15

16

17

18

19

20

21    _____
             Rebecca L. Byrket, RPR, CCR, CSR
22          Moriarty Reporting & Video, LLC
             777 Whispering Forest Drive
23              Ballwin, MO 63021
            Office: (636) 230-8838
24            Fax: (636) 230-8848
            Mobile: (314) 952-0437
25

1                    I N D E X

2                    VOLUME II

3            WEDNESDAY, NOVEMBER 4, 2009

4                      HEARING

5                                              Page

6    RESPONDENT'S EVIDENCE

7            Robert Phillips

8    Direct Examination                        286

9    Cross-examination                         317

10   Government Rests                          364

11   Motion for Directed Verdict               364

12   CONTESTANT'S EVIDENCE

13           Anthony Webb

14   Direct Examination                        367

15   Cross-examination                         426

16   Redirect Examination                      451

17   Recross-examination                       456

18           Drexel Short

19   Direct Examination                        458

20   Cross-examination                         492

21           Gary Hartsog

22   Direct Examination                        499

23   Cross-examination                         572

24   Redirect Examination                      579

25

Page 284

1            Thomas Blandford

2    Direct Examination                          585

3    Conclusion of November 4, 2009

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                            Page 285
1                              EXHIBITS

2

3    Exhibit No.                  Identified        Admitted

4    Government Exhibit 8         297               298
     Mach Exhibit 46              336               337
5    Mach Exhibit 51              420               421
     Mach Exhibit 68              423               424
6    Mach Exhibit 69              424               424
     Mach Exhibit 70              424               425
7    Mach Exhibit 4                                 425
     Mach Exhibit 64                                426
8    Mach Exhibit 103             454               455
     Mach Exhibit 7                                 499
9    Mach Exhibit 1               515               518
     Mach Exhibit 2               526               527
10   Mach Exhibit 5               534               537
     Mach Exhibit 79              587
11   Mach Exhibit 66              588
     Mach Exhibit 60              591
12   Mach Exhibit 78              592
     Mach Exhibit 57              597
13   Mach Exhibit 65              597
     Mach Exhibit 63              598
14

15

16

17

18

19

20

21

22

23

24

25
```

Page 325

1   specialists, perhaps technical support, various

2   people that are assembled to help you make up your

3   mind?

4       A.   Yes, sir.

5       Q.   And the decisions -- and we've got a

6   number of issues in these citations -- and you

7   disapproved the site specific plan based on

8   recommendations from Mr. Roberts?

9       A.   Yes, sir.

10      Q.   And from Mr. Beiter?

11      A.   Yes, sir.

12      Q.   And you denied the base plan based on

13  recommendations from Mr. Roberts?

14      A.   Yes, sir.

15      Q.   And Mr. Beiter?

16      A.   Yes, sir.  And also advice from counsel.

17      Q.   Okay.  You don't deny that Mach has bad

18  roof back in its bleeder entrance, do you?

19      A.   No, sir.  And that's what started the

20  initial -- me wanting to look at what was going on

21  behind there back in October of 2008.

22      Q.   And you heard the testimony of Mr. Beiter

23  yesterday?

24      A.   Yes, sir.

25      Q.   And -- let's see here.  Well, you remember

1  the discussion about the junction point where panel

2  three retreats and becomes parallel approximately to

3  the bleeder entries at panel two?

4      A.   Yes, sir.

5      Q.   And you heard him describe that that was a

6  dangerous place?

7      A.   And that was based upon, I believe,

8  information that Mach submitted as part of their

9  wanting to mine this area that showed a stress zone

10  that would be developed as you mined panel three

11  back by the entries at headgate two and the

12  stresses -- there was a stress zone there.

13          Mr. Pete Hendricks had approached me

14  earlier wanting to mine an additional 1,000-foot

15  inby to try to get away from this stress zone.

16      Q.   And that was upon the recommendation of an

17  outside engineering consultant?

18      A.   Yes.  I believe it was --

19      Q.   And you heard Mr. Beiter say that, you

20  know, he works at tech support, but he agreed in

21  response to Mr. Glasser's question that an operator

22  has to take into consideration the safety of its

23  miners when it's considering how to evaluate its

24  bleeder.  You would agree with that; right?

25      A.   I would agree.

1     Q.   Now, at panel one, the ventilation plan

2  they had for panel one, nothing in that plan

3  required them to walk that bleeder, did it?

4     A.   Not that I'm aware of, no, sir.

5     Q.   And at panel two, nothing in that

6  ventilation plan required them to walk that bleeder?

7     A.   Not that I'm aware of, no, sir.

8     Q.   And you personally approved -- now I think

9  your actual comment was to Mr. Falk that you're not

10  sure of who signed off on panel two, but that's --

11  that's not actually true; right?

12     A.   I don't know that to be true.

13     Q.   Well panel two -- you approved panel two

14  ventilation plan, didn't you?

15     A.   Like I said, I don't remember.  I don't

16  know.  I would have to see it to know.

17     Q.   Were you the district manager of District

18  8 in March of 2009?

19     A.   March of 2009, yes, sir.

20     Q.   And are you aware that Mach got its

21  approval in or around March or April of 2009?

22     A.   Around that time, yes, sir.

23     Q.   You were the district manager?

24     A.   But I may not have been there and signed

25  off on that plan.  It may have been someone else in

1      Q.   And I'm just trying to clarify, you agree

2  with Mr. Roberts that there's no record of methane

3  accumulations in the idle places --

4      A.   I'll agree with --

5      Q.   -- or roof bolts at Mach as far as you

6  know?

7      A.   I'll agree, yes, sir.

8      Q.   And this requirement was not required in

9  the ventilation plan for panel one?

10     A.   No, sir, it was not.

11     Q.   And this requirement was not required for

12 the ventilation plan for panel two?

13     A.   Now -- no.  These -- we're talking not

14 panels now, we're talking the gate entries.

15     Q.   Well, up until now it hasn't been

16 required?

17     A.   That's correct.

18     Q.   All right.  Turn to item no. 4 in the

19 citation 551.  It's just the next one down.

20     A.   Okay.

21     Q.   This concerns the depth of water as an

22 action level?

23     A.   Yes, sir.

24     Q.   You would agree with me, wouldn't you,

25 that it's okay that an operator would want some





1    next, Mr. Hardy?

2                    MR. HARDY:  Gary Hartsog, Your Honor.

3    I need a minute to get some things.

4                    THE COURT:  All right.

5                    Mr. Hartsog, will you raise your

6    right hand please?

7                        GARY HARTSOG,

8            having duly been sworn by the Administrative Law

9    Judge, testified as follows:

10                   THE COURT:  Thank you.

11                   Mr. Paige, do you have something

12   before Mr. Hardy starts?

13                   MR. PAIGE:  Yes, Your Honor.  I do

14   object to Mr. Hartsog as we've identified in our

15   Motion in Limine and our Motion to Strike.  His --

16   his opinions were not presented to the district

17   manager before the citations were issued on

18   September 29th and the documents that we anticipate

19   he will proffer were not proffered to the district

20   manager before the citations were issued and,

21   therefore, his -- under the arbitrary and capricious

22   standard, that does not have any relevance to the

23   district manager's decision.

24                   MR. HARDY:  Your Honor, I think you

25   have to deal with his testimony as we ask him

1  questions, but he can testify on many subjects

2  concerning what our witnesses testified to today,

3  what work he did evaluating the MSHA ventilation

4  surveys, what our witnesses testified to is

5  reasonable, whether the positions taken by the

6  district are reasonable all pre 9/29.

7           So he certainly brings a whole body

8  of testimony that doesn't have anything to do with

9  what occurred after 9/29.

10           THE COURT:  All right.  And is he

11  being proffered -- is he an expert witness?

12           MR. HARDY:  Yes, ma'am, he is.

13           THE COURT:  All right.  So we'll let

14  him go forward with those objections in mind

15  because, again, I'm -- I think you were here when I

16  said earlier that I'm not really going to look at

17  exhibits that came -- that were, number one, not

18  shown to the district manager, and certainly

19  anything that came after may or may not have been,

20  but it's not relevant to the citation on

21  September 29th.

22           MR. HARDY:  I think you've made it

23  clear.

24           THE COURT:  Okay.

25           MR. HARDY:  All right.

1  document that was proffered as Contestant's Exhibit

2  No. 2 and ask you to identify this document for us.

3        A.    This document was a representation of the

4  summary air readings from Alpha Engineering's

5  ventilation survey in July of '09.

6        Q.    So this is the document that shows the

7  work that was done independent of MSHA by Alpha to

8  validate MSHA's work?

9        A.    Yes, sir.

10       Q.    And is that -- did you prepare that

11  document based on the data that was gathered by your

12  crew doing their ventilation survey in July of '09?

13       A.    Our company did, yes.

14       Q.    All right.  Is it -- and, again, it's

15  professional judgment involved here, is it

16  consistent with the MSHA studies of April and June

17  of 2009?

18       A.    Yes, sir, it is.

19             MR. HARDY:  I'll move admission of

20  this document, Your Honor.

21             MR. PAIGE:  Same objection, Your

22  Honor.

23             THE COURT:  Mr. Hartsog, did you at

24  any time give a copy of this document or your

25  findings to MSHA?

1              THE WITNESS:  No, ma'am.

2              THE COURT:  No you did not?

3              THE WITNESS:  No, ma'am.

4              THE COURT:  All right.  Well, I'll

5     admit Exhibit 2, but with -- I'm not sure what the

6     relevance is at this point, but I can --

7              MR. HARDY:  Well, it was part of his

8     work, Your Honor, in --

9              THE COURT:  Okay.

10             MR. HARDY:  -- examining the MSHA

11    studies and validating the MSHA studies to make sure

12    they were good, hard data.  So he did his own to

13    match up with theirs before he started to do --

14    reach his conclusions on what the MSHA data showed.

15             THE COURT:  All right.  I understand.

16    Thank you.

17             MR. HARDY:  Need a moment to confer,

18    Your Honor.

19             THE COURT:  Sure.

20    Q.   (By Mr. Hardy:)  Mr. Hartsog, before we

21    wrap up on the ventilation surveys, did you reach a

22    conclusion based on looking at this objective data

23    and then, of course, doing your own survey, as to

24    whether the ventilation system was working well at

25    the time that MSHA did its work and you did your

* * *

1  believe.

2      Q.   Okay.  Now, in taking measurements

3  outside -- outside the mine at the top of the

4  bleeder shafts, that's what you testified Mach says;

5  right?

6      A.   Yes, sir.

7      Q.   And when you take measurements outside the

8  mine at the top of the bleeder shafts, it does not

9  tell you the direction of airflow at the -- in the

10  bleeder entries at the back of headgate one, does

11  it?

12      A.   Does that -- we know that it has to be

13  going that way for it to get outside.

14      Q.   My question is when you take the readings

15  outside, it doesn't tell you what the direction of

16  airflow at the bleeder entries at the back of

17  headgate one, does it?

18      A.   That one reading alone, no, sir.

19      Q.   Okay.  And it also doesn't tell you -- the

20  outside reading doesn't tell you what the quality of

21  the air is in the bleeder entries at the back of

22  headgate one, does it?

23      A.   No, sir, it doesn't.

24      Q.   And it also doesn't tell you what the

25  quantity of air is in the bleeder entries at the

1  back of headgate one, does it?

2      A.    Sir, I'm assuming from the way you're

3  pointing at that one spot, that you mean at that one

4  spot, so I'm going to say, no, I can't tell that one

5  spot reading from outside.

6      Q.    Okay.  And the same would hold true for

7  the bleeder entries at the back of headgate number

8  two, wouldn't it?

9      A.    Under this scenario, that is correct.

10     Q.    And the same would hold true for the

11 bleeder entries at the back of headgate number three

12 once they start mining it -- or once they start

13 mining longwall panel number three?

14     A.    No.  Now at that point we're going to the

15 back of those bleeders to evaluate and make certain

16 of the direction, quantity, and quality of the air

17 at that location.

18     Q.    And I appreciate that, and I'm sorry I

19 might have misspoken.  Let me rephrase the question.

20          The readings at the top of the bleeders

21 shafts outside the mine will not tell you the

22 quality or quantity or direction of air at the back

23 of headgate number three, will it?

24     A.    From that one reading outside, no, but

25 we're taking that other reading underground.

1      Q.   I understand that, sir, that you're going

2  here now and taking that, but if you just took it

3  here, it wouldn't tell you what's going on right

4  here, would it?

5      A.   No, sir.

6      Q.   And it's true, isn't it, that there in --

7  in the -- in the approved mining plan for Mach right

8  now, there is a minimum airflow for ventilation

9  across the longwall face, isn't there?

10      A.   Yes, sir.

11      Q.   It's also true that there is no minimum

12  airflow requirement to ventilate or for air coursing

13  through the gob of panel one; isn't that true?

14      A.   Not to my knowledge.

15      Q.   And I just want to -- are you familiar

16  with MSHA standards 75.334, sir?

17      A.   I'm afraid I don't have all the numbers

18  quite memorized yet, so if you don't mind I'd like

19  to look at the book.

20      Q.   Actually I'll just phrase it this way.

21  MSHA regulations generally require that a mine has

22  to be either properly ventilated, properly

23  evaluated, or sealed; isn't that right?

24      A.   Yes, sir.

25      Q.   And you also testified a little bit about



Page 595

1   is justified.

2           So the mere fact that it was in

3   MSHA's databases doesn't make it -- doesn't

4   necessarily mean the operator actually presented it

5   to the district manager in the form he now seeks to

6   present it.

7           THE COURT:  Mr. Hardy, I'm not going

8   to admit Exhibits 66 or 78 at this point.

9           MR. HARDY:  As an alternative, Your

10  Honor, we would ask that it would be -- the section

11  specifically related to Mach be admitted.  In other

12  words, the one line on the chart that shows specific

13  Mach, and I would direct the Court's attention to

14  the June 16th letter from MSHA questioning the

15  respirable dust history at the mine in connection

16  with the use of belt air.

17          THE COURT:  All right.

18          MR. HARDY:  That is Exhibit --

19  Exhibit 33, Your Honor.

20          THE COURT:  Okay.  I appreciate that,

21  Mr. Hardy, but I'm not -- at this point I'm not

22  going to accept either of the exhibits in full or in

23  part.

24          MR. HARDY:  All right.

25          THE COURT:  Are there other exhibits

1    that Mr --

2                    MR. HARDY:  Your Honor, I'd like to

3    go ahead and make those part of the record for

4    identification, the two dust sampling exhibits.  I

5    guess it's 78 and 66.

6                    THE COURT:  I think if that's the

7    case, you just need to make an offer of proof and I

8    will include them for that reason.

9                    MR. HARDY:  Offer of proof in what

10   form?  Just --

11                   THE COURT:  I think you've already

12   done it.  You've already told me what you intend to

13   offer them for, so that's fine.

14                   MR. HARDY:  Okay.

15                   THE COURT:  I will accept that as an

16   offer of proof and include 66 and 78 in the record.

17                   MR. HARDY:  Okay.  I need a minute to

18   confer, Your Honor.

19                   THE COURT:  Sure.

20                   MR. GLASSER:  Your Honor, could I

21   just do this to make it go faster?  I think I could

22   cause this to happen very fast.

23                   THE COURT:  You can try.

24                   MR. GLASSER:  Is it the Court -- it's

25   the Court's position, as I understand it, that

1  you're going to consider only what the DM looked at

2  and he had no legal responsibility to look for other

3  data in the MSHA system; right?

4              THE COURT:  You're not going to do

5  this with me by arguing with me because that's not

6  what I said.  But what's your point?

7              MR. GLASSER:  Well then I would like

8  to vouch the record and have it made this -- for

9  identification for the exact same reasons Mr. Hardy

10 went, Exhibit 57, which is a belt air comparison of

11 approvals among mines that's consistent with the

12 Court's ruling before, and Exhibit 65, which is a

13 water handling chart comparing Mach to Eastern U.S.

14 longwall mines.

15             So for the exact same reasons the

16 Court allowed the other two exhibits to be made

17 available to the record for identification, I ask

18 that Exhibits 65 and 57 also be made part of the

19 record --

20             THE COURT:  All right.

21             MR. GLASSER:  -- for identification

22 only.

23             THE COURT:  What they are --

24             MR. GLASSER:  They are, likewise,

25 comparisons of Mach to other mines in the Eastern

1  United States on water and on belt air.

2                THE COURT:  All right.  I understand

3  that.  What I asked Mr. Hardy was if you make an

4  offer of proof and these rejected exhibits then will

5  be a part of that offer of proof and included in the

6  record as rejected exhibits, and if you want to do

7  that with number 57 and 65, as I understand, on the

8  same basis as the other two.

9                MR. GLASSER:  Yes, ma'am.

10               THE COURT:  All right.  We're good

11  with that?

12               MR. HARDY:  Yes.  It would be 57, 63,

13  65, 66, 78.

14               THE COURT:  Okay.

15               MR. HARDY:  Let me confer one last

16  minute here.

17               THE COURT:  All right.

18               MR. HARDY:  Make sure we have this

19  right.

20               THE COURT:  Okay.

21               MR. HARDY:  We have no questions for

22  this witness.  There's no further questions.

23               THE COURT:  All right.  Thank you.

24  Mr. Paige?

25               MR. PAIGE:  Neither do I.

FEDERAL MINE SAFETY AND HEALTH ADMINISTRATION REVIEW
COMMISSION
OFFICE OF ADMINISTRATIVE LAW JUDGES

_____

| | |
|---|---|
| MACH MINING, LLC | ) CONTEST PROCEEDING |
| | ) |
| Contestant, | ) Docket No. LAKE 2010-J-R |
| | ) Citation No. 6680550; |
| v. | )            9/29/2009 |
| | ) |
| SECRETARY OF LABOR, | ) Docket No. LAKE 2010-2-R |
| MINE SAFETY AND HEALTH | ) Citation No. 6680551; |
| ADMINISTRATION (MSHA), | )            9/29/2009 |
| | ) |
| Respondent. | ) MACH #1 MINE |

_____


TRANSCRIPT OF HEARING
VOLUME III
November 5, 2009


        On November 5, 2009, the above cause came on
for hearing before the HONORABLE MARGARET A. MILLER,
Administrative Law Judge, Federal Mine Safety and
Health Review Commission, 721 19th Street, Suite 443,
Denver, CO 80202-2500, 303.844.1616.

APPEARANCES:

For the Contestant:

Brian A. Glasser          David J. Hardy
Bailey & Glasser, LLP     Christopher D. Pence
209 Capitol Street        Allen Guthrie & Thomas, PLLC
Charleston, WV 25301      500 Lee Street East,
304.345.6555              Suite 800
                          Post Office Box 3394
                          Charleston, WV 25333
Daniel A. Wolff           304.345.7250
Crowell & Moring, LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
202.624.2621

```
 1              APPEARANCES CONTINUED

 2   For the Respondent:

 3   R. Peter Nessen
     Office of the Solicitor
 4   US Department of Labor
     230 South Dearborn Street, Suite 844
 5   Chicago, IL 60604
     312.353.4994
 6
     Thomas A. Paige
 7   Joshua Falk
     Office of the Solicitor
 8   US Department of Labor
     1100 Wilson Boulevard, 22nd Floor
 9   Arlington, VA 22209
     202.693.9343
10

11

12

13

14

15

16

17

18

19              JULIE HUNDELT, CCR
          MORIARTY REPORTING & VIDEO, LLC
20             777 WHISPERING FOREST
               BALLWIN, MO 63021
21           OFFICE: (636) 230-8838
                FAX: (636) 230-8848
22           MOBILE: (314) 952-0437

23          WWW.MORIARTYREPORTING.COM

24

25
```

```
 1                        INDEX

 2                     VOLUME III

 3              THURSDAY, NOVEMBER 5, 2009

 4                       HEARING

 5
     Respondent's Evidence                    Page
 6

 7            Greg Patton:

 8   Direct Examination by Mr. Hardy          609

 9
              Michael Lawless:
10
     Direct Examination by Mr. Wolff          622
11

12   REVIEW OF EXHIBITS                       664-665

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 604

1                          EXHIBITS

2
     MACH'S EXHIBITS:
3                                                      Page
        4   - Map                                      612
4       8   - Michael Lawless' Resume                  623
       33   - 6/16/09 Letter to Anthony Webb           605
5            from Robert Phillips
       35   - 6/25/09 Letter to Mr. Phillips           605
6            from Anthony Webb
       80   - Readings Referenced in Stoltz Memo       607
7      81   - Readings Referenced in Stoltz Memo       607

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 624

1   Mach binders, which I believe is in this one.  Do you

2   have that before you?

3        A    Yes.  That's my resume.

4        Q    Do you want to take a minute to flip through

5   and make sure it's all intact?

6        A    Yes.

7             MR. WOLFF:  Your Honor, at this time I

8   move for the admission of Contestant's Exhibit 8.

9             MR. PAIGE:  Your Honor, I don't have any

10  objection to this witness as an expert in and of

11  himself; but to the extent that he's cumulative

12  with other expert testimony we've heard, I don't

13  know that the Court needs to hear any more along

14  those lines.

15            THE COURT:  That's true.  I'm not going

16  to hear things that are cumulative or repetitive.

17  I assume he has something to add that we haven't

18  heard already.

19            MR. WOLFF:  He does have something to

20  add, and I would request obviously in your role as

21  decision maker you consider when we get to the

22  conclusion.  It's going to be obvious and apparent

23  what he adds to this case.

24            THE COURT:  We'll take it as we go.  C8

25  is admitted.



Page 631

1　him or agree that he's an expert in MSHA policy or

2　procedure.  He's certainly well qualified to talk

3　about mining and mining engineering, and I'll

4　allow him to do that.

5　　　　　MR. WOLFF:  Mr. Paige said he didn't

6　object to the first three.  The first four were

7　mining, engineering, underground coal mining, coal

8　ventilation, and bleeder systems and system

9　evaluation.

10　　　　　MR. PAIGE:  I meant everything but the

11　last one, Your Honor.

12　　　　　THE COURT:  That's fine.

13　　　Q  (By Mr. Wolff) Mr. Lawless, you've reviewed

14　Mach's proposed ventilation plan for panel three;

15　correct?

16　　　A　　Yes.

17　　　Q　　You sat in the courtroom today or all this

18　week, and you've heard testimony from the MSHA

19　witnesses and from the Mach witnesses?

20　　　A　　Yes.

21　　　Q　　Have you reached an opinion on the

22　effectiveness of the bleeder evaluation system?

23　　　A　　Yes.

24　　　Q　　What is that opinion?

25　　　A　　I think that the evaluation system that Mach



1  that this witness cannot testify to.

2           THE COURT:  It's sustained.

3           MR. WOLFF:  Can I respond?

4           THE COURT:  Of course.

5           MR. WOLFF:  The Court ruled that

6  Mr. Lawless would not be qualified categorically

7  on MSHA policy and practice.  Now I submit to you

8  that if they're holding up Mr. Phillips as able to

9  render ex cathedra opinions as the district

10  manager and that he somehow is infallible, that

11  puts us in a difficult position.

12           Mr. Lawless is the perfect witness for us,

13  because he can actually inform you from his experience

14  as to what properly goes into a district manager's

15  discretion.  Now you can judge that on the weight as

16  part of your consideration of the evidence, but he's

17  perfectly capable and should be invited to give an

18  opinion that allows us to defend ourselves when we're

19  subjected to a burden of demonstrating, if we're

20  subjected to a burden of demonstrating arbitrance.

21           THE COURT:  I understand your argument.

22  I really do, but there are a couple of things.

23  One, I know several times during the hearing, and

24  I know it happens often that evidence can be

25  admitted, and it can be used for weight or no

Page 636

1    weight or little weight.  I really don't operate

2    that way.  I really don't want the record full of

3    extraneous things.  I really want things that help

4    me make a decision.

5              Mr. Lawless' opinion as to what Mr. Phillips

6    did or whether he was arbitrary and capricious has no

7    relevance whatsoever in this case.  What Mr. Phillips

8    knew and what he did is completely separate from

9    anything that any other district manager did with this

10   mine.

11             So I'm really not going to let Mr. Lawless

12   second guess this district manager or talk about what

13   might have been when he left in 2002, what he thought

14   was proper discretion at that time.  It's 2009, and

15   I'm just not going to let him do that.

16             MR. WOLFF:  Would the Court allow me to

17   rephrase and ask Mr. Lawless what he would have

18   done when he was a district manager for MSHA?

19             THE COURT:  No.

20        Q  (By Mr. Wolff) Let me come at it from this

21   angle.  As a former district manager, you were

22   intrinsically involved in the plan approval process;

23   correct?

24        A    That's correct.

25        Q    Who is responsible for writing and basically

1 taking responsibility for a mine plan?

2     A     The mine plan is the mine operator's plan.

3 I think that's been a basic tenant of MSHA ever since

4 I've been involved in coal mining is that the plan

5 itself is the mine operator's plan.  It's not MSHA's

6 plan.

7     Q     Who is responsible for the plan if something

8 goes wrong?

9     A     The Mine Act uniquely gives responsibility

10 for the health and safety of the miners to the mine

11 operator, and that includes the planning, the

12 implementation of the plan to the mine operator.

13     Q     What is the discretion of MSHA in its

14 approval process of that plan?

15          MR. PAIGE:  Objection, Your Honor.

16          THE COURT:  Sustained.

17     Q  (By Mr. Wolff) Let's talk about the

18 six-month review process and what MSHA does in

19 reviewing plans.  I mean is this a performance based

20 review that an operator has a plan and should be

21 judged on a going forward basis based on the

22 performance of its plan to date?

23     A     Yes.

24     Q     And speak of that performance, the

25 performance standard that is inherent to the mine plan

Page 639

1    A    Yes.

2    Q    If those ventilation surveys show that the

3    system is working, in your experience, would that ever

4    justify a new design?

5        MR. PAIGE:  Objection.  Your Honor, it

6    goes to the same question to what this witness

7    would do in place of Mr. Phillips.

8        THE COURT:  That's right.

9    Q  (By Mr. Wolff) Fact question.  Is it -- I

10   mean how common is it for a mine operator to have

11   the benefit of just a single ventilation survey

12   conducted not by itself but by the Mine Safety and

13   Health Administration let alone two?

14   A    It's not very common.  Ventilation surveys

15   take a lot of resources by tech support, and those

16   resources are fairly thin; because there are a lot of

17   problems around the country that they need to be

18   involved in.

19        To have one complete ventilation survey is,

20   it's not usual in and of itself; because you know, a

21   new mine starting out like this, it's not a major

22   engineering decision as far as whether this involves

23   prudent engineering design or not, but to have two

24   surveys done within that short time period is highly

25   unusual.

Page 641

1          MR. PAIGE:  Objection, Your Honor.

2          MR. WOLFF:  Fact question.

3          THE COURT:  It's an irrelevant fact

4    question.  The objection is sustained.

5      Q   (By Mr. Wolff) You heard testimony from some

6    of the MSHA witnesses including Mr. Beiter about the

7    concern, a future concern about the capacity of this

8    system through panels three, four, five and six.  Do

9    you recall that testimony?

10      A   Yes.

11      Q   In your review of this, the materials you've

12   looked at in your listening to the case, are you

13   aware, have you reached a conclusion or an opinion on

14   the reserve capacity of this system?

15      A   Yes.

16      Q   Do you have an opinion as to whether the

17   reserve capacity as shown now is more than capable of

18   getting through the first six panels?

19      A   Yes.

20      Q   Explain that opinion a little bit.

21      A   Mr. Beiter, he included in his report the

22   resistance curves of the gob, and he compared those

23   and plotted them with the fan curves.  If you look at

24   those curves what you'll -- what it shows is that what

25   we're seeing is relatively low resistance of airflow



1  directly, yes, I think this mine has a lot of reserve

2  capacity that would lead me to conclude that this

3  system will work much longer than the next year or two

4  as would be involved in the plan approval process.

5      Q    In your experience -- fact question, in your

6  experience, were you ever familiar with MSHA under

7  your direction subjecting an operator to concerns that

8  are really three or four or five years out?

9          MR. PAIGE:  Objection.  Your Honor, this

10 is still, this witness is testifying as to what he

11 would do in Mr. Phillips' place.

12         THE COURT:  Right.  It's sustained.

13         MR. WOLFF:  We are showing -- let me

14 just say this.  Mr. Phillips testified on

15 cross-examination that it was important for MSHA

16 throughout the districts to apply the standards

17 consistently, his words.  We are demonstrating

18 that there's inconsistencies here.

19         We're demonstrating here that Mach is being

20 uniquely treated or by all appearances to a level of

21 scrutiny that bears no relation to what they're

22 actually doing and has everything to do with

23 speculation of what's going to happen years hence.

24 I'm asking him a fact question if in his experience he

25 ever saw this kind of thing.

1      THE COURT:  But it's not relevant what

2  he saw, so the objection is sustained.

3      Q  (By Mr. Wolff)  Okay.  Let's talk about the

4  evaluation of the effectiveness of the bleeder

5  system.

6      A    Okay.

7      Q    Again, you've reviewed the mine plan.

8  You've heard testimony.  Have you reached an opinion

9  on whether Mach has developed a means of properly

10  evaluating the effectiveness of its bleeder system

11  based on its proposed evaluation points?

12      A    Yes.

13      Q    What's your opinion?

14      A    I think what Mach has proposed is fully

15  suitable to this system.  It gives them the

16  information that they need to take whatever action is

17  necessary if there's some problem that develops within

18  the bleeder system.

19      Q    Okay.  I'll follow up on that.  But you

20  heard Mr. Beiter testify about the need to get

21  information from this junction, what people have been

22  calling the elbow, not just for a little while but for

23  all time?

24      A    Okay.

25      Q    Do you think that going to that point for

Page 649

1    Q    In your consideration of this case, you've

2    actually been to the mine; haven't you?

3    A    Yes.

4    Q    What was your impression when you went

5    underground?

6    A    Like I said earlier, this is a -- what MSHA

7    inspectors call a good coal mine.  It's well

8    ventilated, it's well maintained.  The cleanup and

9    rock dusting is superb.  The equipment maintenance is

10   well above average.  This is a coal mine that MSHA

11   should be proud of.

12   Q    In your experience, fact question, in your

13   experience as a district manager, did you ever require

14   an operator to travel to a point that everyone knew

15   was unsafe?

16        MR. PAIGE:  Objection, Your Honor.

17        THE COURT:  Sustained.

18   Q  (By Mr. Wolff) You mentioned earlier about

19   the plan being the responsibility of the operator?

20   A    Yes.

21   Q    If they adopt a provision at the request or

22   demand of MSHA, is that still by law the operator's

23   plan?

24        MR. PAIGE:  Objection, Your Honor.

25   That's a legal conclusion that this witness is not



1    Q    In your understanding of Mach based on the

2    fact that there's no evidence of methane accumulations

3    where the idle places are or where roof bolter

4    operations take place, is there any cause to require

5    Mach to change its plan with respect to that issue?

6    A    I didn't see anything in the record that

7    would be cause to do that.

8          MR. PAIGE:  Your Honor, I'll object to

9    any further questions about what this witness

10   believes to be or not to be cause.

11         THE COURT:  Right.

12   Q  (By Mr. Wolff) Overall, with respect to a

13   reasonable degree of mining engineering certainty

14   and drawing on your experience, long experience with

15   MSHA and as a district manager, is Mach's

16   ventilation plan safe, suitable, and effective for

17   the mining conditions and the mining system at Mach

18   Mine?

19   A    Yes.

20   Q    And has Mach proposed and in fact used

21   effectively for panels one and two a means of properly

22   evaluating the effectiveness of the bleeder system?

23   A    Yes.

24   Q    Have all the opinions you've rendered today

25   been made to within a reason degree of mining

Page 652

1  engineering certainty?

2      A    Yes.

3          MR. WOLFF:  One minute, Your Honor.

4          THE COURT:  Sure.

5          MR. WOLFF:  Your Honor, I'm going to

6  vouch for the record that had Mr. Lawless been

7  allowed to testify on questions of district

8  manager discretion, he would have submitted that

9  there has been an abuse of discretion in this case

10  in denying the plan and in requiring certain

11  additional provisions, the relevant provisions in

12  the ventilation plan.

13          THE COURT:  Okay.

14          MR. WOLFF:  With that, I turn over the

15  witness.

16          MR. PAIGE:  Secretary has no questions

17  of this witness, Your Honor.

18          THE COURT:  Mr. Wolff, do you have any

19  other witnesses?

20          MR. WOLFF:  I believe we are done with

21  our witnesses.

22          THE COURT:  All right, Mr. Paige or

23  Mr. Nessen -- Sorry.  Mr. Lawless, you may step

24  down.  Thank you.  Mr. Nessen does the Secretary

25  has any rebuttal or further evidence?

Mine Safety and Health Administration
Pittsburgh Safety & Health Technology Center
P.O. Box 18233
Pittsburgh, PA   15236



Ventilation Division

May 19, 2009

MEMORANDUM FOR ROBERT L. PHILLIPS
District Manager, Coal Mine Safety and Health, District 8

THROUGH:        *M. Terry Hoch*
                M. TERRY HOCH
                Chief, Pittsburgh Safety and Health Technology Center

FROM:           *Richard T. Stoltz*
                RICHARD T. STOLTZ
                Chief, Ventilation Division

SUBJECT:        Mine Ventilation Air Pressure and Air Quantity Investigation,
                and Tracer Gas Study at the Mach #1 Mine, Mach Mining,
                LLC, MSHA I.D. No. 11-03141

A request for assistance was received by Richard T. Stoltz, Chief, Ventilation Division,
Pittsburgh Safety and Health Technology Center (PS&HTC), on March 10, 2009, from
Maryjo Bishop, Assistant District Manager (Inspection), Coal Mine Safety and Health
(CMS&H) District 8, concerning a longwall bleeder system at the Mach #1 Mine, Mach
Mining, LLC, MSHA I.D. No. 11-03141.  In response, PS&HTC Ventilation Division
personnel conducted a mine ventilation air pressure and air quantity investigation, a tracer gas
study, and gathered additional pertinent information from March 31 through April 2, 2009, at
the Mach #1 Mine.  Persons who participated in the investigation and study are listed in an
attachment.

Dennis A. Beiter, Supervisory Mining Engineer, and George N. Aul, Geologist, of the
Ventilation Division conducted the close-out meeting with Anthony Webb, Mine Manager,
Mach #1 Mine, on April 2, 2009.  Issues discussed with the mine operator during the
investigation and/or at the close-out meeting are listed in an attachment.  Messrs. Stoltz and
Beiter conducted a conference call the week following the investigation to discuss the
preliminary findings with Maryjo Bishop and other District 8 personnel.  A digital copy of the
field notes and incomplete summary maps compiled during the investigation were provided to
Mach Mining, personnel following the investigation.  The findings of the investigation are
discussed below and on the attached figures.

## General Information

Mach #1 Mine was located near Johnston City, Williamson County, Illinois. Coal was mined in the Herrin No. 6 coalbed via one longwall section and two development sections. The mine workings are depicted on attached Figure 1, the Bleeder System Overview Map. The main entries in the mine were developed south and identified as South Mains. Longwall gateroad developments were mined east off South Mains, a distance of approximately 19,000 feet. Tailgate 1 (TG #1) was the tailgate for the first longwall panel, Panel 1. Headgate 1 (HG #1) was the headgate for longwall Panel 1. Headgate 2 (HG #2) was the headgate for longwall Panel 2. The longwall panels were 1,250 feet wide. Panel 1 was 17,100 feet long. Panel 2 was 17,300 feet long. Bleeder entries had been developed north from HG #1 to TG #1 and north from HG #2 to just north of HG #1.

The active longwall section was mining longwall Panel 2. Mining commenced in Panel 2 on March 11, 2009. Approximately 800 feet of Panel 2 had been mined when the investigation began. Panel 1 was completed. Longwall equipment was still being removed from HG #1 outby the recovery face for Panel 1. Continuous mining sections were developing gateroads in Headgate 3 (HG #3) and Headgate 4 (HG #4) for successive longwall panels in the same longwall district. At the time of the investigation, mining was temporarily prohibited in HG #3 due to a previous MSHA enforcement action.

## Mine Ventilation

The mine was ventilated with a combination blowing and exhausting mine ventilation system. Air was forced into the mine by a blowing fan at the surface of an intake shaft. The Jeffrey 8HUA-96 Aerodyne Fan produced 517,000 cubic feet per minute (cfm) with a static pressure near the fan outlet of approximately 4.80 inches water gauge (in. w.g.). The total pressure near the fan outlet was determined to be approximately 5.6 in. w.g. A digital display in the fan house indicated the fan motor was operating at a speed of 1,140 rpm. The blowing fan forced a portion of the air that ventilated a belt air course to the surface through the single compartment belt/travelway slope (101,000 cfm) and a portion of the return air from the development sections through a return shaft (95,000 cfm). The remaining air that ventilated a belt air course was directed into HG #1. The remaining return airflow was directed into TG #1.

A bleeder fan system was used to ventilate the worked-out area of Panel 1 and Panel 2, including the open gate entries of TG #1, HG #1, and inby the longwall face of HG #2. The bleeder fan was located on the surface and connected through ductwork to two bleeder shafts (North Bleeder Shaft and South Bleeder Shaft). The bleeder shafts were located at the inby end of TG #1. The operating point of the Model 13 BCD centrifugal bleeder fan was 321,000 cfm at 4.39 in. w.g. The centrifugal fan was operated with the damper fully opened and the performance curve adjusted through use of a variable speed drive. Fan records indicated the bleeder fan was started March 21, 2009. Prior to that, only the blowing fan was operating.

Attached Figures 2 and 3 depict fan performance curves and operating points for the blowing fan and bleeder fan, respectively. Figure 1 shows an overview of the ventilation of the bleeder system. Attached Figures 4 and 5 depict detailed ventilation information collected in the bleeder entries, Panel 2 face area, and HG #1.

**Methane Liberation**

Air samples were collected at many of the locations where air quantities were measured during the investigation. The results of the gas chromatography analyses of many of those air samples are shown on Figures 4 and 5. Analysis results indicated the approximate methane liberation of the mine was 2.2 million cubic feet per day, of which nearly 2 million cubic feet per day exited through the bleeder shafts.

**Bleeder System Evaluation**

The approved mine ventilation plan required weekly examinations at EP #1 (at the surface of the bleeder shafts), at EP #2 (near the front of TG #1 in No. 1 and No. 2 Entries of TG #1), at EP #3 (approximately 3 crosscuts inby the longwall face in No. 1 and No. 2 Entries of HG #2), at EP #4 (approximately 3 crosscuts outby the longwall face in No. 1 and No. 2 Entries of HG #1), at EP #5 (between Crosscut 18 and Crosscut 19 in No. 1 and No. 2 Entries of HG #1), and at HG #2 EP (located between Crosscut 159 and Crosscut 160 in No. 1 and No. 2 Entries of HG #2). The specific locations of the EPs were not marked underground.

Measurement points MP-A and MP-B, located near the longwall face in HG #2 and HG #1, respectively, were identified as on-shift examination locations in the mine ventilation plan. MP-A, MP-B, and EP #3 were to move in relation to the retreating longwall face and were not at fixed locations.

Additional monitoring points were located at fixed points along the headgate entries in HG #2: HG #2 MP-B, HG #2 MP-C, and HG #2 MP-D. Examinations were required to be conducted at these monitoring point locations at least weekly. As the longwall face progressed outby each respective location, the points would become active. At the time of the investigation, the longwall face had not retreated past any of these locations. These locations are not depicted on the attached figures.

Additional preshift examinations were identified in the March 5, 2009, mine ventilation plan approval letter for mining of Panel 2. These additional preshift examinations were in the TG #1 No. 1 and No. 2 Entries where they met the bleeder entries (TG #1 EP), at the bottom of the bleeder shafts (in each underground approach to both bleeder shafts), at the HG #1 bleeder evaluation point (initially located between Crosscut 188 and Crosscut 189 in No. 2 Entry of HG #1), at EP #5 and EP #4, and the tailgate entry in HG #1 from EP #5 to the longwall face.

There were two approaches to the North Bleeder Shaft (South and West) and four approaches to the South Bleeder Shaft (North, East, South, and West). It was reported that no preshift examination was being made in the West approach to the South Bleeder Shaft due to deteriorated roof. The record books indicated cumulative results of the examinations for each bleeder shaft. The approximate locations of the additional preshift examinations, the evaluation points, and the measurement points are depicted on Figures 1, 4, and 5.

Prior to the investigation, a roof fall in HG #1 No. 2 Entry at Crosscut 189 blocked access to the initial HG #1 EP location. The examination for HG #1 EP was being conducted in HG #1 No. 2 Entry between Crosscut 189 and Crosscut 190. Prior to the investigation, no record for a preshift examination had been made for HG #2 EP. Figure 4 depicts details of observations in the area surrounding HG #1 EP.

Substantial supplemental roof supports had been installed in the bleeder entries. However, ground conditions in the bleeder entries were deteriorated. Additional supplemental supports needed to be added in portions of travel routes in the bleeder entries to maintain access to the preshift examinations locations.

Temporary ventilation controls (check curtains and un-plastered dry-stacked concrete block stoppings), constructed inby the longwall face in HG #2 were used to control airflow distribution in the bleeder system. Inadvertent changes had occurred to at least one of the check curtains, causing it to come loose from the mine floor to which it was weighted down. Another check curtain was observed with a large opening, where it appeared pieces of curtain had become separated due to the relatively significant ventilating pressure different applied across it (0.7 in. w.g.). The personnel door in the un-plastered dry-stacked concrete block stopping in the No. 2 Entry of HG #2 was difficult for one person to open due to the large ventilating pressure differential applied across it (3.6 in. w.g.). No airlock was provided at the location. The numerous holes between the re-used blocks of the un-plastered dry stacked concrete block stoppings functioned as regulator openings. Permanent ventilation controls are less susceptible to inadvertent changes by mine personnel and damage.

**Control of Water in the Bleeder System**
Water in the bleeder system was controlled by natural drainage and water pumps. De-watering turbine pumps moved water directly to the surface. De-watering turbine pumps were installed at Crosscut 136 in the No. 1 Entry of TG #1, near Crosscut 169 in the No. 2 Entry of HG #1, and in a sump at the bottom of the North Bleeder Shaft. The turbine pumps were automatically operated daily, cycling off based on the amperage required to operate the pump motor. Mine management indicated they would continue to be operated in that manner. Floor and roof elevations indicated water could roof in a portion of the No. 1 and No. 2 Entries in the area of the TG #1 de-watering turbine pump if water was not adequately removed by the pump. No means to determine the depth of the water was provided.

A pipe was installed from the surface in the South Bleeder Shaft that provided compressed air for operation of air-powered water pumps. A hose connected to the pipe at the bottom of the shaft supplied the compressed air to an air-powered water pump located in HG #1 near the longwall face. Mine management reported the compressed air hose was buried under the roof falls in the No. 2 Entry of HG #1 outby HG #1 EP. Water accumulations were encountered in TG #1 (inby the Panel 1 recovery face) and HG #1 (in the No. 2 Entry) that impeded travel. Bridges had been constructed in the HG #1 tailgate travelway for extended distances to enable persons to travel the tailgate entry without wading through water.

**Mine Records**
Copies of mine examination records and fan pressure charts were obtained and reviewed.
Attached Figures 6, 7, and 8 depict charts show air quantities, methane concentrations, and
methane make, respectively, at HG #1 EP, TG #1 EP, and the bottom of the bleeder shafts
based on information from the record books. The linear trends of the methane make,
calculated from the mine records, and the methane concentration at HG #1 EP are depicted in
Figures 8 and 7, respectively.

Air quantities recorded in the mine examination record books varied significantly for several
locations. Also, the methane and carbon monoxide concentrations appeared to not have been
recorded properly on some dates. The methane concentration value was indicated as whole
percent when it was likely tenths of one percent (4 instead of 0.4) and the carbon monoxide
concentration was indicated in tenths of a part per million when it was likely in parts
per million (.6 instead of 6).

The operating pressure of each mine fan was recorded using the mine computer system. The
mine computer system generated hard copies of the fan operating pressure charts for both mine
fans. A computer printout of the blowing fan operating pressure charts indicated an operating
pressure of 4.1 in. w.g. just prior to when the measurements and observations were made at the
blowing mine fan. A digital display, mounted to the side of the blowing fan, indicated the fan
operating pressure varied between 2.33 and 3.01 in. w.g. Inconsistencies existed between the
measured operating pressures, the digital display, and the operating pressure charts for the
blowing fan.

Unusual changes in the operating pressure of the bleeder fan were indicated on the mine
computer system generated fan operating pressure charts. On four occasions, the operating
pressure decreased abruptly (more than 0.5 in. w.g.), stabilized for an extended period of time
(about 1.5 hours), then abruptly returned to the normal pressure. Mine management could not
explain the phenomenon. Bleeder fan operating pressure charts showed what appeared to be an
erroneous pressure from 12:00 a.m. on March 23, 2009, through approximately 9:00 p.m. on
March 24, 2009. The operating pressure indicated on the fan pressure printout of less than
1 in. w.g. The normal operating pressure of the bleeder fan indicated on the charts was more
than 5 in. w.g.

**Remote Sampling Boreholes**
Boreholes, for the purpose of providing a means to remotely sample the mine atmosphere near
TG #1 EP and HG #1 EP, had been drilled. The TG #1 EP Borehole had intersected the mine
in No. 2 Entry of TG #1 between Crosscut 189 and Crosscut 190. A metal plate was installed
over the borehole casing on the surface on March 31, 2009, to prevent airflow from entering
the bleeder system through the borehole. No means to remotely sample the mine atmosphere
was in place at TG #1 EP Borehole. HG #1 EP Borehole was stopped before it intersected the
mine. It had been proposed to intersect the mine in No. 2 Entry of HG #1 between Crosscut
186 and Crosscut 187. However, underground access to this location was lost before
completion of the borehole. The approximate location of each of these boreholes is depicted
on Figure 1.

**Tracer Gas Study**

A tracer gas study was conducted using sulfur hexafluoride ($SF_6$). $SF_6$ is an inert, non-toxic gas that can be detected in very small concentrations (parts per billion) and does not exist naturally in the underground environment. The tracer gas study was conducted to determine if gases that might flow out of the caved area of Panel 1 and into the airflow in the No. 2 Entry of HG #1 might enter No. 3 entry of HG #1 and be carried toward the longwall face. The tracer gas study was conducted on April 2, 2009. $SF_6$ was released in the No. 2 entry of HG #1 between Crosscut 18 and Crosscut 19 using a 1 liter per minute regulator beginning at 9:06 a.m. At 9:32 a.m., a free flow regulator was attached to the bottle of tracer gas. The release of tracer gas ended at 9:39 a.m. Air samples were collected at 15 minute intervals in 10 cubic centimeter air sample bottles at three collection sites: TG #1 No. 2 Entry EP located between Crosscut 186 and Crosscut 187 in No. 2 Entry of TG #1 beginning at 9:15 a.m.; HG #1 No. 2 Entry between Crosscut 178 and Crosscut 179 beginning at 8:30 a.m.; and HG #1 No. 3 Entry between Crosscut 178 and Crosscut 179 beginning at 8:30 a.m. Forty air samples were collected at each sample collection location. The tailgate side of the longwall face was located between Crosscut 179 and Crosscut 180 in HG #1 during the tracer gas study. Air flowed from Crosscut 179 to Crosscut 180 in both the No. 2 Entry and the No. 3 Entry of HG #1 and air flowed from the longwall face to Crosscut 179 in No. 3 Entry of HG #1. The tracer gas release location and the air sample collection locations are shown on Figures 1, 4, and 5. The approximate location of the longwall face during the tracer gas study is shown on Figures 4 and 5.

Tracer gas was detected in samples collected at HG #1 No. 3 Entry between Crosscut 178 and Crosscut 179 beginning at 10:45 a.m. Tracer gas was detected in samples collected at HG #1 No. 2 Entry between Crosscut 178 and Crosscut 179 beginning at 11:00 a.m. Tracer gas was detected in samples collected at TG #1 No. 2 Entry between Crosscut 186 and Crosscut 187 beginning at 1:00 p.m. The results of the tracer gas study are depicted on the chart in attached Figure 9. The results of the tracer gas study revealed that gases exiting the adjacent worked-out area of Panel 1 into the No. 2 Entry of HG #1, near the SF6 release location, would flow into the No. 3 Entry of HG #1, the tailgate travelway, and be carried inby toward the longwall face.

**Conclusions**

Measurements of methane and oxygen concentrations and air quantities and a test to determine if the air was moving in the proper direction at or near the following locations were analyzed:
1. Where air entered the worked-out area (including all accessible crosscuts between the No. 2 Entry of HG #1 and the caved area of Panel 1),
2. Immediately before the air exited the bleeder system to the surface through the bleeder fan, while traveling at least one entry of the set of bleeder entries from HG #2 to TG #1,
3. At the locations in the bleeder entries specified in the mine ventilation plan (including the required preshift examinations locations),
4. At the additional required preshift, evaluation point, and measurement point locations.

Sufficient information to evaluate the effectiveness of the bleeder system was obtained. The bleeder system caused air to move, in a general pattern, from HG #2 toward HG #1 and the bleeder entries, in the area outby the longwall face from HG #1 toward TG #1, and from the

South Mains toward the bleeder entries. Air was found moving away from the tailgate side of the longwall face inby toward the bleeder entries and in the tailgate entry from the longwall face to the next outby open crosscut. Methane-air mixtures and other gases were moved from the worked-out area away from active workings and to the surface of the mine. The distribution of the airflow in the bleeder system was adequate to dilute and render harmless methane-air mixtures in the worked-out area. No hazardous concentrations of gases were found in the areas traveled. It was determined the bleeder system was effective.

The results of the tracer gas study revealed that gases exiting the adjacent worked-out area of Panel 1 into the No. 2 Entry of HG #1, near the SF6 release location, would flow into the tailgate travelway and be carried inby toward the longwall face.

Temporary ventilation controls (check curtains and un-plastered dry-stacked concrete block stoppings), constructed inby the longwall face in HG #2 were used to control airflow distribution in the bleeder system. Permanent ventilation controls are much less susceptible to inadvertent changes by mine personnel and damage.

Ground conditions in the bleeder entries were deteriorated. Installation of additional supplemental supports needed to be added in some of the travel routes in the bleeder entries to maintain access to some of the preshift examinations locations and was recommended to the mine operator.

Attachments

cc:     M. Bishop, CMS&H District 8
        M. Eslinger, CMS&H District 8
        M. Rennie, CMS&H District 8

**Persons Participating in the March 31 – April 2, 2009, Mine Ventilation
Investigation and Tracer Gas Study at Mach #1 Mine**

MSHA PS&HTC Ventilation Division
Richard T. Stoltz
Dennis A. Beiter
Charles D. Campbell
Mark E. Schroeder
George N. Aul
Thomas A. Morley
Kim S. Diederich
Matthew J. Wharry

MSHA District 8
Mark O. Eslinger
Bobby F. Jones
Edward W. Law
Danny R. Ramsey
Stanley E. Reeder

Mach Mining. LLC
Gary Clendenin
Chris England
Barrett Fox
Sam Gulley
Morris Niday
Slim Patton
Anthony Webb
Guy Webster

Bcc:   R. Stoltz
       D. Beiter
       C. Campbell
       M. Schroeder
       T. Morley
       G. Aul
       D. Sulkowski
       M. Wharry
       Ventilation Files
MSHA: TS: DBeiter:gd:Tri:304-547-2320
T:\Vent\FY09 Correspondence\memos\working draft

**Issues Discussed With the Mine Operator During the Investigation and/or at the April 2, 2009, Mach #1 Mine Ventilation Investigation and Tracer Gas Study Close-out Meeting**

A de-watering turbine pump was expected to be installed at Crosscut 47 in HG #1. A compressed air pipe was expected to be installed at that location that will provide compressed air to underground water pumps to be positioned in HG #1 during the mining of Panel 2. The air pumps were expected to dewater local accumulations in HG #1 outby the longwall face and move the water to the turbine pump at Crosscut 47. The compressed air hose was buried under the roof falls in the No. 2 Entry of HG #1 outby HG #1 EP.

The HG #1 remote monitoring borehole that was intended to intersect the mine in No. 2 Entry of HG #1 between Crosscut 187 and Crosscut 188 was not completed because roof falls occurred which blocked access to the location underground. The location for a new HG #1 remote monitoring borehole was identified as No. 2 Entry of HG #1 between Crosscut 189 and Crosscut 190, the present underground location of HG #1 EP. Drilling of the new HG #1 remote monitoring borehole was expected to begin soon and completed within one week.

HG #2 EP was located in No. 2 and No. 3 Entries of HG #2 between Crosscut 159 and Crosscut 160.

Ground conditions in the bleeder entries were deteriorated. Specific locations where maintenance of deteriorated ground conditions in the bleeder entries was suggested were identified for Anthony Webb during the underground investigation on March 31, 2009. These areas were mentioned and the need for consideration of maintenance reiterated.

Air in HG #1 was flowing away from No. 2 entry and into the caved area of Panel 1 at most crosscuts between the Panel 2 longwall face and the Panel 1 recovery face. The airflow was usually perceptible only when using chemical smoke to make tests for airflow direction in the crosscuts between No. 2 and No. 1 Entries at the edges of the caved material of Panel 1. Airflow direction was difficult to discern in most crosscuts between HG #1 No. 3 and No. 2 Entries between the Panel 2 longwall face and the Panel 1 recovery face.

Proper evaluation of the effectiveness of the bleeder system depended in part on the information collected at the examination locations in the bleeder entries.

Ventilation pressure differential was from the return air course to the belt air course at the front of HG #4, at the front of HG #3, and in the South Mains from HG #4 to HG #3. Any leakage between these air courses in those areas would result in return air entering the belt air course.

Temporary ventilation controls (check curtains and un-plastered dry-stacked concrete block stoppings), constructed inby the longwall face in HG #2 were used to control airflow distribution in the bleeder system. Inadvertent changes had occurred to at least one of the check curtains, causing it to come loose from the mine floor to which it was weighted down. Another check curtain was observed with a large opening, where it appeared pieces of curtain

had become separated due to the relatively significant ventilating pressure different applied across it. The personnel door in the un-plastered dry-stacked concrete block stopping in the No. 2 Entry of HG #2 was difficult for one person to open due to the large ventilating pressure differential applied across it (3.6 in. w.g.). No airlock was provided at the location. Permanent ventilation controls are less susceptible to inadvertent changes by mine personnel and damage by changing natural conditions





Figure 2
Mach # 1 Mine
Jeffrey 8HUA - 96 (Blowing Configuration)

Mine Resistance Curve

Approximate Fan Operating Point:
517,000 cfm @ 4.8" w.g. FRSP

6B-6S

5B-5S

3B-3S

Density: 0.074 lbs/cu. ft.
Speed: 1140 rpm

Fan Rated Static Pressure
(inches of water)

Air Quantity (thousand cfm)



Figure 3
Mach #1 Mine
Bleeder Fan - 13 BCD (Exhausting Configuration)

Mine Resistance Curve

Damper Fully Open

Density: 0.072 lbs/cu. ft.
Speed: 829 rpm

Approximate Fan Operating Point:
321,000 cfm @ 4.64" w.g. FRSP

Fan Rated Static Pressure
(inches of water)

Air Quantity (thousand cfm)



TG #1

TG #1 EP Borehole

TG #1 EP

EP #1
(on the surface of
bleeder shafts)

North Bleeder Shaft

South Bleeder Shaft

SF₆ Capture
Locations

HG #1

Turbine Dewatering
Pump

EP #4

approximate location of longwall face on
tailgate side (tracer gas test date)
April 2, 2009

approximate location of
longwall face on tailgate side
April 1, 2009

approximate location
of longwall face
March 31, 2009

MP-B

HG #1 EP

MP-A

HG #2

HG #3 EP

HG #2 EP

LEGEND

Figure 4
Mach Mining, LLC
Mach #1 Mine
MSHA I.D. No. 11-03141

Ventilation
Investigation
March 31 - April 2,
2009

Bleeder and Longwall
Face Area Detail Map

SCALE feet

N



Figure 5
Mach Mining, LLC
Mach #1 Mine
MSHA I.D. No. 11-03141
Ventilation
Investigation
March 31–April 2,
2009
HG #1 Detail Map



Figure 6
Mach #1 Mine
Mine Record Air Quantities



Figure 7
Mach #1 Mine
Mine Record Methane Concentrations



Figure 8
Mach #1 Mine
Mine Record Methane Make Calculations

Approximately 694 cfm of methane is equivalent to 1,000,000 cubic feet of methane per day.

JA-109



Figure 9
Mach #1 Mine
Tracer Gas (SF$_6$) Study Results - April 2, 2009

Tracer gas (SF$_6$) was released in No. 2 Entry of HG #1 between Crosscut 18 and Crosscut 19 from 9:06 a.m to 9:39 a.m.

The tailgate side of the longwall face was located between Crosscut 179 and Crosscut 180 during the tracer gas study.

Air flowed from Crosscut 178 to Crosscut 179 in both the No. 2 Entry and the No. 3 Entry of HG #1 during the tracer gas study.

Begin SF$_6$ Release - EP #5 - #2 Entry

Complete SF$_6$ Release - EP #5 - #2 Entry

SF$_6$ Concentration (ppb)

Date

— ■ — HG #1 – #3 Entry 178-179 xc   — ● — HG #1 – #2 Entry 178-179 xc   — ◆ — TG #1 EP – #2 Entry 186-187 xc

**U.S. Department of Labor**
Mine Safety and Health Administration
Pittsburgh Safety & Health Technology Center
P.O. Box 18233
Pittsburgh, PA  15236



Ventilation Division

September 14, 2009

MEMORANDUM FOR ROBERT L. PHILLIPS
District Manager, Coal Mine Safety and Health, District 8

THROUGH:       *John W. Fredland*
               JOHN W. FREDLAND
               Acting Chief, Pittsburgh Safety and Health Technology
               Center

FROM:          *Richard T Stoltz*
               RICHARD T. STOLTZ
               Chief, Ventilation Division

SUBJECT:       Mine Ventilation Air Pressure and Air Quantity
               Investigation Conducted at the Mach #1 Mine, Mach Mining, LLC,
               MSHA I.D. No. 11-03141

Your request for assistance concerning the longwall bleeder system at the Mach #1 Mine, Mach Mining, LLC, MSHA I.D. No. 11-03141, was received by Richard T. Stoltz, Chief, Ventilation Division, Pittsburgh Safety and Health Technology Center (PS&HTC), on May 26, 2009.  A previous mine ventilation investigation of the longwall bleeder system was conducted March 31-April 2, 2009, when longwall Panel 2 had not yet been retreated 1,000 feet.  The purpose of the request was to determine how mining an additional nearly 5,000 feet in a period of 10 weeks affected the bleeder system.  In response, PS&HTC Ventilation Division personnel conducted a mine ventilation air pressure and air quantity investigation at the Mach #1 Mine and gathered additional pertinent information from June 9-11, 2009.  Persons who participated in the investigation are listed in an attachment.

Dennis A. Beiter, Supervisory Mining Engineer discussed preliminary findings with Anthony Webb, Mine Manager, Mach #1 Mine, during the investigation.  No formal close-out meeting was held.  Incomplete summary maps depicting collected field data were compiled and made available to Mach Mining, LLC, personnel during the investigation.  A partial summary of the investigation findings was presented during a meeting at the Coal Mine Safety and Health (CMS&H) District 8 office in Vincennes, Indiana, on June 19, 2009, in which future development in the bleeder system was discussed with representatives of the mine operator.  A list of participants of the meeting is attached.  The preliminary findings of the investigation were also reviewed with you and other District 8 personnel prior to the June 19, 2009, meeting.  The findings of the investigation are discussed below and depicted on the attached figures.

**General Information**

Mach #1 Mine was located near Johnston City, Williamson County, Illinois. Coal was mined in the Herrin No. 6 coalbed via one longwall section and two development sections. The mine workings are depicted on attached Figure 1, the Bleeder System Overview Map. The main entries in the mine were developed southward and were identified as the South Mains. The first three longwall gateroad developments were mined east off South Mains, a distance of approximately 19,000 feet. Tailgate 1 (TG #1) was the tailgate for the first longwall panel, Panel 1. Headgate 1 (HG #1) was the headgate for longwall Panel 1. Headgate 2 (HG #2) was the headgate for longwall Panel 2. The longwall panels were 1,250 feet wide. Panel 1 was approximately 17,100 feet long. Panel 1 was completed. Panel 2 was projected to be approximately 17,300 feet long. Bleeder entries had been developed north from HG #1 to TG #1 and north from HG #2 to just north of HG #1.

The active longwall section was mining longwall Panel 2. Mining commenced in Panel 2 on March 11, 2009. Approximately 5,400 feet of Panel 2 had been mined when the investigation began. Continuous mining sections were developing gateroads in Headgate 4 (HG #4) and Headgate 5 (HG #5) for successive longwall panels in the same longwall district. HG #3 was developed approximately 1,000 feet inby HG #2. At the time of the investigation, development in HG#3 was prohibited due to previous MSHA enforcement action.

**Mine Ventilation**

The mine was ventilated with a combination blowing and exhausting mine ventilation system. Air was forced into the mine by a Jeffrey 8HUA-96 Aerodyne Fan installed in a blowing configuration at the surface of an intake shaft that was located near the slope bottom. The blowing fan forced a portion of the air that ventilated a belt air course to the surface through the single compartment belt/travelway slope. The remaining air that ventilated a belt air course was directed into HG #1. The blowing fan forced a portion of the return air from the development sections to the surface through a return shaft. The remaining return airflow was directed into TG #1. A bleeder fan system was used to ventilate the longwall section, the worked-out area of Panel 1 and Panel 2, and the open gate entries of TG #1, HG #1, and those inby the longwall face of HG #2. A Model 13 BCD centrifugal bleeder fan was installed in an exhausting configuration on the surface and connected through ductwork to two bleeder shafts (North Bleeder Shaft and South Bleeder Shaft), which were located in the bleeder entries at the inby end of TG #1.

The ventilation of the bleeder system was investigated on June 9, 2009. Outby the longwall face, the bleeder system caused air to move, in a general pattern, from the South Mains toward the bleeder entries and from HG #1 toward TG #1. Inby the tailgate side of the longwall face, air moved toward the bleeder entries and, in a general pattern, both from HG #1 toward TG #1 and from HG #1 toward HG #2. The 13,000 cfm of airflow exiting into the bleeder entries at the former HG #1 EP contained 0.13 percent methane and 20.90 percent oxygen. No hazardous methane-air mixtures were found in the areas traveled.

The conditions in the worked-out area immediately inby the longwall face were such that the unsupported mine roof behind the shields was not caving as usual. The lack of caving resulted in more open area within the worked-out area near the face, particularly near the tailgate side of the face. This more open area permitted more airflow to enter the worked-out area than usual, resulting in decreased airflow ventilating the full length of the longwall face. The decreased airflow was notable in the lower air velocity measured on the tailgate side of the longwall face.

Line curtain was hung against the back of the shields across much of the face, reportedly to prevent too much air from leaving the longwall face so as to maintain the required minimum air velocity on the tailgate side of the face. This is not an uncommon practice when the roof does not cave normally. However, it should be noted that the reason air is leaving the face is that significant open areas exist in the worked-out area that provide for relatively easy communication with the adjacent longwall face area. The line curtain prevents air from ventilating these open areas as fully as would occur if the curtain was not in place. These open areas are also locations where, if not adequately ventilated, methane and other gases may accumulate. In general, greater airflow is necessary through worked-out areas that contain large open areas than through those with lesser open areas to ensure gases do not accumulate in the worked-out area but are diluted and moved away from the active workings. An alternate method of ensuring minimum air velocities are maintained on the longwall face and the worked-out area nearest the face is well ventilated when these caving conditions occur would be to increase the volume of air delivered to the longwall face.

A series of temporary ventilation controls (check curtains) constructed inby the last open crosscut in HG #2 were used to control airflow distribution in the bleeder system. Four curtains were installed across the No. 3 Entry of HG #2; three across the No. 2 Entry of HG #2; and three between the caved material and the No. 2 Entry of HG #2. Most of the check curtains were weighted down to the mine floor with concrete blocks, rocks, and wood wedges. The largest ventilating pressure differential across a single curtain in the series was 1.92 inches of water gauge (in. w.g.). The cumulative ventilating pressure differential across the curtains installed across the No. 3 Entry of HG #2 was approximately 3.28 in. w.g. Some of the curtains were in areas not required to be examined during preshift or on-shift examinations. The curtains were difficult to pass through without compromising their integrity. The mine examiner was required to pass through the series of curtains to travel to EP #3 and HG #2 EP. Permanent ventilation controls are less susceptible to damage and inadvertent changes by mine personnel.

A change to the ventilation in the bleeder system was completed on June 10, 2009. Un-plastered dry-stacked concrete block stoppings were constructed across the Nos. 2 and 3 Entries of HG #2 between Crosscut 155 and Crosscut 156. The approximate locations of these controls are shown on Figure 2.

On June 11, 2009, portions of the bleeder system were again investigated, including HG #1 from the longwall face to South Mains, HG #2 from the longwall face to the bleeder entries, and the bleeder entries from HG #2 to the former HG #1 EP. Results of this additional investigation revealed the mine ventilation change in HG #2 increased the ventilating pressure across the worked-out area of Panel 2 by more than 1-inch of water gauge, redistributed airflow in the bleeder system, and changed the direction of airflow ventilating the inby part of Panel 2. The change in direction is depicted in Figure 2. The airflow measured at HG #2 EP decreased from approximately 152,000 cfm to approximately 103,000 cfm, a change of approximately 49,000 cfm. Although the airflow at HG #2 EP decreased after the ventilation change, the methane concentrations measured at both of the HG #2 EP examination locations also decreased. Figure 2 shows an overview of the ventilation of the bleeder system in the areas traveled on June 11, 2009.

The personnel door in the un-plastered dry-stacked concrete block stopping in the No. 3 Entry of HG #2 was difficult for one person to open due to the large ventilating pressure differential applied across it (3.75 in. w.g.). No airlock was provided at the location. The numerous holes between the re-used blocks of the un-plastered dry stacked concrete block stoppings functioned as regulator openings. Permanent ventilation controls are less susceptible to inadvertent changes by mine personnel and damage.

The air quantities at the mine fans were measured on June 11, 2009, after the ventilation change had been completed on June 10, 2009. The blowing Jeffrey 8HUA-96 Aerodyne Fan produced 526,000 cubic feet per minute (cfm) at a fan rated static pressure of approximately 7.16 inches water gauge (in. w.g.). The static pressure near the fan outlet was approximately 4.70 in. w.g. Debris covered portions of the fan inlet screen. Approximately 2.46 in. w.g. of ventilating pressure was consumed across the inlet screen. The variable speed fan drive was reportedly operating at a speed of 1,140 rpm. A digital display, mounted to the side of the blowing fan, indicated the fan operating pressure varied between 2.07 and 2.62 in. w.g.

The operating point of the exhausting Model 13 BCD centrifugal bleeder fan was 341,000 cfm at a fan rated static pressure of 5.94 in. w.g. The centrifugal fan was operated with the damper fully opened and the performance adjusted through use of a variable speed drive. Instrument displays in the fan house indicated the speed of the fan was 839 rpm.

Attached Figures 3 and 4 depict fan performance curves and operating points for the blowing fan and bleeder fan, respectively. Figure 1 shows an overview of the ventilation of the bleeder system as found on June 9, 2009. Attached Figures 5 and 6 depict details of information collected in the bleeder entries, Panel 2 face area, and HG #1, on June 9, 2009.

**Methane Liberation**
Air samples were collected at many of the locations where air quantities were measured during the investigation. The results of the gas chromatography analyses of many of those air samples are shown on Figures 5 and 6. Analysis results indicated the approximate methane liberation of the mine exhausted through the bleeder shafts was 2.0 million cubic feet per day on June 9, 2009. Collected air samples and air quantity measurements at the bleeder fan on June 11, 2009, indicated the approximate methane liberation of the mine exhausted through the bleeder fan was 1.5 million cubic feet per day. No analysis of coal production information was conducted to determine if the difference in methane liberation was due to longwall mining coal production activities.

**Bleeder System Evaluation**
The approved mine ventilation plan required weekly examinations at EP #1 (at the surface of the bleeder shafts), at EP #2 (near the front of TG #1 in No. 1 and No. 2 Entries of TG #1), at EP #3 (approximately 3 crosscuts inby the longwall face in No. 1 and No. 2 Entries of HG #2), at EP #4 (approximately 3 crosscuts outby the longwall face in No. 1 and No. 2 Entries of HG #1), at EP #5 (between Crosscut 18 and Crosscut 19 in No. 1 and No. 2 Entries of HG #1), and at HG #2 EP (located between Crosscut 159 and Crosscut 160 in No. 1 and No. 2 Entries of HG #2).

Measurement points MP-A and MP-B, located near the longwall face in HG #2 and HG #1, respectively, were identified as on-shift examination locations in the mine ventilation plan. MP-A, MP-B, EP #3, and EP #4 moved in relation to the retreating longwall face and were not at

fixed locations. The approximate locations of the evaluation points (EPs) and measurement points (MPs) are depicted on Figures 1, 2, 5, 6, and 7. The specific locations of the EPs and MPs were not marked underground.

Additional monitoring points were to be placed at fixed locations along the headgate entries in HG #2: HG #2 MP-B, HG #2 MP-C, and HG #2 MP-D. Examinations were required to be conducted at these monitoring point locations at least weekly. As the longwall face progressed outby each respective location, the points were to become active. At the time of the investigation, the longwall face had not retreated past any of these locations. These locations are not depicted on the attached figures.

The additional preshift examinations identified in the March 5, 2009, mine ventilation plan approval letter for mining of Panel 2, were no longer required and had been discontinued after April 13, 2009. These additional preshift examinations had been in the TG #1 No. 1 and No. 2 Entries where they met the bleeder entries (formerly TG #1 EP), at the bottom of the bleeder shafts (in each underground approach to both bleeder shafts), at the HG #1 bleeder evaluation point (formerly HG #1 EP), at EP #5 and EP #4, and the tailgate entry in HG #1 from EP #5 to the longwall face. HG #1 EP was initially located between Crosscut 188 and Crosscut 189 in No. 2 Entry of HG #1 before a roof fall in HG #1 No. 2 Entry at Crosscut 189 blocked access to the HG #1 EP location. The examination for HG #1 EP was then conducted in HG #1 No. 2 Entry between Crosscut 189 and Crosscut 190 until the additional preshift examinations were discontinued.

Although no longer required to be examined, the bleeder entries were traveled during the investigation from HG #2 to the bottom of the bleeder shafts, to the former TG #1 EP location, and to the former HG #1 EP location. Observations were made in all accessible areas of the bleeder entries. Details of observations are depicted in Figure 5. Substantial supplemental roof supports had been installed in the bleeder entries. However, the roof support system was inadequate to control the ground conditions in the bleeder entries. Further deterioration had occurred since the investigation conducted on March 31 – April 2, 2009. The roof fall in the No. 2 Entry of HG #1 at Crosscut 189 also appeared to have become more restrictive to airflow. The sound of the air passing over the inby edge of the roof fall could be heard similar to that which can be heard at a regulator that restricts airflow with considerable pressure differential. Additional roof deterioration occurred in the bleeder entries during this investigation. Travel in the bleeder entries was not expected to be possible for much longer.

A borehole that had been drilled in TG #1 for the purpose of providing a means to remotely sample the mine atmosphere when that area was being examined was not in use as such. The TG #1 EP Borehole had intersected the mine in No. 2 Entry of TG #1 between Crosscut 189 and Crosscut 190. A metal plate was installed over the borehole casing on the surface to prevent airflow from entering the bleeder system through the borehole. No means to remotely sample the mine atmosphere was in place at the TG #1 EP Borehole. The approximate location of the TG #1 EP Borehole is depicted on Figure 1.

6

6

Noted observations included the following:
- The direction of change in the operating pressure of the blowing fan during what appeared as stoppages of the bleeder fan were the reverse of that expected.
- There appeared to be missing fan operation information for the two fans on June 9 and 10, 2009.
- The extent of the displayed operating pressures of the blowing fan displayed on different sets of hard copies for the same time period was not consistent.
- On several occasions, unusual changes in the operating pressure of the bleeder fan were also noted.

Copies of mine examination records were also obtained and reviewed. There were two separate examination locations each for EP #2, EP #3, EP #4, EP #5, HG #2 EP, and MP-B, and three separate locations for MP-A. The results of examinations at measuring points and evaluation points that were comprised of multiple examination locations sometimes were recorded as measured for each separate location and other times recorded as a single cumulative measurement. Mine records indicated significant changes in ventilation from one examination period to the next on multiple occasions and at multiple locations.

Noted observations included the following:

- The air quantities recorded in the preshift mine examination record book for EP #4 and EP #5 on April 2 and April 4, 2009, were significantly different from all other preshift entries for those locations. The difference in the air quantities measured at the two evaluation points indicated the direction of airflow ventilating Panel 1 between the Panel 1 recovery face and the face of the active longwall section. A lower air quantity at EP #4 compared with that of EP #5 would indicate a net flow of air through Panel 1 from HG #1 to TG #1 between those two evaluation points. Airflow through Panel 1 from HG #1 to TG #1 would carry gases from the worked-out area of Panel 1 away from the tailgate travelway for the active longwall section. On the two dates indentified, the air quantity at EP #4 was greater than EP #5, indicating a reversal in the direction of net flow of air ventilating Panel 1 between those two evaluation points. Airflow through Panel 1 from TG #1 to HG #1 would carry gases from the worked-out area toward the tailgate travelway for the active longwall section. This change would be significant. Mach Mining, LLC personnel indicated in meetings with MSHA that the flow of air through Panel 1 between EP #5 and EP #4 would be from HG #1 to TG #1 for the bleeder system to be determined to be working effectively. However, no notations were observed in the preshift mine examination record book under "Action Taken" in either case.
- The air quantity recorded in the weekly examination record book for EP #1 indicated greater than a 20 percent decrease in airflow occurred at the bleeder fan from April 8, 2009, (467,458 cfm) to April 15, 2009, (362,100 cfm). A change in airflow of this magnitude would typically be considered a significant change in a bleeder system.
- The air quantity recorded in the weekly examination record book for EP #3 varied greatly (i.e. April 9, 2009 (112,942 cfm), May 12, 2009 (61,157 cfm), June 5, 2009 (100,860 cfm). Changes in airflow of this magnitude would typically be considered significant changes in the bleeder system.
- The air quantity recorded in the weekly examination record book for HG #2 EP varied by greater than 20 percent between consecutive weeks (i.e. May 12, 2009 (105,610 cfm), May 19, 2009 (137,456 cfm), May 29, 2009 (106,236 cfm), June 5, 2009 (134,289 cfm).

Changes in airflow of this magnitude would typically be considered significant changes in the bleeder system.
- The record of the examination reported in the weekly examination record book for HG #2 EP on June 4, 2009, indicated the methane concentration was 0.2 percent in 134,289 cfm of airflow. The methane concentration measured at HG #2 EP on June 9, 2009, during the investigation, was 0.9 percent in the No. 2 Entry of HG #2 and 0.2 percent in the No. 3 Entry of HG #2. The air quantity measured at HG #2 EP on June 9, 2009, during the investigation, was 57,078 cfm in the No. 2 Entry of HG #2 and 94,847 cfm in the No. 3 Entry of HG #2 (a total 151,925 cfm).

**Conclusions**

The results of measurements of methane and oxygen concentrations and air quantities and tests to determine if the air was moving in the proper direction at or near the following locations, made on June 9, 2009, were reviewed:
1. At the evaluation point and measurement point locations specified in the mine ventilation plan (measurements in the approaches to the bleeder shafts were substituted for those at EP #1);
2. Where air entered the worked-out area (including all accessible crosscuts between the No. 2 Entry of HG #1 and the caved area of Panel 1);
3. Immediately before the air exited the bleeder system to the surface through the bleeder shafts;
4. While traveling at least one entry of the set of bleeder entries from HG #2 to TG #1;
5. And at the additional preshift examination locations identified in the March 5, 2009, mine ventilation plan approval letter for mining of Panel 2 that were no longer required.

It was determined that sufficient information to evaluate the effectiveness of the bleeder system was obtained by MSHA personnel investigating the bleeder system on June 9, 2009. Based on the information collected, it was determined the bleeder system was working effectively on that date.

However, the weekly means of evaluation of the bleeder system did not require travel to, and examinations at, all the locations where information was gathered during the June 9, 2009, mine ventilation investigation. The adequacy of the airflow distribution in the bleeder system and the dilution of methane elsewhere in the bleeder system in addition to the 30 CFR Part 75.323(e) location(s), could not be determined from information collected at the required weekly examination locations for the bleeder system. It could not be determined that the bleeder system was working effectively by collection of information at only the required examination locations. The required weekly examinations did not provide sufficient information for a proper evaluation of the effectiveness of the bleeder system.

Temporary ventilation controls (check curtains and un-plastered dry-stacked concrete block stoppings), constructed inby the longwall face in HG #2 were used to control airflow distribution in the bleeder system. Permanent ventilation controls are much less susceptible to inadvertent changes by mine personnel and damage.

Ground conditions in the bleeder entries had further deteriorated since the mine ventilation investigation of the bleeder system conducted March 31 – April 2, 2009.

Recording the results of the examinations for each separate location for MPs and EPs with multiple locations is a more accurate representation of the findings and enables a more thorough interpretation of the results of the examinations.

Attachments

cc:     MS&H District 8
        M. Bishop
        M. Rennie
        K. Roberts

**Persons participating in the June 9 – 11, 2009, Mine Ventilation Investigation at Mach #1 Mine**

MSHA PS&HTC Ventilation Division
Richard T. Stoltz
Dennis A. Beiter
Charles D. Campbell
George N. Aul
Mark A. Pompei
Kim S. Diederich
Donald A. Sulkowski
Matthew J. Wharry
Timothy A. Nolan
Jason Reichart


MSHA District 8
Danny R. Ramsey


Mach Mining, LLC
Morris Niday
Danny Samples
Mike Skelton
Anthony Webb

**Persons participating in the June 19, 2009, meeting at the CMS&H District 8 Office**

MSHA PS&HTC Ventilation Division
Richard T. Stoltz
Dennis A. Beiter
Thomas A. Morley


MSHA District 8
Maryjo Bishop
Ronald E. Hixson
Robert L. Phillips
Mark A. Odum
Keith W. Roberts
David L. Whitcomb


Mach Mining, LLC
Coetta Bratton
Casey Mowery
Anthony Webb


Cline Resources
Mike Beyer
Drexel Short



JA-122



JA-123



Figure 3
Mach #1 Mine - June 11, 2009
Jeffrey 8HUA - 96 (Blowing Configuration)

Mine Resistance Curve

Approximate Fan Operating Point:
526,000cfm @ 7.16 " w.g. FRSP

3B-3S

5B-5S

6B-6S

Density: 0.070 lbs/cu. ft.
Speed:    1140  rpm

Fan Rated Static Pressure (in. w.g.)

Air Quantity (thousand cfm)



Figure 4
Mach #1 Mine - June 11, 2009
Bleeder Fan - 13 BCD (Exhausting Configuration)

Mine Resistance Curve

Density:   0.071 lbs/cu. ft.
Speed:     839 rpm

Approximate Fan Operating Point:
341,000 cfm @  5.94" w.g. FRSP

Damper Fully Open

Air Quantity (thousand cfm)

Fan Rated Static Pressure (in. w.g.)



TG #1

Unused TG #1 EP Borehole

Former TG #1 EP

EP #1
(on the surface of
bleeder shafts)

North Bleeder Shaft
South Bleeder Shaft

Former HG #1 EP

HG #1

HG #2

HG #2 EP

LEGEND

Figure 5
Mach Mining, LLC
Mach #1 Mine
MSHA I.D. No. 11-03141

Mine Ventilation
Investigation
June 9, 2009

Bleeder and HG #2
Detail Map

N

SCALE (feet)

JA-126



Figure 6
Mach Mining, LLC
Mach #1 Mine
MSHA ID. No. 11-03141

Mine Ventilation
Investigation
June 9, 2009

Longwall Face Area and
HG #2 Detail Map



Figure 7
Mach Mining, LLC
Mach #1 Mine
MSHA I.D. No. 11-03141
Mine Ventilation Investigation
June 9, 2009
HG #1 Detail Map



September 29, 2009

Mr. Anthony Webb
Mine Manager
Mach Mining, LLC
P.O. Box 300
Johnston City, IL 62951

**Re: Mach Mine #1, Identification Number 11-03141, Site-Specific Ventilation Plan Supplement – Headgate #3, dated September 3, 2009**

Dear Mr. Webb:

During the past three months MSHA has tried diligently to work with Mach Mining, LLC (Mach) to achieve a longwall mining plan that provides the safest possible mining methods for the miners, and provides for a proper evaluation of the effectiveness of the bleeder system. Mach Mining has provided the needed ventilation components (main mine fan and bleeder shafts) to provide the necessary air volumes and ventilating pressures to properly ventilate the worked-out areas of the bleeder system. However, Mach has not established a method for the proper evaluation of the effectiveness of the bleeder system. Further, Mach has not maintained one of the most key components of the bleeder system, the bleeder entries.

The multiple interconnected longwall panel bleeder system has been designed with multiple locations where air enters the worked-out areas. The bleeder system has also been designed to provide multiple primary airflow paths through the worked-out areas. Though possibly considered simple in basic concept, it is complex in function. The bleeder system will become more complex with each subsequent longwall panel added to the district. Changes in resistance of each primary airflow path potentially affect the distribution of airflow through other primary airflow paths of the bleeder system. Further, the proposed method of evaluation does not result in a proper evaluation of the effectiveness of the bleeder system because the quantity, quality, and direction of airflow exiting critical open areas of the worked-out area, including the path that provides a direct conduit to the tailgate side of the active longwall panel, cannot be determined before mixing with other volumes of airflow. The means to control the air passing through the area, with the development of longwall Panel 3 inby the present bleeder entries in HG#2, does not appear adequate. No ventilation controls are depicted in HG#2 outby crosscut 162 between the active tailgate and bleeder entries, possibly resulting in a short circuit of airflow. Locations of regulators depicted or indicated may not be where needed.

The bleeder entries at the Mach #1 Mine are located in an area with extremely adverse roof conditions. Since the inception of longwall retreat mining the existing bleeder entries have experienced more than 20 unintentional roof falls. These roof falls and other deteriorated

1

ground conditions in the bleeder entries have been documented by MSHA Inspection and MSHA Technical Support personnel, and likewise, observed by Mach mine officials. Deteriorated ground conditions and roof falls generally increase the resistance of mine entries to airflow. This increase in resistance can impact airflow and its distribution in a bleeder system. Equally important, these deteriorated ground conditions can prevent the proper evaluation of the bleeder system by denying access to critical evaluation points. In this case, the means for maintaining the bleeder entries free of obstructions such as roof falls has been so inadequate that safe travel in their entirety is no longer possible. This has resulted in the inability to access locations in the bleeder system, specifically in the bleeder entries, where critical information to evaluate the effectiveness of the bleeder system must be gathered.

Typical bleeder systems in mines throughout the country have established examination locations where air enters the worked-out area, in the bleeder split immediately before the air enters a return split or reaches the surface of the mine, and at additional measurement points locations specified in the mine ventilation plan. These locations are in the bleeder entries where tests and measurements can be made to assure that the worked-out area(s) is being ventilated so that methane–air mixtures are being continuously diluted, routed away from active workings and to a return air course on the surface, and that hazardous accumulations do not develop. In addition, one entry of the set of bleeder entries is traveled.

Mach seeks to establish only two evaluation points in lieu of traveling one entry of the set of bleeder entries and establishing measurement point locations, regardless of the number of worked-out interconnected longwall panels added to the system. One evaluation point, located at the inby end of the headgate of the active longwall panel, is intended to verify that air travels away from the longwall face to the bleeder entries in the active headgate and provides for an evaluation of the sufficiency of that airflow in that portion of the bleeder system only. The other evaluation point is located on the surface of the bleeder shafts. The surface evaluation point depicted in the plan supplement is the only location that receives data from the remainder of the entire bleeder system, which includes multiple splits of the bleeder air, including that which ventilates the worked-out area inby the tailgate side of the active longwall panel and the open areas along the completed first longwall panel and between all subsequent longwall panels. These open areas are areas where methane might accumulate if adequate ventilation is not provided. Nothing can be determined about the adequacy of the distribution of airflow ventilating these unevaluated open areas from these two evaluation points, and hence, a proper evaluation of the effectiveness of the bleeder system cannot be completed.

The Federal Mine Safety and Health Act of 1977, Sec. 303(z)(2), required that "...*all areas from which pillars have been wholly or partially extracted and abandoned areas be ventilated by bleeder entries or by bleeder systems or equivalent means, or be sealed....When ventilation of such areas is required, such ventilation shall be maintained so as continuously to dilute, render harmless, and carry away methane and other explosive gases within such areas and to protect the active workings of the mine from the hazards of such methane and other explosive gases.*" 30 C.F.R. § 75.334(b)(1) states, "*during pillar recovery a bleeder system shall be used to control the air passing through the area and to continuously dilute and move methane-air mixtures and other gases, dusts, and fumes from the worked-out area away from active workings and into a return air course or to the surface of the mine.*"

2

MSHA believes proper evaluation of the system's effectiveness must include an assessment of the airflow distribution, determination of air quality in critical areas, and determination of airflow direction in the bleeder system, including the open areas of the worked-out area. A properly designed and maintained bleeder system enables accomplishment of these objectives.

Examinations provide a means of collecting information needed to evaluate a bleeder system's effectiveness. To evaluate the effectiveness of bleeder systems, measurements of methane and oxygen concentrations and air quantity, and a test to determine if the air is moving in the proper direction must be made at all locations required in 30 C.F.R. § 75.364(a)(2)(i), (ii), and (iii).

As previously stated in a letter dated August 6, 2009, Mach has two options for assuring the health and safety of the miners during longwall retreat mining of Headgate #3 (HG #3). One option includes connecting into the existing bleeder entries after first developing new bleeder entries from HG #3 to the bleeder shafts. Next, mine the extension entries into TG #1, HG #1, and HG #2. Finally, connect the HG #3 entries to the existing bleeder system at the HG #2. The map of this revised bleeder system must identify appropriate measurement point locations to determine the effectiveness of the revised bleeder system and must identify appropriate ventilation controls within the revised system intended to control the air passing through the area.

Alternatively, a retreat mining plan to connect HG #3 to the existing bleeder system could be considered. The plan would have to provide for evaluation points in HG #3 at the top of the wrap-around bleeder segment and at the "stair-step" point where the wrap-around bleeder of HG #3 intersects the existing bleeder system at HG #2. The ventilation controls needed to ventilate the wrap-around section of the system must be shown in the plan sketches. **The plan must also state that if any of these evaluation points can not be physically accessed, mining will be discontinued, the longwall equipment will be removed, and the entire bleeder and gob system will be permanently sealed.**

In summary, the site-specific plan supplement does not provide sufficient evaluation points in the bleeder entries to determine the effectiveness of the bleeder system, does not depict ventilation controls such as regulators and stoppings used to control air movement throughout the worked-out areas, and does not depict ventilation controls such as stoppings to assure that air from the adjacent worked-out area is directed away from the active longwall section and tailgate travelway.

Also, the supplement depicts the use of the belt conveyor haulage entry to provide air to ventilate the longwall working section. Section 75.350(d) states that the use of air from the belt air course to ventilate a working section shall be permitted only when evaluated and approved by the District Manager in the mine ventilation plan. The mine operator must provide justification in the plan that the use of air from a belt entry would afford at least the same measure of protection as where belt haulage entries are not used to ventilate working places. No such justification has been submitted with this site-specific supplement.

**Therefore, based on the information submitted, the ventilation plan supplement cannot be approved.** The Agency again offers Mach the opportunity to meet with District and Technical Support personnel to develop a ventilation plan that provides for the effective evaluation of the bleeder system for the existing longwall district at Mine #1.

Sincerely,

*Robert L. Phillips*

Robert L. Phillips
District Manager
Coal Mine Safety and Health
District 8

4

JA-132



September 29, 2009

Mr. Anthony Webb
Mine Manager
Mach Mining, LLC
P.O. Box 300
Johnston City, IL 62951

**Re: Mach No. 1 Mine, ID 11-03141, Revised Mine Ventilation Plan, dated June 4, 2009**

Dear Mr. Webb:

The Mine Safety and Health Administration has reviewed the submitted ventilation plan for the Mach #1 Mine. Based on the information submitted the plan **cannot be approved**. The following are deficiencies and concerns in the plan:

## I. Section and Face Ventilation Systems (Page 2 of 30)

Two sets of mechanized mining equipment are located on each development unit working section at the Mach #1 Mine. These development units are ventilated with a single split of intake air. The plan must specify the means that Mach Mining will take to assure compliance with 75.332(a)(2).

The continuous mining machines are equipped with remote control and the working places are advanced with extended (40 ft.) cuts. The means for performing methane tests required by 75.362(d)(1)(i), (ii) and (iii) must be specified. Also, the plan must specify that methane monitors mounted on the continuous miner will be located on the return air side of the machine.

Section 75.321(a)(1) authorizes the District Manager to require a minimum air quantity to be provided to working places *other* than those where coal is being cut, mined, drilled for blasting or loaded. The Herrin No. 6 coal seam at the Mach #1 Mine is classified as "gassy". Working places at neighboring mines in this same seam have experienced accumulations of methane when working places were not provided with adequate ventilation. Therefore, all working places developed more than 20 feet inby the rib line must be provided with a ventilation control device. Curtain set-back distances and air quantities used to ventilate such working places must be specified in the ventilation plan.

1

## II. Bleeder System (Page 3 of 30)

**Item 1** – The following sentence must be removed from the plan: *Whenever the depth of water in the travelable bleeder entry (active tailgate/future tailgate) exceeds 12 inches, rib-to-rib for a linear distance of 100 feet, pumps or bridges will be needed to reduce the water to a depth of 12 inches.* MSHA does not approve water depth in the bleeder system. The mine operator is required to maintain the bleeder and gob system free of obstructions from water and **only the means to accomplish this requirement should appear in the plan.** Water at depths of less than 12 inches may pose a travel hazard to miners if the water covers bottom irregularities and/or coal, rock or timbers on the mine floor. Also, bridging does not prevent obstructions from water.

**Item 2** – The bleeder entries at the Mach #1 Mine are located in an area with extremely adverse roof conditions. Since the inception of longwall retreat mining the existing bleeder entries have experienced more than 20 unintentional roof falls. These roof falls have been documented by MSHA Inspection and MSHA Technical Support personnel and have occurred despite the installation of supplemental support shown in the ventilation plan. The falls have substantially reduced the total cross-sectional area of the bleeder entries and have created obstructions to the air flow paths within the bleeder and gob system. The supplemental support as described and depicted in the plan is not adequate to maintain the bleeder entries *free of obstructions* from falls of roof. The plan must specify the means, beyond the supplemental support system currently in use, to adequately support the mine roof in the bleeder entries.

## Means for Determining the Effectiveness of the Bleeder System (page 3 of 30)

The proposed method of evaluation does not result in a proper evaluation of the effectiveness of the bleeder system. Further, the proposed plan does not acknowledge the examinations at the 75.364(a)(2)(i) locations and the other proposed MPs and EPs in the proposed plan as part of the information to be considered in the evaluation of the bleeder system as required under 75.364(a)(2). The plan text in the first paragraph states *"the bleeder evaluation system is so designed that the gob areas in previous panels will be ventilated by using return air..."* However, the design of this system results in the evaluation of the general airflow patterns, not the "evaluation" of the bleeder system. The text also states *"to ensure the gob of previous panels and the active gob of the current longwall panel are ventilated effectively, evaluation points will be established."* The proposed evaluation points do not accomplish this. EP-1 is the 75.364(a)(2)(ii) location(s). The only information pertaining to effective ventilation of any specific portion of the "gob" that can be collected at the proposed evaluation locations are in the headgate of the active longwall panel. EP-1 is a required examination location(s) under 75.364(a)(2)(ii) and provides evaluation of the sufficiency of the capacity of the total airflow in the bleeder system to dilute methane to less than 2 percent as required by 75.323(e). This data is necessary information to be considered in evaluation the effectiveness of the bleeder system. However, in this complex bleeder system of multiple interconnected longwall panels, even in combination with the other proposed examination locations, it is not sufficient for a proper evaluation of the effectiveness of the bleeder system.

2

Nothing is stated that requires a determination of the flow of air away from the tailgate travelway from the active tailgate to the previous tailgate entries, either by direct tests and measurements at each opening to the adjacent worked-out area or through differences in air quantity measurements in the tailgate of the active longwall panel at EP#4 and the EP at the outby end the gate roads.

The plan must clarify if the Monitoring Point (MP) that is stated will be *"established at the start of each panel where longwall mining is currently taking place"* the headgate MP at the inby end of the panel just outby the bleeder entries. The text indicates only quality and direction will be checked weekly. Air quantity measurements and a test for air direction must be made. This location is not referenced to any drawing to indicate the specific location.

The existing surface evaluation point is the only location that receives data from the "return or gob side" of the bleeder system and for all practical purposes serves as an atmospheric monitoring station (AMS). The preamble of the 1992 rule states *"because of the inability of the AMS to inform the operator of roof conditions and water build up ...... the final rule does not permit the use of AMS for evaluating worked-out areas instead of weekly examinations."* Proper evaluation of the effectiveness of a bleeder system can only be achieved by comparison of measurements taken in the bleeder system. In most instances, one of the most important measurements is the air quantity at strategic points <u>in the bleeder system.</u>

The continuing deterioration of the mine roof and the existing roof falls prevent proper bleeder and gob system evaluation. These worsening roof conditions threaten the viability of these entries to service projected panels #3, #4, #5 and #6 and are reasonably likely to threaten the internal flow paths of the worked-out panels of HG #1 and HG #2. Therefore, the plan must provide a map with the design of the revised bleeder system depicting longwall panels 3, 4, 5 and 6 developed to a depth of 19,000 feet and how the revised system will connect into the existing bleeder entries. One option includes connecting into the existing bleeder entries after first developing new bleeder entries from HG #3 to the bleeder shafts. Next, mine extension entries from the new bleeder entries into TG #1, HG #1, and HG #2. Finally, connect the HG #3 entries to the existing bleeder system at the HG #2. The map of this revised bleeder system must identify appropriate measurement point locations to determine the effectiveness of the revised bleeder system and must identify appropriate ventilation controls within the revised system intended to control air passing through the area.

Alternatively, a retreat mining plan to connect HG #3 to the existing bleeder system could be considered. The plan would have to provide for an evaluation point in HG #3 and at the "stair-step" point where the wrap-around bleeder of HG #3 intersects the existing bleeder system at HG #2. **The plan would also need to state that if either evaluation point can not be physically accessed that mining would be discontinued and the entire bleeder and gob system permanently sealed.**

3

**Note statement on Page 4 of 30**

The referencing of a policy statement should be removed from the plan. Section 75.370(e) requires that before implementing a revision to a ventilation plan, persons affected by the revision shall be instructed by the operator in its provision. Also, 75.324 & 75.370 are mandatory standards that do not require restatement in the ventilation plan.

## III. Carbon Monoxide – Ambient Levels (Page 5 of 30)

If the underground belt conveyors are provided with point-type heat sensors for early warning and fire detection, no additional information is needed. However, if a carbon monoxide sensor system is used for this purpose the plan must include the installation, operation, and testing/calibration procedures for the system as well as actions taken in response to an alarm condition.

## IV. Diesel Equipment Ventilation Rates (Page 6 of 30)

Any equipment proposed to be exempted from ventilation rates must be specified in the plan and the reason for the exemption detailed.

The sentence at the bottom of the page states that *the diesel exhaust gas monitoring point during longwall recovery and set-up will be located 1 break outby the longwall face as depicted in drawings pages 22 – 24.* This point indicates the level of diesel exhaust gases in the ambient air, but does not provide an indication of the diesel exhaust gas exposure level for miners working on the longwall face down wind of any permissible diesel equipment. A diesel exhaust gas monitoring point is needed at the most down wind work location on the longwall face and must be depicted on the specified sketches.

## V. Dust Control Methods and Devices (Pages 7, 8, & 9 of 30)

### MMU 001-0

Type of Equipment:

- Should specify the type of shields used (Make & Model)

Shield Controls:

- First sentence should be modified to read: "Sprays on the shield tips will be used to create a 'water curtain'…"

- Last sentence should be modified to read: "If the infrared sensor fails it shall be repaired as soon as possible. As an interim dust control measure no one will be allowed down wind of the shearer until the sprays are operational."

4

**MMU 002-0/MMU 003-0**

**Ventilation:**

- Second sentence should be modified to read: "…without the scrubber operating. The scrubber capacity is [insert here – if plate quantity so state]."

- Third sentence should be modified to read: "…20% at the end of the line curtain prior to activating the scrubber." Note the maximum requirement of 20% greater with the scrubber operational is no longer required.

- Fifth sentence should be modified to read: "Curtain setback from face – Maximum 40 feet…"

**CM Scrubber:**

- "The scrubber capacity is [insert here – if plate quantity so state]. The actual operational volume will be measured with a centerline pitot tube reading during the 75.362(2)(2) examination correlated to a weekly full pitot traverse."

**Roof Bolter Controls:**

- Specify line curtain distance and quantity to control dust at the roof bolter.

- Specify number of times per shift or cycle the roof bolter may work downwind of the continuous miner.

**Other:**

- Specify whether coal haulers will be running return routes.

- Specify that attended coal haulers will not be parked or idled downwind of the continuous miner.

- Specify that coal haulers will not park under active ventilation controls that interrupt the ventilating air current to the continuous miner or roof bolter.

## VI. Belt Air Justification (Page 10 of 30)

During the July 8, 2009, meeting in the meeting between the District Manager, Arlington staff and representatives from Mach Mining, MSHA granted the continued use of air from the belt haulage entry for the remaining retreat mining in Headgate #2. However, the Final Rule for the Use of Air From the Belt Entry, published December 31, 2008, with an effective date of March 2, 2009, stipulates "The use of air from a belt air course to ventilate a working section or an area where mechanized mining equipment is installed or removed, shall be permitted only when evaluated and approved by the District Manager in the mine ventilation plan."

5

No citations or 107(a) imminent danger withdrawal orders for excessive methane levels have been issued on longwall working sections at the Mach #1 Mine even when citations for low face air velocity near the longwall tailgate have been issued by inspectors. Also, no information or data on face ignitions or degasification systems has been provided. The section intake air course (Entry #3) can readily provide the air quantities needed for compliance with methane and respirable dust control standards. Additional air from the belt haulage to ventilate the longwall working section entry is unnecessary.

Additionally, conveyor equipment in the belt entry presents a fire risk within this air course. Notwithstanding the use of early warning fire detection and fire suppression devices at belt drives and take-up assemblies, isolating the working places from the products of combustion from a fire in the belt entry is paramount to the safe and rapid evacuation of miners. The longwall retreat mining working sections at the Mach #1 Mine have both escapeways located on the headgate side of the panel. Any smoke or other products of combustion from a fire in the belt haulage entry would flow directly onto the longwall face. This would immediately impede the rapid, safe evacuation of miners on the working section by delaying or denying them access to either the primary or the alternate escapeway.

Therefore, the justification in the June 4, 2009, revised plan submittal does not indicate that the use of the air from a belt entry is justified nor does the use belt air afford at least the same measure of protection as where belt haulage entries are not used to ventilate working places. A sight-specific supplement to the revised plan needs to be submitted to the District Manager outlining the use of air from the belt entry to ventilate the remaining portion of the Longwall/HG #2 working section. The remaining sketches/drawing in the proposed plan must be revised to delete the use air from the belt haulage entry for the ventilation of working sections and areas where equipment is being installed or removed.

**Sketches/Drawings**

**Page 12 of 30** – The maximum blowing line curtain set-back distance is 40 feet from the deepest penetration of the face. The sketch states a set-back distance of 45 feet. Also, the sketch must depict the location of the line curtain.

**Page 13 of 30** – The sketches is titled MAIN ENTRIES and show a 3-entry system. Mach #1 Mine does not use this mining system for Main/Sub-Main entry development; therefore, this sketch needs to be revised to depict the actual number of entries used in main entry development. In the revised sketch specify the curtain(s) that will be removed or relocated to facilitate shuttle car haulage. Also, the location of the 20,000 cfm measurement point must be indicated. Finally, the sketches depict the belt air current traveling inby in one sketch and outby in the other. The sketches must depict the method of belt haulage entry ventilation that will be used during mining and illustrate that method only. If at a later date an alternate method of belt haulage entry ventilation is needed a site-specific ventilation plan supplement can be submitted for approval. **Please note that this applies to all subsequent drawings which are duplicated or have side-by-side sketches solely for the purpose of depicting the belt haulage entry ventilation in both directions.**

6

**Page 14 of 30** - The sketches are titled MAIN ENTRIES and show a 5-entry system. Mach #1 Mine does not use this mining system for Main/Sub-Main entry development, therefore this sketch needs to be revised to depict the actual number of entries used in main entry development. In the revised sketch specify the curtain(s) that will be removed or relocated to facilitate shuttle car haulage. Also, the location of the 20,000 cfm measurement point must be indicated.

**Page 15 of 30** – The direction of air flow within the belt entry is not legible in the sketches.

**Pages 16 & 17 of 30** – The sketches depict an entry developed 40 feet inby the proposed cross cut. All working places developed more than 20 feet inby the rib line must be provided with a ventilation control device. If Mach #1 Mine proposes to develop entries and cross cuts as depicted curtain set-back distances and air quantities used to ventilate such working places must be specified and depicted in the ventilation plan.

**Page 18 of 30** – This sketch depicts the use of the belt haulage entry to ventilate the working section that should be part of a site-specific supplement for Longwall/HG #2 but not part of the revised ventilation plan. The sketch must be revised to show the belt air current being directed to a return air course or to the surface. The sketch must show the minimum air quantity available at the intake end of the longwall face at the connecting cross cut between entry #1 and entry #2 (face cross cut). If the air is split at this location to create outby air flow for the belt entry then this quantity of air must be subtracted from the quantity in the face cross cut to determine if the minimum quantity of air at the intake end of the longwall face is provided. Also, the sketch depicts curtains in entry 2 and entry 3 to turn the air onto the longwall face. Results from a ventilation survey conducted on June 8 & 10, 2009, indicate significant pressure on these curtains such that considerable leakage existed. Therefore, these controls need to be of substantial construction beyond that provided by a simple check curtain. The type of construction needs clarified. Finally, the dust monitoring point must be removed from the sketch.

**Page 19 of 30** - The sketch depicts curtains in entry 2 and entry 3 to turn the air onto the longwall face. Results from a ventilation survey conducted on June 8 & 10, 2009, indicate significant pressure on these curtains such that considerable leakage existed. Therefore, these controls need to be of substantial construction beyond that provided by a simple check curtain. The type of construction needs clarified. The dust monitoring point must be removed from the sketch.

**Page 20 of 30** - This sketch depicts the use of the belt haulage entry to ventilate the working section that should be part of a site-specific plan for Longwall/HG #2 but not part of the revised ventilation plan. The sketch must be revised to show the belt air current being directed to a return air course or to the surface. The sketch must show the minimum quantity available at the intake end of the longwall face at the connecting cross cut between entry #1 and entry #2 (face cross cut). If the air is split at this location to create outby air flow for the belt entry then this quantity of air must be subtracted from the quantity in the face cross cut to determine if the minimum quantity of air at the intake end of the longwall face is provided. Also, the sketch depicts curtains in entry 2 and entry 3 to turn the air onto the longwall face. Results from a ventilation survey

7

conducted on June 8 & 10, 2009, indicate significant pressure on these curtains such that considerable leakage existed. Therefore, these controls need to be of substantial construction beyond that provided by a simple check curtain. The type of construction needs clarified. The dust monitoring point and the 50% belt air statement must be removed from the sketch.

**Page 21 of 30** - The sketch must show the minimum air quantity available at the intake end of the longwall face at the connecting cross cut between entry #1 and entry #2 (face cross cut). If the air is split at this location to create outby air flow for the belt entry then this quantity of air must be subtracted from the quantity in the face cross cut to determine if the minimum quantity of air at the intake end of the longwall face is provided. Also, the sketch depicts curtains in entry 2 and entry 3 to turn the air onto the longwall face. Results from a ventilation survey conducted on June 8 & 10, 2009, indicate significant pressure on these curtains such that considerable leakage existed. Therefore, these controls need to be of substantial construction beyond that provided by a simple check curtain. The type of construction needs clarified. The dust monitoring point must be removed from the sketch.

**Page 22 of 30** - This sketch depicts the use of the belt haulage entry to ventilate the working section that should be part of a site-specific plan for Longwall/HG #2 but not part of the revised ventilation plan. The sketch must be revised to show the belt air current being directed to a return air course or to the surface. The sketch is missing a curtain in entry No.1 inby the set-up room that is needed to direct the air current down the set-up room. The 9,000 cfm note needs to be removed and the 30,000 cfm measuring point must be shown in the face ventilating cross cut between entries No. 1 & No. 2. Also, a diesel exhaust gas monitoring point is needed at the most down wind work location on the longwall face and must be depicted on the specified sketches.

**Page 23 of 30** - This sketch depicts the use of the belt haulage entry to ventilate the working section that should be part of a site-specific plan for Longwall/HG #2 but not part of the revised ventilation plan. The sketch must be revised to show the belt air current being directed to a return air course or to the surface. Also, a diesel exhaust gas monitoring point is needed at the most down wind work location on the longwall face and must be depicted on the specified sketches. Also, the sketch depicts curtains in entry 2 and entry 3 to turn the air onto the longwall face. Results from a ventilation survey conducted on June 8 & 10, 2009, indicate significant pressure on these curtains such that significant leakage exists. Therefore, these controls need to be of substantial construction beyond that provided by a simple check curtain. The 9,000 cfm note needs to be removed as this quantity pertains only to areas where non-longwall type of equipment as stated on Page 2 of 30 and the 37,500 cfm measuring point must be shown in the face ventilating cross cut between entries No. 1 & No. 2. Also, a diesel exhaust gas monitoring point is needed at the most down wind work location on the longwall face and must be depicted on the specified sketches.

8

**Page 24 of 30** - The sketch depicts curtains in entry 2 and entry 3 to turn the air onto the longwall face. Results from a ventilation survey conducted on June 8 & 10, 2009, indicate significant pressure on these curtains such that significant leakage existed. Therefore, these controls need to be of substantial construction beyond that provided by a simple check curtain. The type of construction needs clarified. The 9,000 cfm note needs to be removed and the 37,500 cfm measuring point must be shown in the face ventilating cross cut between entries No. 1 & No. 2. Also, a diesel exhaust gas monitoring point is needed at the most down wind work location on the longwall face and must be depicted on the specified sketches.

**Page 25 of 30** – Adverse roof conditions and unintentional roof falls in the existing bleeder entries indicate that the listed spacing of the supplemental supports depicted on the sketch as ineffective to control the mine roof. Using only the currently approved roof control measures for development mining of the bleeder entries a "skin-to-skin" placement of these supplemental supports is recommended. Also, the roof fall history in the bleeder entries at the mine indicates that additional supplemental support beyond that which is depicted in the sketch is needed to prevent obstructive roof falls.

**Page 28 of 30** – The sketch is difficult to read. A larger, legible sketch is needed.

**Page 29 of 30** – The sketch is labeled Sugar Camp Energy LLC – Sugar Camp Mine. If this sketch is applicable it needs to be labeled referencing the correct mine.

**NOTE:** The longwall retreat mining sketches show no stoppings in the tailgate entry. If the air is flowing toward the longwall face as depicted, then a stopping line is needed between the tailgate entry and the middle entry. Also, stoppings would need to be shown inby the longwall face in the headgate entries between the #2 entry and the #3 entry for the subsequent panels. This scheme would result in the tailgate entry being a separate air course and the gob gasses from the worked-out longwall panels would not be directed toward the active longwall face. If Mach does not wish to build the stoppings in the headgate entries as the longwall retreats, the air in the tailgate entries, outby the longwall face, would be required to flow in the outby direction. Air from the worked-out area cannot flow toward the active workings and the longwall face per 75.334(b)(1). Also, air would be required to be moved from the tailgate travelway to the worked-out area of the adjacent panel at each opening between them and examination locations established in each opening. Appropriate arrows depicting airflow direction at each opening should be depicted on all maps, drawings and sketches as appropriate. All openings would be 75.364(a)(2)(i) locations. These stoppings would not have to be built in the last headgate of the bleeder system as it would not become a tailgate entry for a future panel.

**ADDITIONAL INFORMATION NEEDED IN MINE VENTILATION PLAN**

This mine has exhibited periods of non-compliance with the respirable dust standards since January 1, 2008. Citation Number 9942492 was issued January 3, 2008, on MMU 002-0 when the Designated Occupation (DO) average concentration of operator's samples indicated an average exposure of 2.436 mg/m³ exceeding the applicable standard of 2.0 mg/m³. Citation Number 9942540 was issued January 9, 2009, on MMU 002-0 when the DO concentration of operator's samples indicated an average exposure of 3.459 mg/m³ exceeding the applicable standard of 2.0 mg/m³. Citation Number 7572900 was issued March 18, 2009, on the MMU 002-0 when the Non-Designated Occupation 050 indicated the average concentration of MSHA samples indicated an average exposure of 5.0 mg/m³ exceeding the applicable standard of 1.7 mg/m³. Continued excursions of the applicable respirable dust standard may indicate compliance with the applicable standard cannot be achieved with extended (40 ft) cut mining. Therefore, the plan needs to include provisions for panel and main entry development using a maximum line curtain set-back distance of 20 feet.

The plan does not address information required by 75.371(t) – designated area sampling locations (including a line diagram).

Sincerely,

*Robert L. Phillips*

Robert L. Phillips
District Manager
Coal Mine Safety and Health
District 8





Exhibit AES-2

Mach Mining, LLC
Williamson County, IL

Mach No. 1 Mine
AES Mine Ventilation Survey
July 2009

Prepared For
Mach Mining, LLC

ALPHA ENGINEERING SERVICES, INC.

Project MOH-001

October 2009
AES-2

**Legend**

INTAKE
NEUTRAL/BELT HAULAGE
BLEEDER
RETURN

* NOTE: Arrows Show Direction of Air Flow

GOB

Map based on information provided by others; qualities provided by Alpha Engineering.

Selected Alpha Air Readings

Check Curtain
Overcast
Stopping
Stopping with Mandoor
Regulator    R

36.000

300  0  300  600
FEET

Panel No. 1
Panel No. 2
Panel No. 3
Panel No. 4
Panel No. 5
Panel No. 6

Bleeder Fan    324.000
117.000
113.000
189.000
131.000
80.000
26.000
46.000
54.000
96.000
50.000
104.000
53.000
40.000
101.000
63.000
40.000
112.000

Tailgate No. 1    96.000
Headgate No. 1
Headgate No. 2
Headgate No. 3
Headgate No. 4
Headgate No. 5

83.000
52.000
28.000
125.000

153.000
166.000
528.000

Return Shaft    528.000
Fan    78.000

151.000
Slope



Exhibit AES-4

Mach Mining, LLC
Williamson County, IL

Mach No. 1 Mine
Mine Ventilation Simulation
HG #3 with Belt Air Ventilating Face

Prepared For
Mach Mining, LLC

ALPHA ENGINEERING SERVICES, INC.

October 2009
AES-4

Project MCH-001

**Legend**

INTAKE
NEUTRAL/BELT HAULAGE
BLEEDER
RETURN

* NOTE: Arrows Show Direction of Air Flow

GOB

36,000    Alpha Simulated Air Reading

Check Curtain
Overcast
Stopping
Stopping with Mandoor
Regulator    R

300  0  300  600
FEET

Summary Resume of:  **Gary M. Hartsog**, PE & PS(SU)

## *Experience:*

⇨ Over Thirty Years' Engineering and Administrative Experience:

⇨ Supervisory experience includes:  establishing and operating consulting engineering firm;supervising employees in coal mining operations; surveying and mapping operations; major construction projects; supervising mining health and safety programs.

⇨ Design experience includes:  reserve analysis and exploration; mine design and layout; ventilation system design and maintenance including fans; Roof control design and analysis; operational analysis; site design and preparation for coal mining activities; shaft/slope design and specification; specification, installation andoperation of water supply, drainage and dewatering systems.

⇨ Construction experience includes:  mine sites; ventilation and access slopes and shafts; portal facilities; pumping, water handling and treatment facilities; underground facility construction; ventilating fan installation and operation.

⇨ Litigation Support includes: Inspections, investigations, analysis, testifying

⇨ Employers Include:

⇨ Alpha Engineering Services, Inc., 1991 to present.  Beckley, West Virginia.

⇨ Eastern Associated Coal Corporation/ Peabody Coal Company, 1976 to 1991.  Various operations, Northern and Southern West Virginia.

## *Education:*

⇨ Master of Business Administration, West Virginia University, Morgantown, WV, Conferred 2005.

⇨ Master of Science, Engineering of Mines, West Virginia University, Morgantown, WV, Conferred 1985.

⇨ Bachelor of Science, Engineering of Mines, West Virginia University, Morgantown, WV, Conferred 1979.

⇨ Bachelor of Science, magna cum laude, Elementary Education, West Virginia University, Morgantown, WV, Conferred 1976.

⇨ Continuing Education & Activities:  Supervisory Management, GPS and Surveying, Mechanical Shaft Excavation, Ventilation, Coal Preparation, Fan Design, Computer Courses and Business Management, Safety and Law Committees for National Mining Association and WV Coal Association, PE Exam Review Committee, National Council of Examiners of Engineers and Surveyors.

⇨ Teaching Experiences:  Training and retraining classes for supervisors, miners and others; Conduct special seminars in various operations and technical mining topics.  Basic and advanced seminars in underground surveying and mapping and ventilation for Professional Surveyors, Professional Engineers and others.

## *Certifications:*

⇨ Registered Professional Engineer in WV, IL, KY, VA, UT, PA, AL, OH, IN.

⇨ Professional Surveyor w/Underground Surveying Endorsement in West Virginia.

⇨ Underground Mine Foreman Certificate in West Virginia, and various other MSHA and WV mining safety and training certifications.

⇨ Teaching Certificate, Grades 1-9, 1976, State of West Virginia.

*Rev 04/14/2009*

## Michael J. Lawless, P.E.
### *Curriculum Vitae*

### Personal Data

Name:       Michael J. Lawless, P.E.

Address:  184 Daniel Road
            Kingston, TN 37763

E-mail:    mjlawless@bellsouth.net

Phone:    Home  (865) 717-0439
            Cell    (865) 591-8157

### Professional History

**07/02 – 05/05   Corporate Director of Safety, Murray Energy Corporation**

In this position, I gave corporate oversight and direction regarding all matters relating to safety and compliance with state and federal regulations for a major coal producer with approximately 2500 employees, producing about 26 million tons of coal annually. Murray Energy Corporation had five mines in Kentucky, Ohio, Illinois, and Pennsylvania using longwall and conventional underground mining techniques. I advised mine managers on plan development for ventilation, roof control, and other areas needing regulatory approval. I gave advice and counsel to the Owner/CEO of the company and was the corporation's authority in all matters dealing with the regulatory agencies, including engineering plans submitted for approval, and compliance issues. I had direct supervision of an assistant, and safety directors at each of the five separate companies within the corporation.

**12/99—07/02   Deputy Administrator, MSHA, Arlington, Va**

As the Deputy in charge of field operations, all the Coal Mine Safety district managers reported to me. I gave them guidance and direction in all areas relating to enforcement of federal mine safety regulations. This included direction in the application of inspection policy, hiring and development of inspectors and engineers, and the administration of the budget. I had final approval authority for Petitions for Modification. I maintained daily contact with the field managers, and was involved in MSHA's actions in response to mine fires, fatal accidents, or other life and property threatening occurrences at underground or surface coal mines. During this period, there were three mine fires, a major impoundment spill, and a mine explosion. As a response to the impoundment spill, the National Academy of Sciences was commissioned to study

the disaster and develop a report of suggested research and means to prevent a similar occurrence. I served as the MSHA liaison to the group chosen for the study. In this role, I participated in the public hearings, and coordinated the development of MSHA's response to the Academy's report.

**08/99—12/99  Deputy Director, MSHA Technical Support**

As the Deputy Director of Technical Support I was the supervisor of the two Center Chiefs, located at the Approval and Certification Center at Triadelphia, West Virginia, and the operations facility at Bruceton, Pennsylvania, as well as the headquarters staff, consisting of staff engineers and administrative personnel. The Approval and Certification Center had responsibility for testing and approval of the electrical components on mining equipment used in the United States, as well as the fire resistance qualities of certain materials such as conveyor belting. The Bruceton Center had the responsibility for providing technical expertise to the mining industry and the federal inspection force on all engineering subjects. They were staffed with engineers and specialists in the areas of roof control, ventilation, impoundment design, electrical safety, and explosives. They also had expertise in mine fires and explosions.

I provided advice and assistance to the managers of the Coal and Metal inspection divisions, as well as to the Assistant Secretary for Mine Safety and Health whenever there was a disaster or unusual inspection problem in the field requiring technical expertise. I provided leadership and direction to the Chiefs regarding the technical assistance provided to MSHA metal and coal inspection personnel, as well as the technical assistance and engineering expertise provided to the mining industry. During this period there were three mine fires that required Headquarters oversight. In this regard, I provided guidance and advice to the field personnel of Technical Support as well as the Coal Mine Safety headquarters personnel and field managers.

**10/98—08/99  Acting Director, MSHA Technical Support**

As the Acting Director, I was responsible for the overall direction of the Technical Support organization, including policy development, priority of field initiatives, budgeting and personnel. I began the practice in Technical Support of using the data from fatality investigations to serve as the roadmap for Technical Support initiatives. In this way, the engineering expertise of the engineers and other technical persons with Technical Support could be better applied to assisting the industry in solving existing safety and health problems. One such initiative was the design of reinforced cabs for dozers working on preparation plants. I directed the development of the mine rescue robot, and made a presentation to the Secretary of Labor regarding funding for the robot prototype. The robot is now in use by the MSHA mine rescue team. I was also in charge of coordinating with NIOSH and private industry the development of the respirable dust monitor. This technology has since undergone several iterations, but is near completion in the form of a person wearable dust monitor.

## 1990—1998  MSHA District Manager

During this time period, I was the district manager in three separate districts, each with unique mining conditions, and each with unique engineering problems. As the district manager, I was responsible for the administration and enforcement of all aspects of the federal mine safety and health regulations, including the approval of all engineering plans required of mine operators by the Mine Act. The following summarizes my work as a District Manager:

### Norton, Virginia (District 5)

This district had both large, extremely gassy mines, and many small, short-lived, hilltop mines. It was challenging geologically because of the major faults traversing the mining areas. It also included some of the most gassy mines in the world. Since my responsibility included approval of all mining plans submitted by the mine operators in this district, I had to give particular attention to the engineering aspects of ventilation and roof control measures.

In this district, the Southmountain Mine explosion occurred in December of 1992. As the district manager, I was the official in charge of the attempts to recover the miners trapped underground, and later, the recovery of their bodies. These activities involved intensive mine rescue, mine fire analysis, and disaster response actions.\

In this district I improved the plan approval and inspection process by developing a Mine Profile system that was used to provide data and analysis to mine operators and inspection personnel regarding the inspection history at each of the mines. This system was later put in place in several other MSHA districts.

Also during this time period I was chosen to participate as a member of a team of health and safety experts to travel to Albania and assess the health and safety conditions of the coal and metal mines and mills in that country. The report that was developed after the mission was used by the Agency for International Development to determine the type of support needed by that country.

During this period I served on a three person committee to interview and select candidates for MSHA enforcement supervisory positions. About thirty persons were chosen to participate in an extensive supervisor training program at the Mine Health and Safety Academy. I served on this committee for three years and was involved in the selection of the majority of the MSHA inspection supervisors.

### Mt. Hope, West Virginia (District 4)

MSHA's District 4 is the largest district because of the number of mines and the number of federal mine inspectors stationed in southern West Virginia. It is also one of the most diverse districts because it contains large and small underground coal mines, large and small surface coal mines and several coal seams with varying conditions and problems. My evaluation and approval of operators' ventilation and roof control plans required a broad understanding of different mining techniques and design.

In this district I made several organizational changes including consolidating and eliminating Subdistrict offices, and realigning field offices and mine assignments for more efficient use of manpower. I also incorporated the Mine Profile system into the

inspection and plan approval process similar to the system I had implemented in the previous district.

I served as a member of a steering committee to develop a national policy regarding the ventilation of bleeders and gobs.

<u>Birmingham, Alabama (District 11)</u>

All the coal mines in this district are large, very deep, and very gassy. This required a comprehensive understanding of ventilation, roof control, and related subjects to evaluate and approve the mining plans submitted by mine operators. Shortly after I became district manager there, a mine fire caused by spontaneous combustion occurred in the Jim Walter No. 5 Mine. The fire lasted four months with varying degrees of intensity. During that period I had to evaluate mine fire data to approve the operator's fire-fighting activities.

**1989—1990  Subdistrict Manager, Fairmont, West Virginia**

While a subdistrict manager, I was in charge of the inspection of all coal mines in the northern West Virginia area, as well as coal mines in western Maryland. I managed four MSHA field offices, and directed the work of seven field office supervisors. The field offices inspected both large and small underground and surface mines. The underground coal mines in this area used both conventional and longwall mining methods. Many of the mines were large, complex, gassy operations.

In response to the needs of the industry in this area, I developed the Repeat Violation Reduction Program, which is a process of providing assistance to the mine operators in reducing the incidence of noncompliance at their mines. It involves a means to systematically analyze the root causes leading to violations of the regulations. This course is presently taught at the MSHA Academy.

Also during this period I taught a night course in Ergonomics at Fairmont State College.

**1976—1989  Chief, Office of Engineering, MSHA District 3, Morgantown, W.Va.**

As Chief, Office of Engineering for District 3, I was in charge of evaluating and recommending for approval or disapproval all engineering plans required by the federal regulations for all coal mines in northern West Virginia, Maryland, and Ohio. This involved managing the work of several engineering groups with responsibility for, ventilation, roof control, health, electrical, and impoundments. I also was in charge of accident investigations in the district, and served on several national committees, including those focused on industrial hygiene, ventilation, and dust control.

**1970—1976  Mining Engineer, Morgantown, West Virginia**

My work with MSHA began primarily as a ventilation and roof control engineer. I was involved extensively in helping coal mine operators adapt to the new Coal Mine Health and Safety Act, and assisting federal inspectors (U.S. Bureau of Mines inspectors at that time) in understanding and applying relevant engineering principles. In this regard,

I made numerous ventilation studies to assess the ventilation systems in effect at the district mines, including pressure/quantity studies, and gob ventilation effectiveness. These studies were used to assist mine operators in adapting to the recently enacted ventilation regulations. I also was the principal fatal accident investigator, and I served on several national committees to develop regulations and policy to implement the Mine Act.

During this time I was chosen to serve on a team of engineers to assess the feasibility of storing oil in abandoned mines. This initiative was in response to the Oil Embargo of 1973 and had national importance and priority. A salt dome in Louisiana was eventually selected as the site for the storage, and the facility is in operation today. The project was completed in 1978 and I was awarded the Secretary of Labor's Recognition Award for my work on the project.

### *Education*

West Virginia University—graduated with Honors, 1970
Bachelor of Science: Mining Engineering

University of Pittsburgh, Graduate School of Public Health, 1973
Master of Science: Industrial Hygiene

### *Professional Registration*

Registered Professional Engineer (P.E.), West Virginia No. 9094
Certified Mine Safety Professional (CMSP)

### *Honors and Awards*

1995—Distinguished Career Service, U.S. Department of Labor
1986—Engineer of the Year, Mine Safety and Health Administration
1976—Secretary of Labor's Recognition Award for work on the Strategic Oil Reserve

### *Professional Memberships*

National Mine Rescue Association
Tau Beta Pi Engineering Honorary
International Society of Mine Safety Professionals
Society for Mining, Metallurgy, and Exploration, Inc. (SME)

## Publications

M.J. Lawless, _Particle Size Determination Using Sedimentation in Non-Ionic, Non-Polar Liquids,_ Masters Thesis, University of Pittsburgh, Graduate School of Public Health (1973).

M. J. Lawless, J. Tisdale, et.al. _Piping Methane in Underground Coal Mines,_ IR 1094, (U.S. Bureau of Mines 1978).

## References

References are available upon request



## JAN 2 8 2010

|  |  |  |
|---|---|---|
| MACH MINING, LLC, | : | CONTEST PROCEEDINGS |
| Contestant, | : | |
| | : | Docket No. LAKE 2010-1-R |
| | : | Citation No. 6680550; 9/29/09 |
| v. | : | |
| | : | Docket No. LAKE 2010-2-R |
| | : | Citation No. 6680551; 9/29/09 |
| SECRETARY OF LABOR, | : | |
| MINE SAFETY AND HEALTH | : | Mach #1 Mine |
| ADMINISTRATION (MSHA), | : | Mind ID 11-03141 |
| Respondent. | : | |

### DECISION

Appearances: Thomas Paige, Office of the Solicitor, U.S. Department of Labor, Arlington Virginia and Peter Nessen, Office of the Solicitor, Chicago Illinois, for Petitioner;

Daniel Wolff, Crowell & Moring, LLP, Washington, D.C., and David Hardy, Allen Guthrie & Thomas, PLLC, Charleston, West Virginia, for Respondent.

Before: Judge Miller

These cases are before me upon Contestant's request for an expedited hearing to challenge Citation Nos. 6680550 and 6680551 issued pursuant to section 105(d) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq. (the "Act" or "Mine Act"). The citations allege that Mach Mining was operating its #1 Mine with an unapproved ventilation plan (both a site specific and a base ventilation plan) in violation of 30 C.F.R § 75.370(d). The cited standard requires, in essence, that the mine operator develop and follow a ventilation plan approved by the Secretary.

On June 4, 2009, Mach Mining ("Mach" or "Contestant") submitted a ventilation plan, which included a base plan and site specific plan, to the Mine Safety and Health Administration ("MSHA"). The parties entered into negotiations and discussed various plan provisions. In September, 2009, Mach communicated its intent to implement the unapproved plan in order to bring these contests. By agreement between MSHA and the Contestant the mine began operation without an approved plan in place and, subsequently, on September 29, 2009, was issued two citations by MSHA Inspector Keith Roberts. In addition, MSHA sent a deficiency letter to Mach that addressed the points remaining at issue. The letter and the citations list the

-1-

specific items that are in dispute in the site specific plan for the #3 longwall panel and the base, or general, plan at the mine. At hearing, the parties stipulated to specific items listed in the citations that remain in dispute for review by this Court. Specifically, the parties stipulated that the basis for the Secretary's disapproval of the ventilation plans involved the following issues:

1) Issue #1 in Citation No. 6680550 (panel #3) and Issue #6 in Citation No. 6680551 (general plan): Means of evaluating the effectiveness of the bleeders, bleeder evaluation points.

2) Issue #2 in Citation No. 6680550 and Issue #15 in Citation No. 6680551: Use of regulators as ventilation controls in the worked-out areas.

3) Issue #3 in Citation No. 6680550 and Issue #14 in Citation No. 6680551: Use of stoppings as ventilation controls in the active tailgate entry.

4) Issue #4 in Citation No. 6680550 and Issue #9 in Citation No. 6680551: Use of belt air to ventilate the working longwall face.

5) Issue #1 in Citation No. 6680551: Requirement to specify means of compliance with 30 C.F.R. § 75.332, continuous mining machines and split air.

6) Issue #3 in Citation No. 6680551: Requirement to show means of ventilating idle places and places where the roof bolter is operating.

7) Issue #4 in Citation No. 6680551: Inclusion of a depth-of-water action level to avoid issues regarding safe travelways.

8) Issue #8 in Citation No. 6680551: Requirement to change the manner of shuttle car operation.

9) Issue #11 in Citation No. 6680551: Requirement to use something other than check curtains in the headgate entry to direct air across the face.

MSHA argues that the above items, except issue #4 in Citation No. 6680551, should be included in the plan in a manner that meets MSHA's goals of providing a safe and effective ventilation plan. Mach argues that the plan it has used for panels #1 and #2 in the mine has worked successfully and, therefore, will work successfully for panel #3 without any change. Further, Mach alleges that its ventilation system is superior to other systems due to the high capacity fans that allow it to ventilate without "artificial" controls.

The Secretary maintains that the MSHA district manager was not arbitrary and capricious in finding that Mach's current ventilation plan is not suitable for the mining conditions at the #1 Mine while, on the other hand, the plan proposed by MSHA is suitable. The Secretary argues that the district manager, with the assistance of others at MSHA, reviewed all factors and reached a reasonable conclusion regarding the plans.

The contested citations allege violations of 30 C.F.R. § 75.370(d), which states that "[n]o proposed ventilation plan shall be implemented before it is approved by the district manager." In deciding whether to approve a proposed ventilation plan MSHA looks to § 75.370(a), which provides in pertinent part that "[t]he operator shall develop and follow a ventilation plan approved by the district manager [and] [t]he plan shall be designed to control methane and respirable dust and shall be suitable to the conditions and mining system at the mine." 30 C.F.R. § 75.370(a).

As a general matter, the Commission has held that plan formulation under the Mine Act requires MSHA and the operator to negotiate in good faith for a reasonable period of time concerning disputed plan provisions. *Carbon County Coal Co.*, 7 FMSHRC 1367, 1371 (Sept. 1985). "Two key elements of good faith consultation are giving notice of a party's position and adequate discussion of disputed provisions." *C.W. Mining Co.*, 18 FMSHRC 1740, 1747 (Oct. 1996). In this proceeding there is some question as to whether Mach negotiated in good faith. Mach requested that negotiations end a number of times in order to take the matter to hearing. It is no secret that Mach was up against a deadline to set up the #3 panel so that the longwall could be moved on time. In addition, there is testimony from one of Mach's witnesses regarding the use of the hearing process to resolve ventilation plan disputes in other districts, which could imply that Mach failed to negotiate in good faith. (Tr. 480). Further, Mach hired two experts, Hartsog and Blandford, in July and August 2009 to advise the mine and create courtroom exhibits for the anticipated hearing. (Tr. 505, 572-573, 587-589). However, in spite of such evidence, the record supports the premise that the Secretary and Mach had extensive back and forth discussions over a period of eight months. *See Emerald Coal Res., LP*, 29 FMSHRC 956, 967 (Dec. 2007). The discussions between the district manager and Mach included telephone calls, emails, letters and meetings, at both the district and national level. During the negotiations both parties made adjustments in their positions regarding the issues. The discussions were ongoing and, based upon those talks, several of the issues were removed from consideration. While I believe the Secretary's argument that Mach failed to negotiate in good faith has some merit, the evidence presented indicates that what negotiations did occur adequately met the requirement of good faith consultation.

For reasons that follow below, I affirm Citation No. 6680550 and Citation No. 6680551 and dismiss Mach's contest proceeding.

## Findings of Fact

Mach employs a longwall mining system at the #1 Mine. (Tr. 143-144). The dispute in this case centers on whether Mach's proposed system of ventilating panel #3 is suitable, as well as whether the base, or general, plan is suitable to the conditions at the mine. Mach's ventilation system is a "push-pull" fan system, designed to flood the entire mine with air. The "push" of this system is provided by a large capacity intake fan that sends air into the mine, while the "pull" is provided by a large capacity exhaust fan at the back of the bleeder shafts that pulls air out of the mine. Some stoppings and curtains are utilized in the system, but fewer than in a traditional system. Mach's position is that, because the fans put such velocities and volumes of air into the mine by utilizing pressure differentials, the air flows across the face, adequately ventilates the gob area and exits by way of the bleeders. In Mach's view, the system works well and should not be changed or adjusted. The ventilation system design is a relatively new one that has provided ample air to ventilate the #1 and #2 panels during mining. However, the system is not flexible or easily altered, making it difficult to meet changing needs as mining progresses.

Mach's system utilizes the development sections to create the main entries and the gate road entries for the longwall. (Tr. 143). The development system makes use of three mine entries with connected cross-cuts. (Tr. 148). At the time the citations were issued the mine had developed and mined the #1 panel and was in the process of mining the #2 panel. Part of the dispute in this case arose when Mach began to develop panel #3. While mining the #2 panel the mine encountered adverse roof conditions, primarily in the bleeder entries of the mine. In an effort to avoid further adverse roof conditions, the mine developed panel #3 1000 feet beyond the bleeders of panels #1 and #2. This extended development was done without consultation or approval of MSHA.

Inspector Keith Roberts, who has more than 30 years of mining experience, testified that he reviewed the two plans at issue for the #1 Mine. After consultation with the district manager, and armed with information from MSHA and a survey team, Roberts drafted the list of deficiencies contained in the citations. He did so with the input of technical support, including that of Dennis Beiter, a ventilation specialist. After discussing his findings with the district manager, he, along with MSHA personnel, discussed the two ventilation plans with Mach. On several occasions, all parties traveled to Arlington to speak with higher ranking authorities regarding the plans. Roberts visited the mine on several occasions and consulted with inspectors, supervisors, and the operator about the various issues that continued to be disputed.

Robert Phillips, the MSHA district manager in Vincennes, Indiana at the time of this dispute, has been in the mining industry in various positions since 1960 and has been employed by MSHA for 27 years. At the time Phillips started working in this position he was notified that roof control problems existed at the Mach #1 Mine, and that the mine was operating with a "conditional" ventilation plan. In response, Phillips spoke with his roof control specialist about reviewing that plan and arranged to have the ventilation plan reviewed so that an unconditional plan could be put into place. About the same time, the Contestant asked for a review of the ventilation plan for the #3 panel, which had been developed 1000 feet beyond the bleeders of panel #1 and #2. MSHA issued a citation for failing to follow a ventilation plan and, after a contest, Judge Manning agreed that Mach had made a substantial change to the ventilation that required plan approval. *Mach Mining*, 31 FMSHRC 709, 714-715 (May 2009) (ALJ). Mach and MSHA were engaged in two plan discussions: one for the overall mine, and one specifically for the #3 panel area that was being developed with an eye toward mining after the #2 panel was complete. Mach was eager to develop the #3 panel so that it was ready to mine once the #2 panel was complete. Consequently, it pushed MSHA to make findings with regard to the ventilation in that area so that it could have a plan in place to meet the mine's timeline for development. While Mach pushed ahead its plans for the #3 panel, it was also negotiating on a base, or overall, plan for the mine.

District Manager Phillips explained that each district has its own procedure for processing and approving ventilation plans. First, Phillips reviews the plans in a cursory manner and then forwards the plan for review to his technical assistant. From there, the plan is forwarded to the proper supervisor for ventilation. The plan is then faxed to the field office responsible for the mine where the inspector assigned to the mine reviews and provides remarks on the plan. The plan then goes back and forth between the inspector and his supervisor before the remarks are sent to the ventilation supervisor in the district. Phillips, in order to keep track

of the progress of the plan, requires comments from his staff and from the mine to be put in writing rather than exchanged verbally. If there are issues, he asks for assistance, as he did here, from the technical support division of MSHA. Mach's proposed plan, Gov. Ex. 1, dated June 4, 2009 and the proposed plan for the #3 panel, Gov. Ex. 2, dated September 3, 2009, went through such a process. After much discussion and review, both plans were rejected on September 29, 2009. (Tr. 299-302).

I find District Manager Phillips to be thoughtful in his deliberation regarding the plan, and cautious in reviewing every comment and document provided to the district. He sought the assistance of not only the technical support division, but also the headquarters office in Arlington, Virginia. Phillips credibly testified that he considered all input when making his decision regarding the two plans and signing the letters regarding the deficiencies in the plans submitted by Mach.

a.    *Use of Belt Air to Ventilate the Working Longwall Areas. Issue #4 in Citation No. 6680550 (Panel #3) and Issue #9 in Citation No. 6680551 (General Mine Ventilation Plan).*

The Secretary's position is that Mach did not justify the use of belt air as required by the Secretary's new regulation found at 30 C.F.R. § 75.350(b) that requires the operator to provide substantial justification for the use of belt air. The new regulation, according to its preamble, requires a mine operator to have a compelling "need" to use belt air. *Flame-Resistant Conveyor Belt, Fire Prevention and Detection, and Use of Air from the Belt Entry*, 73 Fed. Reg. 80580-01, 80591-92 (Dec. 31, 2008)   Mach, on the other hand, stresses that its system is designed to use belt air, which it has used successfully on the first two panels. In Mach's view, the system delivers twice the required air to the face and, as a result, there have been no respirable dust citations or methane ignitions. Mach argues that the use of belt air is necessary to keep the longwall face ventilated and, further, it is "safer" to use belt air than not.

Phillips and Roberts credibly addressed the issue of belt air in their testimony. Phillips explained that a new belt air rule was implemented in March, 2009. The Mach "conditional" plan had been approved prior to the new rule and the mine was using belt air to ventilate the working areas in the #2 panel. In an effort to give Mach more time to address the issue, MSHA agreed that Mach could continue to use belt air in the #2 panel while discussing the new plan. However, MSHA did not approve the use of belt air for the #3 panel. In reviewing the Mach plan, Phillips relied on a memo outlining the new belt air rule that was prepared by MSHA and circulated to all district managers. Gov. Ex. 3. The memo explains the new belt air regulation and instructs the district managers to look to four specific items in evaluating the use of belt air. First, the operator must evaluate the hazardous condition it believes will be addressed by using air from the belt entry. In most cases, the hazard will be either methane or dust at the working area. Second, the operator must evaluate how the belt air will mitigate the hazard and explore other possible solutions. Third, the operator must review technology and safety measures that it will implement to use belt air. Fourth, and finally, the district manager must determine whether the use of belt air would afford at least the same measure of protection as not using belt air. The guidance given to the district managers tracks the standard and explains the regulation and its intent. *Id.*

Phillips explained the long history of belt air, including the belt air committee and its recommendations regarding the use of belt air. He discussed the general hazards associated with using belt air in working areas, including smoke and fire carried to the working face from the belt. According to Phillips, Mach failed to address the four criteria necessary for him to make a reasoned decision, and therefore did not justify the use of belt air in its plan. Phillips requires more of an explanation and Mach has not provided it. (Tr. 314-317).

Roberts agreed with Phillips regarding the use of belt air. In his testimony, Roberts described how Mach's proposed plan depicts the use of belt air to ventilate the working sections. However, he stated that Mach failed to identify a hazardous condition that would justify the use of belt air and, in addition, did not discuss providing at least the same measure of protection as entries that were not using belt air. Further, Roberts reviewed the new regulation and administrative documents and understands that a mine operator must meet all of the requirements in the regulation in order to justify the use of belt air. (Tr.78-80).

Mach's position is that it would be "less safe" if it were not permitted to use belt air to ventilate the longwall face. Mach used belt air to ventilate the longwall face in panel #1 and #2 and, therefore, according to Mach, its safety is justified. Mach has had no dust violations in the belt entry on the active longwall section or longwall face. (Tr. 110, 397). Mach argues that hazards would be present without the use of belt air, and believes it has justified the use to the district manager. Mach argues that it submitted some additional information to the district manager at a meeting in Arlington, Virginia, but was under the impression that belt air would not be allowed and did not pursue it further. (Tr. 346-349). Gary Hartsog, Mach's expert witness, testified that eliminating the use of belt air would cause problems with the overall ventilation system. He explained that in order to direct the belt air outby, the mine must turn down the bleeder fan to such a low setting that there would not be enough air going through the gob to keep it adequately ventilated. (Tr. 520). While Hartsog acknowledged the inherent dangers recognized by the belt air technical study panel, he nevertheless believed that it was safe to use belt air at the #1 Mine. (Tr. 578-581).

Phillips agreed that Mach had expressed concerns about discontinuing the use of belt air. However, there is no evidence in the record that Mach provided sufficient information during its meetings with MSHA to explain its position. Mach, in turn, agrees that MSHA believes Mach had not submitted enough information. The citations and the letters explain to Mach that they have not provided sufficient information to the District to make an appropriate evaluation of the use of belt air. At the present time, given that Mach has not provided sufficient information to justify the use of belt air, the plan proposed by MSHA is suitable.

b.      *Bleeder Evaluation Points. Issue #1 in Citation No. 6680550 (Panel #3) and Issue #6 in Citation No. 6680551 (General Ventilation Plan): Means of Evaluating the Effectiveness of the Bleeders and Specifically Evaluation Points in the Bleeder System.*

MSHA requires Mach to evaluate the effectiveness of the bleeders, and, as part of that obligation, requires bleeder evaluation points at specific locations. MSHA argues, among other things, that 30 C.F.R. § 75.364(a)(2)(iii) requires that at least one bleeder be walked every seven

days. The purpose of the regulation is to ensure that the bleeders are free from obstructions and that proper air quantity, quality, and direction continue throughout the system. Mach counters that, because of unstable roof, it is not safe to walk the bleeders and it is not necessary because the air is tested at the point it exits the mine. Mach believes that, given the velocity and pressure differential of the air, there is no need to risk evaluating the bleeder areas when a reading is taken "around the perimeter" and at the end of the system. According to Mach, the risk associated with walking the bleeders far outweighs the information obtained. Mach points out that it has evaluated its bleeders for the first two panels and will continue to do so for panel #3, but without using the evaluation points sought by MSHA.

Dennis Beiter is employed by MSHA in the Pittsburgh Safety and Health Technology Center as the supervisor of the Ventilation Division. (Tr.136). He spends half of his time supervising and the other half participating in mine investigations, face ventilation investigations, and investigations into explosions, accidents, fires and ignitions. Beiter has worked in underground coal mines in Pennsylvania and Illinois, and has worked for MSHA as a mining engineer in ventilation since 1991. He holds a Bachelor of Science in mining engineering from Pennsylvania State University and served on a committee that explored issues associated with bleeders and gob in the aftermath of a fatal explosion at South Mountain. As a member of that committee, he drafted a report on the bleeder and gob issues and made recommendations for education regarding bleeder ventilation systems in underground coal mines. (Tr. 138-139). He is well qualified as an expert in underground coal mine ventilation and ventilation surveys.

Beiter and his team conducted two ventilation surveys at the Mach Mine. The first survey was conducted from March 31 through April 2, 2009, and the second in June. (Tr. 145). At the time of the first survey, the mine had completed mining panel #1 and had advanced about 1000 feet in panel #2. (Tr. 150). Beiter conducted an air pressure and air quantity investigation. He also conducted a tracer gas study, collected bottle samples, took underground readings at identified locations, measured pressure differentials, and used chemical smoke and hand-held gas detectors to determine the direction of airflow and the levels of methane and oxygen. A map attached to his report provides an overview of the bleeder system, the pressure differentials, and the key locations of the ventilation system. Gov. Ex. 4 Figure 1. It also indicates all places where readings and measurements were taken during the survey. (Tr. 147- 148). Beiter relied on this map, as well as others, during his testimony. Gov. Ex. 4 Figure 1, 4.

Beiter and his team, along with representatives from the mine, traveled every bleeder entry and stood in every cross-cut, except those that were not safe due to the deteriorating roof condition in the bleeder entries. They used chemical smoke to determine air movement in all of the cross-cuts between the bleeder entries and the south mains for headgate number one. (Tr. 157, 163). Beiter, or persons in his party, traveled both tailgate entries, the number three entry, and the tailgate travelway in their entirety. They encountered deep water with bridges spanning the water in many locations. (Tr. 162). They traveled the bleeder entries from headgate number two to the bleeder shafts and outby tailgate number one for four cross-cuts, collecting information regarding the adequacy of the airflow distribution and the adequacy of the dilution of gases. (Tr. 180). Traveling the bleeders was necessary to determine if the ventilation system

was effective, as well as to determine what effect the roof falls had on the system. (Tr. 181-181).

The #1 Mine uses an intake shaft with a blower fan located at the surface to bring air into the mine. As the air enters the mine, it is forced into the mine with the blowing fan at the top of the intake shaft. (Tr. 149). At the other end of the mine are two bleeder shafts, one cross-cut apart, that join one another before reaching the bleeder shaft fan. (Tr. 150). The air reaches the bleeder shaft through the bleeder entries, which are perpendicular to the longwall panels and the gate entries. (Tr. 152).

When Beiter's team began the first survey, panel #1 had been mined and was now the gob area. Panel #2 was in the process of being mined and the bleeder entries were connected with the bleeders for panel #1. The bleeders in panel #2 were changed from panel #1 when the mine encountered extremely bad roof. Five bleeder entries were mined from headgate number two to headgate one, and two entries continued on but were never were fully developed to reach the bleeder shafts. (Tr. 154). As the mine began to develop panel #3 in preparation for a move of the longwall from panel #2, the bleeder entries were again changed. Without MSHA's knowledge, Mach developed the bleeder entries of panel #3 an additional 1000 feet beyond the bleeders for panels #1 and #2. According to Beiter, the change in the bleeder entries has an effect on the ventilation and, in turn, on the ventilation plan. Beiter testified that the fact that one panel is mined, which in turn creates a gob area, affects the ventilation plan as each panel moves forward.

Based upon the studies completed by the technical support team, Beiter explained that when the air movement was examined between the number two entry and the number three entry of the tailgate, it sometimes traveled from two to three, and at other times from three to two. (Tr. 166). Beiter was able to determine that the air flow from headgate number one to tailgate number one passed over the gob, or worked-out area. He stated that "[e]ven though there is a significant volume of airflow . . . from headgate one towards tailgate one in the big sense, in the little sense at each cross-cut, there's not a significant volume you can measure." (Tr. 186). He explained that when panel #1 is mined out and panel #2 is being mined, the existence of panel #2 has an effect on how the air from the gob gets to the bleeder system. (Tr. 187). Further, he stated:

> In the three entry longwall development system, as the two panels are mined out, one subsequent to the other, the only opening left between the panels is the middle entry. The number one entry falls for the mining of panel one. Panel two caves entry number three. Now you have some open area along the perimeter of the walk that . . . has some open area to it. The primary place for air to flow and gas to accumulate in volume are in those open entries inby [the] face and along the cave material itself. (Tr. 187).

Beiter confirmed that Mach must have evaluation points to determine the air quality and quantity before the air reaches the bleeder entries and at points within the bleeder system. He suggested that evaluation points be placed at the areas proposed by MSHA because the evaluation points are necessary for panel number #3 and for the base ventilation plan. He

confirmed that the mining of panel #3 changed in design from the previous panels. When the panel #3 entries were driven, they were driven beyond those of panel #2, creating a "stair-step" in the bleeder entries inby panel #3. (Tr. 194-195). In order to determine if the system is functioning effectively, Beiter would require a number of measuring points and evaluation points. (Tr. 198-199).

Mach places much emphasis on the fact that both of Beiter's surveys contain the same conclusion, i.e., the bleeder system was working effectively on the date of each survey. However, the reports generated as a result of the surveys go on to reach a number of other conclusions. The conclusion of Beiter's team was that the "adequacy of the airflow distribution in the bleeder system and the dilution of methane elsewhere in the bleeder system in addition to the 30 C.F.R. Part 75.323(e) location(s), could not be determined from information collected [by the mine] at the required weekly examination locations for the bleeder system." Gov. Ex. 5 at 7. Beiter and his team were able to make their recommendation and conclude that, based upon measurements at evaluation points that are not contained in the proposed plan of Mach, the system was working effectively on the day of the survey. For this reason, Beiter believes that in order to adequately evaluate the system, readings at the evaluation points recommended by MSHA are important. Mach's proposal lacks "consideration of a very significant piece of information, and that's the adequacy of the airflow to dilute the contaminants that are being liberated in that worked-out area to safe levels." (Tr. 209). That is why Beiter suggested the location of evaluation points at the back end of panel #3 and the bleeder entries. (Tr. 209). Evaluation at those areas would provide representative information regarding airflow and the dilution of contaminants. (Tr. 209).

Beiter explained that Mach had requested a change to the mine ventilation plan for its #1 Mine to allow the use of a step bleeder system as it developed the #3 panel. He explained that MSHA could not approve the plan primarily because of the location of the evaluation points for the ventilation system. Mach asserts that it is sufficient if it tests and finds little, if any, methane at the point the air exits the mine. However, the exit point does not explain to Mach or MSHA where the air is going or what the readings are at the working areas or idle areas in the mine. It is critical, as Beiter explained, that the system be evaluated and tested at various points in the mine.

Anthony Webb, the general mine manager for the Mach #1 Mine, explained the mine's current method of evaluating the bleeder system and confirmed that it is the method used in panels #1 and #2. (Tr. 378-380). Webb testified, as he did with each issue, from notes that were handed to him by his attorney, thereby making his testimony less believable. He testified primarily about the quantity of air that moved in the system. He believes that the evaluation points suggested by MSHA cannot be representative of what is going on in the flow path of the system. (Tr. 389). Webb maintains that during the prospective mining of panel #3, ventilation will not be any less effective given that the mine fan still has 30% unused capacity left and, therefore, further evaluation points sought by MSHA are unnecessary. (Tr. 388). In Webb's view the value of the data must be weighed against the risk of obtaining it. (Tr. 390).

Mach argues that it has developed an "alternative method of evaluation" of its bleeder system through the evaluation and monitoring of points located around the perimeter of the

bleeder system. Mach claims it is able to obtain all relevant information, including the air quantity, quality, and direction, without endangering the lives of miners by requiring them to walk the bleeder entries. According to Mach, the evaluation points around the perimeter tell the examiner that the air is moving in the right direction, while the evaluation point on the surface reads the quantity and quality of air that exits the bleeder system. Mach's expert, Gary Hartsog, agrees that the evaluation points proposed by Mach are effective to evaluate the "ventilation system." (Tr. 548-49). Hartsog, who has an engineering degree from West Virginia University, conducted his own ventilation survey after reviewing the two conducted by MSHA. (Tr. 513). He reached the same conclusion as Beiter, i.e., that the system was effective at the time of his survey. However, he did not make any recommendations or address the recommendations made by MSHA as a result of their own ventilation surveys.

Mach admits that wide variations in air quality, as portrayed in Beiter's survey, are coming through the bleeder system. Mach Brief at 10; (Tr. 236-237). Hartsog says that traveling the bleeder system would provide "minimal relevant information." (Tr. 556). In his opinion, the evaluation around the perimeter would provide sufficient information to evaluate the effectiveness of the bleeders. (Tr. 549). Hartsog admits, however, that taking air measurements at the exhaust fan will not indicate where, and in what quality, the air has traveled in the bleeders

There is no question that there are adverse roof conditions existing in bleeders which may deteriorate further as mining progresses. However, those adverse roof conditions may have an effect on the ventilation system. (Tr. 552). The district manager's reliance on the information gathered by Beiter and the conclusions reached by Beiter's team are all well-founded and suitable for this mine. I conclude that, unlike Hartsog's proposals, the evaluation points recommended by Beiter give a complete view of the effectiveness of the ventilation system.

c.    *Stoppings in Active Tailgate Entries. Issue #3 in Citation No. 6680550 (Panel #3) and Issue #14 in Citation No. 6680551 (General Ventilation Plan): Use of Stoppings as Ventilation Controls in the Active Tailgate Entry.*

The Secretary argues that Beiter's survey established that air was moving toward the active tailgate entry, rather than away from the active tailgate entry, and that stoppings should have been in place to assure the correct movement of air. (Tr. 210-11). The stopping line required by MSHA would protect the active tailgate entry from methane and move air away from that entry. Mach argues, again, that its system is effective without imposing new ventilation controls. Mach alleges that MSHA failed to prove that the use of controls in the #1 Mine is safer and therefore more suitable to the mine.

It is Beiter's opinion that there should be ventilation controls in the bleeder entries of panel #3 that are sufficient to control and distribute the airflow. (Tr. 206). The lack of ventilation controls makes it difficult to control airflow distribution in the system. He explained that during his survey it was clear that the controls in headgate number two were critical to controlling the airflow of the system. Those controls worked in conjunction with the curtains near the face to build pressure across the worked-out area and provide airflow across the longwall face and into the bleeder entries. The controls, not part of the Mach proposal, are

important to establish pressure differential and direction of airflow into the worked-out area, in the headgate, and on the longwall face. (Tr. 206).

Stoppings are necessary, based upon the MSHA survey, to "prevent the vast majority of any airflow that was in the number two entry and its contaminants from entering into the tailgate entry." (Tr. 211). Beiter's opinion is based not only on the two surveys conducted at the mine, but also on his observation of notable changes in the air movement when stoppings were put in place during the course of the second survey. The second survey was conducted in the same manner as the first and, like the first survey, was conducted with Mach personnel. (Tr. 212-213). The longwall face had progressed at the time of the second survey from about 800 feet to approximately 4800 feet in the second panel. (Tr. 215). Ventilation controls, i.e., stoppings, that were in place for the first survey had been removed by the time of the second survey. Gov. Ex. 5 Figure 5. The second survey began on June 9. When the survey team returned on June 11, the stoppings had been reconstructed in the same manner as they had been for the first ventilation survey. According to Beiter and his team, the stoppings made a significant difference in airflow patterns and pressure differential. (Tr. 217). The pressure differential changed when the ventilation controls were reconstructed prior to the team's arrival on June 11. (Tr. 221). The result was that the direction of air movement carried the liberated gases into the caved areas. (Tr. 222). Mach argues that the change in the stoppings is insignificant, that the ventilation controls will compromise the overall Mach system, and that they are difficult to construct. Mach, however, presented no real evidence that the tailgates would be adequately ventilated without the stoppings in place. Beiter's view of the need for stoppings, however, has a legitimate basis in fact and is a sound basis for the inclusion in the ventilation plan.

d.    *Bleeder Entry Ventilation Controls. Issue #2 in Citation No. 6680550 and Issue #15 in Citation No. 6680551: Use of Regulators as Ventilation Controls in the Worked-out Areas.*

The Secretary argues that because Mach chose to drive the #3 panel 1000 feet outby the bleeder entries of panel #1 and #2, it created a stair-step effect that requires controls to ensure proper ventilation in the bleeder entries. MSHA proposes a permanent stopping line and other controls across the bleeders behind panel #3. The ventilation controls are needed to ensure that air does not short circuit and travel through caved areas or around the corner of the stair-step. (Tr. 198-199, 203, 205-207).

At the time of Beiter's second survey, Mach removed ventilation control stoppings behind panel #2, which resulted in a redistribution of air in the bleeder system. (Tr. 216-217, 220-222). Mach's expert, Hartsog, believes that the controls suggested by Beiter would only add resistance in the system and slow down the air movement. (Tr. 564). Hartsog failed to explain how the air would avoid a short circuit without some control in place. Hartsog also opined that it would be difficult to get to the area to build stoppings. He testified that it would take enormous time and effort to get the materials into the bleeders for construction, and that it might prove to be dangerous to undertake construction given the roof conditions. (Tr. 552-554). Consequently, Mach argues that no stoppings should be built in the bleeder system because it would be labor intensive and the roof is bad. In addition, Mach believes that its ventilation design works

effectively because there are few, if any, ventilation controls to block or redirect air flow. (Tr. 419-20, 550-56).

The Secretary has demonstrated the need for ventilation controls in the bleeder entries and the importance of those controls to be included in the ventilation plan of the mine.

e.    *Ventilation of Idle Places and Places where Roof Bolter is Operating. Issue #3 in Citation No. 6680551: Requirement to Show Means of Ventilating Idle Places and Places Where the Roof Bolter is Operating.*

The Secretary argues that a methane buildup hazard is created when a curtain is not present to direct air into idle areas that have been cut but not yet bolted.

Mach argues that MSHA failed to demonstrate a basis for requiring Mach to ventilate its idle areas or areas where roof bolting operations were occurring. Mach has not been asked in the past to use a line curtain to direct air from the main ventilation into idle places or into areas where roof bolting is occurring. (Tr. 90, 355). It is Mach's opinion that, by not using the line curtain the mine avoids directing dust from the continuous miner, that may be working in the area, onto its roof bolters. MSHA, on the other hand, is concerned with methane accumulations in those areas. Mach counters that the mine has not experienced a methane buildup in idle areas, or areas where roof bolts are being installed. In addition, Mach avers that roof bolting machines are equipped with methane monitors and that the bolters use a probe to sweep the area in front of them as they progress. (Tr. 408).

Roberts explained the potential methane hazard that exists if the area where roof bolters are working is not adequately ventilated. The line curtain, in most cases, is used when the continuous miner is cutting, and therefore is already in place and may be adjusted to accommodate the roof bolters. Phillips agreed, and added that an additional factor that must be considered is the nature of roof bolting in causing a spark and, in turn, an ignition if methane has been allowed to build while an area is idle. (Tr. 69). The Secretary points out that adjustments can be made and that it is far safer to avoid a methane buildup in those idle areas, or areas that are being roof-bolted, than it is to completely disregard having a curtain for fear that more dust will reach the roof bolter operator. The Secretary demonstrates a legitimate concern for the possibility of a methane buildup in those areas that are currently idle but will eventually require the roof bolter to enter and bolt the roof.

f.    *Continuous Miners on the Same Air Split. Issue #1 in Citation No. 6680551: Requirement to Specify Means of Compliance with 30 C.F.R. § 75.332.*

As a result of a complaint at the mine, Inspector Roberts issued a citation alleging a violation of 30 C.F.R. § 75.332(a). Roberts found that, contrary to the regulation, two continuous mining machines were operating on the same split of air. (Tr. 57). Roberts, in advising the district manager to include a provision regarding the use of split air in the mine ventilation plan, explained that MSHA wants to assure that the mine has a plan in place to deal with two continuous miners working on the same split of air. (Tr. 70-71, 66,-67). However, both Hartsog and Webb testified that Mach is using an appropriate system to meet the

requirements of the standards and it is not necessary to have the provision in the plan. (Tr. 405-407, 568).

The Secretary avers that, in order to assure compliance, it is appropriate to include a provision regarding the use of air splits when two continuous miners are operating. MSHA relies, rightly, on the premise that additional provisions, including the subject air split provision, may be required to be included in the plan as "required by the district manager." Gov. Brief at 18; 30 C.F.R. § 75.371.

g.      *Issue #4 in Citation No. 6680551: Inclusion of a Depth-of-Water Action Level.*

Mach asks the Secretary to include a provision in the plan allowing the accumulation of up to 12 inches of water before any action is taken. Mach seeks a means to ascertain when a citation may be issued for accumulation of water in the bleeder entries in violation of 30 C.F.R. § 75.371(a). Webb testified on behalf of Mach that 12 inches of water is not a hazard and therefore the proposal is sound. MSHA refused the provision as an attempt on the part of Mach to circumvent the regulation, something that the district manager will not allow. I conclude that the district manager was well within his discretion to deny a proposed plan that places limits on a mandatory standard.

h.      *Issue #8 in Citation No. 6680551: Requirement to Change the Manner of Shuttle Car Operation, and Issue #11 in Citation No. 6680551: Requirement to Use Something Other than Check Curtains in the Headgate Entry to Direct Air Across the Face.*

The Secretary did not present evidence at hearing or brief the issue of the requirement to change the manner of shuttle car operation, or the requirement to use something other than check curtains in the headgate entry to direct air across the face. As a result, I refrain from addressing these issues.

## Conclusions of Law

While plan contests are based on consultations between the Secretary and the operator, the Commission has recognized that "the Secretary is [not] in the same position as a private party conducting arm's length negotiations in a free market." *C.W. Mining Co.,* 18 FMSHRC 1740, 1746 (Oct. 1996). As one court has noted, "the Secretary must independently exercise [her] judgment with respect to the content of . . . plans in connection with final approval of the plan." *UMWA v. Dole,* 870 F.2d 662, 669 n. 10 (D.C. Cir. 1989), *quoting* S. Rep. No. 95-181, at 25 (1977), *reprinted in* Senate Subcomm. on Labor, Comm. on Human Res., *Legislative History of the Federal Mine Safety and Health Act of 1977,* at 613 (1978).

The framework for resolution of a plan dispute has been established by the Commission in a number of cases, including *Twentymile Coal Co.,* 30 FMSHRC 736, 748 (Aug. 2008). The Commission has held that, "absent bad faith or arbitrary action, the Secretary retains the discretion to insist upon the inclusion of specific provisions as a condition of the plan's

approval." *C.W. Mining Co.,* 18 FMSHRC at 1746. At issue is whether the Secretary properly exercised her discretion and judgment in the plan approval process. The standard of review incorporates an element of reasonableness. *See Monterey Coal,* 5 FMSHRC 1010 at 1019 (June 1983). I must therefore look at the issue of suitability in terms of the discretion of the district manager.

*a.      Unsuitability of the Current Mach Plan.*

There are two plans at issue in this case: (1) a general plan for the entire mine and (2) a specific plan for the mining of panel #3. MSHA issued a citation for each plan. Because the issues are fundamentally the same in each citation they may be addressed together. The general plan was in effect when Phillips came to District 8. At that time there was no plan for the development and mining of panel #3. Rather, the plans in place were conditional plans. After his arrival, Phillips instructed his ventilation supervisor to contact Mach and start working on a plan that was not "conditional."

The ventilation plan that was in place at the Mach #1 Mine was found to be unsuitable in a number of ways. First, it did not address the #3 longwall panel that had already been developed an extended distance beyond the bleeders of panels #1 and #2. In developing the panel #3 bleeders 1000 feet beyond those in panels #1 and #2, the mine created a stair-step in the bleeder system and had no means of evaluating the area. This was a substantial change in the ventilation plan and it needed to be addressed. In addition, the longer Mach continued to mine under that plan, the more gob it created, which in turn necessitated ventilation changes to meet the changing circumstances in the mine. Further, as mining progresses and Mach moves forward with panel #3, the air has a longer route to travel. The plan in place contained no provision for these contingencies and therefore was not suitable. Finally, the mine had been conditionally granted the use of belt air, but, following the implementation of the new belt air regulation, the district manager was directed to review the matter. As a result, it is clear that the plan in place was no longer suitable for the mine.

The ventilation surveys conducted by Beiter and technical support at the mine demonstrate that the ventilation was good at the time of the survey. Mach takes this to mean that the plan in place was working, i.e., suitable, and need not be changed. In fact, the experts who testified on behalf of Mach assert that the ventilation system is so good, that it will last throughout the mining of six panels or more. MSHA counters that the system no longer functions properly as new panels are developed and specifically as the # 3 panel begins.

Mach's argument fails to take into account the changing conditions at the mine, i.e., the stair-step bleeder that has been created, the fact that the air course is longer, and the fact that there is a much larger mined-out area, or gob, to ventilate. I agree with the district manager that the plan in place was not suitable to the Mach mine and therefore was subject to review by MSHA.

*b.    Suitability of the MSHA Plan.*

Next, the Secretary must show that the district manager did not abuse his discretion in determining that the MSHA plan is suitable to the conditions at the Mach #1 Mine. Specifically, the Secretary must show that the actions of the district manager were not arbitrary and capricious in his review and decision-making regarding the plan and its suitability. The Commission has defined "suitable" as " 'matching or correspondent,' 'adapted to a use or purpose: fit,' 'appropriate from the view point of . . . convenience, or fitness: proper, right,' 'having the necessary qualifications: meeting requirements.' " *See Secretary v. Peabody Coal Company* 18 FMSHRC 686, 690 (May 1996)(omission in original), *quoting Webster's Third New International Dictionary* 2286 (1986), aff'd 111 F.3d 963 (D.C. Cir. 1997). The evaluation points proposed by MSHA, the ventilation controls, and the belt air all must be suitable to this mine.

The evidence presented by the Secretary clearly demonstrates that the MSHA proposal is suitable as it relates to the evaluation points for the bleeder system. First, Bieter's testimony is well founded that measuring the quality and quantity of air traveling through the system at various points is a crucial part of the ventilation plan, and that the perimeter checks or the exhaust check proposed by Mach is not adequate. The bleeder system was changed by Mach and created an even greater need for reliable evaluations of the system. Mach argues that the plan in place is good enough and that the extended bleeders have not changed that. MSHA refutes this argument based upon the surveys conducted by Beiter. Beiter testified that, if the mine uses the evaluation points it proposes, the information will not be sufficient to evaluate the effectiveness of the system.

Beiter explained that ventilation controls are necessary in the bleeders and the tailgate area, and that the proposal by MSHA is suitable. He was able to witness the changes in the air quantities and qualities when he conducted his second survey. Midway into that second survey, the mine made changes by installing stoppings in certain areas. Given these changes, Beiter opined that the ventilation controls are important and essential to an effective system.

The ventilation surveys conducted by MSHA's technical support people indicate that, while the ventilation system works well, it is important nevertheless to evaluate it at different locations in the mine to be sure that there is no methane or dust in those areas. An evaluation at the exhaust fan where all air exits the mine is not a credible indication of air quality and quantity as air travels through the mine. The evaluation points proposed by MSHA are critical in providing the information necessary to determine the effectiveness of the ventilation system. If the areas cave as the mine says they will, given the roof stresses Mach observed, then those areas will affect the air, which in turn requires an even greater need to regularly and reliably confirm the effectiveness of the bleeders and the ventilation as a whole. MSHA has demonstrated that its plan, which requires the mine to evaluate the air at the recommended evaluation points, is suitable to the mine. The Secretary has demonstrated that, as successive panels are mined, additional airflow paths through the larger worked-out area are created. These additional airflow paths, coupled with the creation of open areas where gases can accumulate, result in a more complex system, which, if not properly addressed, poses a hazard to miners. (Tr. 224).

While Mach's #1 Mine currently uses belt air, MSHA has determined that it may not be suitable. MSHA considers belt air and its associated hazards so important that it commissioned a panel to look into the issue and author a report. As a result of that report a new regulation was promulgated and district managers were given guidelines to follow when making a determination as to whether the use of belt air is appropriate in each circumstance. The regulation, which became effective in March 2009, imposes a higher standard upon mine operators to show that the use of belt air to ventilate the face is a safe option. The panel and the MSHA directive both indicate that belt air should not be used at the face unless there is no safe alternative. Based upon the testimony, the use of belt air has not been eliminated from consideration by the Secretary. However, Mach has a duty to provide further information and justification in order to continue the use of belt air. Mach's argument focuses on how detrimental reversing the belt air would be to the overall ventilation plan. However, Mach did not attempt to address the possibility of directing the air in some other manner or offer an alternative to belt air that is workable. Instead Mach relies upon its argument that it is safer to use belt air because, if the mine is required to turn the belt air around, it will take away air meant to ventilate the face and gob.

I credit Beiter's testimony far more than the generalization made by Mach's expert, Hartsog. Beiter spent significant time in the mine and conducted two very thorough studies of the ventilation system in its entirety. Beiter examined all of the changes made by the mine and the effect those changes had on ventilation. The district manager relied on the information provided by Beiter and his team, and rightfully determined that the plan proposed by MSHA is suitable for this mine.

The parties agree, and I concur, that the current ventilation system at the Mach #1 Mine is a new system that utilizes a high volume of air with the intention of keeping all areas free of methane and dust. The #1 Mine is well built and incorporates a good ventilation system as well as wide entries and up-to-date technology. Although the mine has received dust citations, it has not received a citation for dust at the working face in the two years it has been in operation. The measurements taken at the exhaust fan after the air has left the mine have never shown a methane concentration greater than .4. However, all of this is not enough to convince me that, as Mach asserts, the ventilation plan does not now need, nor ever will need, any changes.

c.    *Decision of the District Manager.*

The Commission in *Twentymile Coal* applied the following guidance in determining if the actions of the district manager are arbitrary and capricious:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." In reviewing the explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not

intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. 30 FMSHRC at 754-755, *quoting Motor Vehicle Mfr's Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

I find that the district manager in this case went beyond the requirements of examining relevant data by seeking out data, information, and opinions from a number of highly qualified people. He articulated a satisfactory explanation both for his finding that the Mach plan was not suitable to the mine and for his determination that the provisions sought by MSHA are suitable. The record clearly demonstrates that the district manager had a solid basis to determine that Mach's plan was not suitable. He understood that the mine was operating on a "conditional" plan, and that the plan contained the use of belt air to ventilate working areas. He was aware that the mine had started to develop the #3 panel, had created a stair-step in the bleeder area, and that the mine had suffered a number of roof falls that may have affected the ventilation.

Further, I find that District Manager Phillips did not abuse his discretion in determining that the plan changes requested by MSHA are suitable to this mine. Based upon the information provided to him from multiple sources, i.e., input from the agency and from the mine, he determined that the use of belt air needed further examination, that there must be relevant evaluation points in the bleeder system, that ventilation controls must be put in place, particularly in the bleeders and the tailgate area, and that the area where the roof bolters are operating must be ventilated. The changes proposed by MSHA are within reason and are suitable to the conditions as they currently exist at the mine. There is a clear connection between the facts found by Phillips and the decisions that he made. His reasoning and explanation fit squarely with the information and evidence that was before him.

I find the approach of the district manager to be reasonable given all of the circumstances. In other words, the district manager's refusal to approve the Mach plan without the provisions listed in the citations was not arbitrary and capricious. The district manager was reasonable in determining that the plan in place at Mach was not suitable, both in general terms and in terms of the mining about to begin in the #3 longwall panel. Phillips did not approach the plans in a vacuum, but instead sought and received input from inspectors, their supervisors, roof and ventilation control specialists, MSHA's technical support division, and finally from the MSHA headquarters office in Arlington. Phillips spent months discussing the issues with Mach, requesting further information, meeting with them, and reviewing material. He has been in the mining industry for more than forty years and has extensive experience with ventilation and ventilation plans. He was familiar with the Mach #1 Mine, its ventilation system, and its arguments regarding the plan. He reviewed all of the information presented to him, followed the instructions of the agency and Congress in assessing the use of belt air, understood the risks of the plan, and, in the end, made a reasonable decision regarding the suitability of the plan provisions proposed by MSHA.

Mach argues that the district manager is seeking to make material changes to the mine's ventilation plan and that the changes make the mine unsafe, and the ventilation ineffective. This

argument focuses primarily on the issues of ventilation controls, belt air, and evaluation points. Mach argues that it makes the system less effective to use ventilation controls and eliminate the use of belt air, that by using the evaluation points proposed by MSHA the mine is less safe as the roof deteriorates, and that building stoppings is not safe and requires an unusual amount of labor.

I reject Mach's proposal that the Secretary be required to prove that the hazard addressed by a new plan provision either exists or is reasonably likely to occur, i.e., that the mine is less safe if the MSHA plan is put in place. "Section 303(o) of the Act, in setting forth the requirement that a ventilation plan be suitable to mining conditions, does not require that plan provisions be based on the existence of specific hazards or the likelihood that specific hazards may occur." *Peabody Coal*, 18 FMSHRC at 690. I conclude that the Secretary carried her burden of proving the suitability of the new MSHA plan provisions, once she identified a specific mine condition not addressed in the previously approved ventilation plan and addressed by the new provision. *Id.*

While MSHA agrees with Mach that the "push/pull" ventilation system is generally a good one, the nuances of the system need work. Mach's view is that the system is good and needs no changes now or in the future. Mach wants little, if any, MSHA involvement in the mine ventilation plan. It appears that while the system is a good one, it has little flexibility to meet the changing conditions in the mine. I find that the Mach experts diminished their credibility by insisting that the ventilation system works in all conditions ad infinitum. Such insistence ignores a realistic assessment of the potential for change as mining progresses. On the other hand, MSHA has reviewed and recognized that changes in the mine are inevitable and the plan must be flexible and meet such change. I find that the district manager was not arbitrary and capricious, that he made well thought-out decisions, and that the plan MSHA proposed is suitable to this mine.

### d. *Other Matters.*

I find no value in Mach's argument that MSHA approved its ventilation plan when it terminated a citation on September 9, 2009. The regulation is clear that a ventilation plan must be approved, in writing, by the district manager. 30 C.F.R § 75.370. There can be no dispute that this did not occur here.

I find no merit to Mach's argument that they should not be subject to both a general plan and a site specific plan for the #3 panel. The Secretary explained why the two discussions were ongoing. It appears that separating the discussions of the #3 panel from the general plan provided Mach an opportunity to focus on that which was most important to it, i.e., having a plan in place to move forward on their mining schedule.

During the course of the hearing, Mach attempted to introduce evidence concerning the ventilation plans at other mines, ventilation or dust surveys at other mines, and information that had not been provided to the district manager during the course of the negotiations regarding the ventilation plans. I refused to allow that evidence for several reasons, but most importantly because it is not relevant to the decision regarding the circumstances and suitability of the plan

to this mine. While I understand that many plans are based upon the experience at other mines, it is extremely unlikely that two underground coal mines would present exactly the same factual situation and the same needs in their ventilation plan.

Since I must examine whether the actions of the district manager are arbitrary and capricious, I must look at how he made his decision, what he had before him at the time, and what information he used. Any document generated after that time is not relevant and will not assist me in making an informed decision in this matter. The same can be said about the testimony of a former district manager, who does not have the same information in front of him; it has no probative value. District managers are individuals and may make different determinations even if it were possible to exactly re-formulate what went into one decision.

I conclude that the Secretary has met her burden of proving that the district manager did not abuse his discretion in determining that the prior Mach ventilation plan is no longer suitable to the mine and that the plan provisions proposed by MSHA are suitable. Accordingly, Citation No. 6680550 and Citation No. 6680551 are affirmed and Contest Proceedings, Docket Nos. LAKE 2010-1-R and LAKE 2010-2-R are hereby dismissed.

Margaret A. Miller
Administrative Law Judge

Distribution:

Peter Nessen, Office of the Solicitor, U.S. Department of Labor, 230 South Dearborn Street, Suite 844, Chicago, IL 60604-1502  (via certified mail)

Thomas Paige, Office of the Solicitor, U.S. Department of Labor, 1100 Wilson Boulevard, 22nd Floor West, Arlington, VA 22209-2247  (via certified mail)

Daniel W. Wolff, Crowell & Moring LLP, 1001 Pennsylvania Avenue NW, Washington, D.C 20004-2595  (via certified mail)

David J. Hardy, Allen Guthrie & Thomas, PLLC, P.O. Box 3394, Charleston, WV 25333-3394 (via certified mail)

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**
U.S. CUSTOM HOUSE
721 19TH STREET, SUITE 443
DENVER, CO 80202-2500
303-844-5267/FAX 303-844-5268

November 3, 2010

| | | |
|---|---|---|
| SECRETARY OF LABOR, | ) | CIVIL PENALTY PROCEEDING |
| UNITED STATES DEPARTMENT | ) | |
| OF LABOR, MINE SAFETY AND | ) | DOCKET NO. LAKE 2010-714 |
| HEALTH ADMINISTRATION (MSHA) | ) | |
|      Petitioner | ) | Assessment Control |
| | ) | No. 000201809 |
|      v. | ) | Cit. Nos. 6680550, 6680551 |
| | ) | |
| MACH MINING LLC | ) | Mine ID: 11-03141 |
|      Respondent | ) | Mine: Mach #1 Mine |

ORDER

This case is a penalty proceeding before me on remand from the Commission, which granted Mach Mining's Motion for Relief From Final Civil Penalty Order on August 31, 2010.[1]  The Secretary filed a penalty petition seeking the assessment of a $100 penalty for each of the two citations at issue, *i.e.*, Citation Nos. 6680550 and 6680551.  Mach answered that it disputes its liability for the two citations, but does not dispute the amounts of the two penalties proposed by the

---

[1] Mach inadvertently paid the penalties for the two citations at issue on or about November 30, 2009, several weeks after the conclusion of the hearing, and several weeks before the issuance of my January 28, 2010 decision, in the contest proceeding (Docket Nos. LAKE 2010-1-R and LAKE 2010-2-R).

Secretary.[2]  Subsequently, the parties filed a joint motion

requesting that I issue an order: (i) assessing a penalty of

$100 for each of the two citations at issue, and (ii)

incorporating by reference the findings of fact and conclusions

of law that I made in my January 28, 2010, decision in the

contest proceeding on the two citations.[3]

Having considered the penalty criteria set forth in Section

110(i) (30 U.S.C. § 820(i)) of the Federal Mine Safety and

Health Act of 1977, as amended, and recognizing that the two

citations here were issued in order to initiate the adjudication

of ventilation plan disputes, I hereby assess a penalty of $100

each for Citation Nos. 6680550 and 6680551.

Additionally, for the sole purpose of removing any

potential jurisdictional defect in my January 28, 2010, decision

resulting from Mach's inadvertent payment of the two penalties

before the decision was issued, I hereby incorporate, reiterate,

and re-issue my findings of fact and conclusions of law in that

decision as if they were fully set forth here.

---

[2] My January 28, 2010, decision finding Mach liable for both
citations is presently on appeal before the Commission (Docket
Nos. LAKE 2010-1-R and LAKE 2010-2-R).  The Commission ordered
that the appeal be held in abeyance pending the disposition of
the instant penalty proceeding.
[3] In their joint motion, the parties stipulated to the
materiality and relevance of the testimony and evidence
introduced at the November 3-5, 2009 hearing in the related
contest proceeding.

2

## ORDER

The Secretary's petition and the parties' joint motion is GRANTED and it is hereby ORDERED that my decision and order of January 28, 2010 is incorporated herein and that Mach pay the Secretary of Labor the sum of $200 for these two violations within 30 days of the date of this order.


Margaret A. Miller
Administrative Law Judge


Distribution: (First Class U.S. Mail)

Daniel W. Wolff, Esq., Crowell & Moring LLP, 1001 Pennsylvania Ave. NW, Washington, DC, 20004-2595

Brian A. Glasser, Esq., Jonathan D. Boggs, Esq., Bailey & Glasser, LLP, 209 Capitol Street, Charleston, WV 25301

Christopher D. Pence, Allen Guthrie & Thomas, PLLC, 500 Lee Street East, Suite 800, Charleston, WV 25301

Edward Waldman, Esq., Office of the Solicitor, U.S. Department of Labor, 1100 Wilson Blvd., Rm. 2228, Arlington, VA 22209-2296

3

# FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

**721 19th STREET, SUITE 443**
**DENVER, CO 80202-2500**
**303-844-5267/FAX 303-844-5268**

September 21, 2012

| | | |
|---|---|---|
| MACH MINING, LLC,<br>      Contestant, | : <br> : <br> : | CONTEST PROCEEDINGS |
| | : <br> : | Docket No. LAKE 2010-1-R<br>Citation No. 6680550; 9/29/09 |
| v. | : <br> : <br> : | Docket No. LAKE 2010-2-R<br>Citation No. 6680551; 9/29/09 |
| SECRETARY OF LABOR,<br>  MINE SAFETY AND HEALTH<br>  ADMINISTRATION, (MSHA),<br>      Respondent. | : <br> : <br> : <br> : <br> : | Mach #1 Mine<br>Mine ID 11-03141 |
| SECRETARY OF LABOR,<br>  MINE SAFETY AND HEALTH<br>  ADMINISTRATION, (MSHA),<br>      Petitioner, | : <br> : <br> : <br> : <br> : | CIVIL PENALY PROCEEDING<br><br>Docket No. LAKE 2010-714<br>A.C. No. 11-03141-201809 |
| v. | : <br> : <br> : | |
| MACH MINING, LLC,<br>      Respondent. | : <br> : | Mach #1 Mine |

## DECISION ON REMAND

Appearances: Thomas Paige, Office of the Solicitor, U.S. Department of Labor, Arlington, Virginia and Peter Nessen, Office of the Solicitor, Chicago, Illinois, for Petitioner;
Daniel Wolff, Crowell & Moring, LLP, Washington, D.C., and David Hardy, Allen Guthrie & Thomas, PLLC, Charleston, West Virginia, for Respondent.

Before:     Judge Miller

These cases were before me upon Contestant's request for an expedited hearing to challenge Citation Nos. 6680550 and 6680551 issued pursuant to section 105(d) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq. (the "Act" or "Mine Act"). The citations allege that Mach Mining was operating its #1 Mine with an unapproved ventilation plan (both a site specific and a base ventilation plan) in violation of 30 C.F.R § 75.370(d).

On June 4, 2009, Mach Mining ("Mach" or "Contestant") submitted a ventilation plan, which included a base plan and site specific plan, to the Mine Safety and Health Administration ("MSHA"). The parties entered into negotiations and discussed various plan provisions. In September, 2009, Mach communicated its intent to implement the unapproved plan in order to

1

bring these contests. By agreement between MSHA and the Contestant the mine began operation without an approved plan in place and, subsequently, on September 29, 2009, Mach was issued two citations by MSHA Inspector Keith Roberts.

The dispute in this case centered on whether Mach's proposed system of ventilating panel #3 was suitable, as well as whether the base, or general, plan was suitable to the conditions at the mine. The parties presented testimony and documentary evidence at a hearing held on November 3, 2009. On January 28, 2010, I issued a decision and determined that the termination of Order No. 8414238 did not amount to approval of Mach's ventilation plan and that the district manager did not abuse his discretion regarding plan provisions for the use of belt air, bleeder evaluation points, stoppings in the active tailgate entries, bleeder entry ventilation controls, ventilation of idle places and places where the roof bolter is operating, the plan requirement to specify means of compliance with 30 C.F.R. § 75.332, and inclusion of a depth-of-water action level. The operator appealed the decision, and on August 9, 2012, the Commission issued a decision affirming in part, and vacating and remanding in part. *Mach Mining LLC*, 34 FMSHRC __, slip op. at 25 (Aug. 9, 2012).

The Commission affirmed the decision related to the various portions of the proposed ventilation plan, except for the determination that the district manager did not abuse his discretion regarding ventilation controls in the bleeder entries. The Commission vacated and remanded this determination, and directed that further clarification be provided as to which ventilation controls MSHA required and whether the ventilation controls depicted in the stair-step were required to remain indefinitely. 34 FMSHRC __, slip op. at 15. In addition, the Commission directed that I further consider Mach's proposed site-specific plan for panel #3. *Id.* In conjunction with these issues, I must also take into consideration whether the issue on remand is moot as a result of a statement by Judge Manning in his decision in Mach Mining LLC on January 18, 2012 that "in 'March or April of 2012, MSHA approved the stair step design for the bleeders and Mach began mining Panel No. 3.'" *Id.* (quoting *Mach Mining LLC*, 34 FMSHRC 198, 205 (Jan. 2012).

On August 31, 2012, I requested submissions as to the issue of mootness from both parties. Both parties agreed that the issue of whether the district manager abused his discretion regarding ventilation controls in the bleeder entries is moot. The parties agreed that the Commission remanded the case for further fact-finding "on the issue of whether the district manager abused his discretion by requiring ventilation controls in the bleeders at Petitioner's mine, or to determine if the issue is now moot." Mach's Unopposed Mot. for Entry of Decision that Remanded Issue is Moot 1. Moreover, the parties agree that no further fact-finding is necessary and the remanded issue is moot. *Id.* Therefore, I find the issue is moot and no further action is required on remand. Accordingly, I reaffirm the findings in my original decision on the merits and **ORDER** payment as set forth in my original decision.


Margaret A. Miller
Administrative Law Judge

Distribution:

Suzanne Dunne, Office of the Solicitor, U.S. Department of Labor, 230 South Dearborn Street, Suite 844, Chicago, IL 60604-1502   (via certified mail)

Daniel W. Wolff, Crowell & Moring LLP, 1001 Pennsylvania Avenue NW, Washington, D.C 20004-2595   (via certified mail)

David J. Hardy, Allen Guthrie & Thomas, PLLC, P.O. Box 3394, Charleston, WV 25333-3394 (via certified mail)

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**

1331 Pennsylvania Avenue, NW, Suite 520N
**Washington, DC 20004-1710**
Telephone No.: 202-434-9950
Telecopier No.: 202-434-9954

October 24, 2012

| | | |
|---|---|---|
| SECRETARY OF LABOR, | : | |
| MINE SAFETY AND HEALTH | : | |
| ADMINISTRATION, (MSHA) | : | Docket Nos. LAKE 2010-1-R |
| | : | LAKE 2010-2-R |
| | : | LAKE 2010-714 |
| v. | : | |
| | : | |
| MACH MINING, LLC | : | |

## NOTICE

A petition for discretionary review was filed by Mach Mining, LLC with the Federal Mine Safety and Health Review Commission under section 113(d)(2) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 823(d)(2). That section provides that review of a decision of an Administrative Law Judge may be granted upon specified grounds and upon the affirmative vote of two Commissioners. Such review is discretionary. 30 U.S.C. § 823(d)(2)(A). However, no two members of the Commission voted to grant the petition or otherwise order review under 30 U.S.C. § 823(d)(2)(B). Consequently, the decision of the Administrative Law Judge is final as of 40 days after its issuance. 30 U.S.C. § 823(d)(1).

Jean H. Ellen
Chief Docket Clerk

Distribution:

Daniel W. Wolff, Esq.
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, DC    20004-2595

Brian A. Glasser, Esq.
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301

Christopher D. Pence, Esq.
Betts Hardy & Rodgers PLLC
P.O. Box 3394
Charleston, WV 25333

W. Christian Schumann, Esq.
Office of the Solicitor
U.S. Department of Labor
1100 Wilson Blvd., 22nd Floor
Arlington, VA 22209-2247

Melanie Garris
Office of Civil Penalty Compliance
MSHA
U.S. Dept. Of Labor
1100 Wilson Blvd., 25th Floor
Arlington, VA 22209-3939

Administrative Law Judge Margaret Miller
Federal Mine Safety & Health Review Commission
Office of Administrative Law Judges
721 19th Street, Suite 443
Denver, CO 80202-5268

## CERTIFICATE OF SERVICE

I certify that on February 4, 2013, a copy of the Stipulated Joint Appendix was electronically filed with the Clerk of Court for the U.S. Court of Appeals for the Seventh Circuit by using the Court's CM/ECF system. I certify that all participants in the case are represented by attorneys who are registered CM/ECF users with this Court and that service on such participants will be accomplished by CM/ECF system service on the following:

John T. Sullivan, Esq.
Office of General Counsel
Federal Mine Safety and Health Review Commission
601 New Jersey Ave., N.W.
Washington, D.C. 20001

Edward Waldman, Esq.
Mine Safety and Health Division
Office of the Solicitor
U.S. Department of Labor
1100 Wilson Boulevard
22nd Floor West
Arlington, VA 22209-2296

/s/ Daniel W. Wolff
Daniel W. Wolff